

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FILED

MAY 21 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| INEOS POLYMERS INC., | : |
| Plaintiff, | : |
| v. | : |
| BASF AKTIENGESELLSCHAFT and BASF CATALYSTS LLC, | : |
| Defendants. | : |

**07CV2817
JUDGE SHADUR
MAG.JUDGE KEYS**

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff INEOS Polymers Inc. ("INEOS"), by and through its undersigned

attorneys, demand a trial by jury on all issues so triable and, for its Complaint against

defendants BASF Catalysts LLC ("BASF Catalysts") and BASF

AKTIENGESELLSCHAFT ("BASF") (collectively, the "Defendants"), upon knowledge

as to its own acts, and upon information and belief as to all other matters, alleges as

follows:

### NATURE OF THE ACTION

1.　 This action arises out of the Defendants' breach of the Catalyst

Supply Agreement, dated September 17, 1992, as amended, originally executed by and

between Amoco Chemical Company ("Amoco Chemical"), a manufacturer and seller

of polypropylene, and Catalyst Resources, Inc. ("CRI"), a commercial producer of

polypropylene catalysts (the "Supply Agreement"). Phillips Petroleum Company

("Phillips"), the then-owner of CRI, also signed and assumed certain obligations under

the Supply Agreement. INEOS is the successor entity to the rights and duties of Amoco Chemical and BASF Catalysts is the successor entity to the rights and duties of CRI and Phillips under the Supply Agreement. The Supply Agreement as originally executed is attached hereto as Exhibit A and relevant amendments thereto are attached as discussed below.

2.      CD-Catalyst is a polymerization reaction activator that is vital to the production of polypropylene pursuant to Plaintiffs' proprietary, patented technology platform. Amoco Chemical entered into the Supply Agreement because it required a guaranteed source of supply of CD-Catalyst at a reasonable price for its own use and in connection with licensing other businesses to utilize Amoco Chemical's proprietary processes for the manufacture of polypropylene.

3.      Pursuant to the Supply Agreement, in 1992, CRI and Amoco Chemical agreed that Amoco Chemical would provide the proprietary technology and make possible the financing whereby CRI would construct a facility to commercially manufacture CD-Catalyst at its Bayport, Texas premises and CRI would then sell the CD-Catalyst made at the Bayport facility exclusively to Amoco Chemical. On information and belief, CRI's only business was the manufacture of polypropylene catalysts at its Bayport site.

4.      Amoco Chemical's right to acquire the CD-Catalyst facility and related assets under certain specified circumstances is set forth in Article 17 of the Supply Agreement. Entitled, "Right of First Refusal," Article 17 specifically and unequivocally granted to Amoco Chemical the right of first refusal to purchase various CRI assets, including the entirety of the CD-Catalyst plant (the "Plant") and Plant site,

2

or to purchase CRI itself, if Phillips or CRI ever received an offer "to transfer the entire ownership or control of CRI, or to transfer the ownership or control of certain assets of CRI," which included, but were not limited to the CD-Catalyst facility and adjacent Plant site.

5.      Pursuant to a series of transactions, as of January 2006, Plaintiff INEOS had succeeded to the rights and obligations of Amoco Chemical, and Engelhard Corporation ("Engelhard") had succeeded to the rights and obligations of CRI and Phillips under the Supply Agreement.

6.      Through a series of amendments and letter agreements, the right of first refusal clause contained in Article 17 was amended and expanded to give Amoco Chemical (and now INEOS) the right to exercise the right of first refusal in the event that there was a change in control of Engelhard.

7.      On May 29, 2006, after a contested takeover battle waged by Defendant BASF for control of Engelhard, the Board of Directors of Engelhard approved an Agreement and Plan of Merger among BASF, its wholly-owned acquisition subsidiary, Iron Acquisition Corporation ("Iron Acquisition") and Engelhard (the "Merger Agreement").

8.      On May 30, 2006, Engelhard and the other parties thereto executed the Merger Agreement. Pursuant to the Merger Agreement, following the consummation of BASF's offer, Iron Acquisition merged with and into Engelhard, and Engelhard became a wholly owned subsidiary of BASF. Pursuant to an August 1, 2006 Certificate of Conversion, Engelhard was renamed and converted to BASF Catalysts. For clarity, this Complaint refers to the entity now called BASF Catalysts

by its prior name, Engelhard, insofar as concerns acts taking place prior to August 1, 2006.

9.      Upon consummation of the merger between Engelhard and Iron Acquisition, there was a "change of control" of Engelhard which triggered the Right of First Refusal contained in Article 17A of the Supply Agreement. However, although required to do so under the Supply Agreement, Engelhard failed to: 1) notify INEOS, in writing, of the terms and conditions of the offer it had received from BASF and Iron Acquisition; and 2) afford INEOS the option to acquire the CRI business or any or all of the assets contemplated in the Supply Agreement.

10.     Subsequent to learning of these triggering events, INEOS contacted the Defendants and sought to exercise the right of first refusal pursuant to the Supply Agreement. In response, on July 28, 2006 and again on December 21, 2006, Defendants rejected Plaintiff's attempt to exercise its rights without specifying any reason for their position.

11.     Defendants have also refused to continue discussions with INEOS regarding critical expansion projects intended to increase the capacity of the CD-Catalyst facility, in breach of Article 8 of the Supply Agreement, and have taken the position that INEOS must abandon its rights under Article 17 of the Supply Agreement in order to pursue such necessary expansion projects pursuant to Article 8 of the Supply Agreement.

## **THE PARTIES**

12.     Plaintiff INEOS Polymers is a corporation organized and existing under the laws of the State of Delaware whose principal place of business is at 2600

4

South Shore Boulevard in League City, Texas. In 2006, Innovene Polymers Inc. was the successor entity to Amoco Chemical under the Supply Agreement following the assignment of Amoco Chemical's rights to Amoco Polymers Inc. ("Amoco Polymers"), which was subsequently renamed BP Amoco Polymers Inc. ("BP Amoco Polymers") and later Innovene Polymers Inc. Innovene Polymers Inc. was renamed INEOS Polymers Inc. following the acquisition of its parent company by the INEOS group in December 2005. INEOS Polymers is the subsidiary of INEOS USA LLC, which markets and sells the catalysts purchased under the Supply Agreement, principally through its office in Lisle, Illinois.

13.     BASF is a German corporation with its principal place of business in Ludwigshafen, Germany and its U.S. headquarters in Florham Park, New Jersey.

14.     BASF Catalysts, formerly named Engelhard Corporation, is a limited liability corporation organized under the laws of the State of Delaware with its principal place of business at 101 Wood Avenue in Iselin, New Jersey. Upon information and belief, BASF is the sole owner of BASF Catalysts, so that BASF Catalysts has the same residency as BASF for jurisdictional purposes. BASF Catalysts is the successor to the rights and duties of CRI and Phillips under the Supply Agreement, including those set forth in Article 17, following the 1994 purchase of CRI by Mallinckrodt, Inc. ("Mallinckrodt"), 1998 sale of the CRI business to Engelhard and 2006 acquisition of Engelhard by BASF.

## JURISDICTION

15.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship among the parties, and 28 U.S.C. §§ 2201 and

2202 based on an actual and justiciable controversy that exists between the parties.

The amount in controversy exceeds $75,000.00, exclusive of interest and costs. This

Court also has supplemental jurisdiction over state law issues pursuant to 28 U.S.C. §

1367 and the doctrine of pendent jurisdiction.

## VENUE

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391. A

substantial portion of the events giving rise to the claims alleged herein occurred in this

judicial district.

## FACTUAL ALLEGATIONS

17.     This action concerns the breach of a long-term supply contract for

the sale of goods by BASF Catalysts and the tortious interference with that contract by

BASF. BASF Catalysts and INEOS, through their predecessors, have had a continuous

contractual supply relationship pursuant to the Supply Agreement since 1992.

18.     The Supply Agreement was originally executed by and between

CRI, a commercial producer of catalysts used in the production of polypropylene

owned by Phillips (which also signed the Supply Agreement and assumed certain

obligations thereunder) and Amoco Chemical, a subsidiary of Amoco Corporation

whose business included the manufacture and sale of polypropylene and licensed

polypropylene process technology.

19.     Pursuant to the Supply Agreement, during the early 1990s, CRI

constructed a new Plant located in Bayport, Texas to commercially manufacture CD-

Catalyst for use by Amoco Chemical, and Amoco Chemical supplied the necessary

process technology and facilitated the construction of the Plant by means of its

6

commitments under the Supply Agreement. The Supply Agreement recited that the Plant was designed to assure to Amoco Chemical a reliable source of CD-Catalyst and that it would take Amoco Chemical at least three years to replicate the Plant if for any reason the arrangement between CRI and Amoco Chemical were to be terminated.

20.     The Supply Agreement further provided that it was intended to ensure Amoco Chemical a secure, ongoing supply of CD-Catalyst, and reflected a transaction under which 1) Amoco Chemical essentially designed and enabled the financing of the facility that manufactured the CD-Catalyst; 2) said facility was dedicated to the production of CD-Catalyst; 3) Amoco Chemical was involved in the operation of the facility on an ongoing basis; and 4) Amoco Chemical had the right to own the CRI business or all or part of the Bayport facility at its option if it ever was to be transferred to new ownership.

21.     The Supply Agreement further provided that it would be governed by and construed in accordance with Illinois law.

22.     INEOS has sought to negotiate with Defendants concerning various capacity and technology improvements at the Plant that would enable INEOS to maintain its competitive position in the market if implemented. However, following Defendants' refusal to acknowledge INEOS's rights under the Supply Agreement, as hereinafter described, Defendants have refused to discuss these improvements and as a result INEOS is now being damaged.

## THE RIGHT OF FIRST REFUSAL

23.     The Supply Agreement includes a right of first refusal clause whereby Amoco Chemical was required to be provided with a right of first refusal

before CRI or Phillips could proceed with a change of control of CRI or of the Plant, which is defined in the Supply Agreement, as "CRI's new facility for the commercial production of CD-Catalyst Products to be constructed by CRI at it premises in Bayport, Texas." The right of first refusal also applied to, among other things, "the land on which the Plant sits," the land upon which assets constructed, installed or used in connection with the Plant sat, and "all land that is functionally part of the Plant."

24. Article 17 of the Supply Agreement, entitled "Right of First Refusal," sets forth the right of first refusal that was granted to Amoco Chemical – and, in turn, INEOS, as its successor. According to Article 17.A, neither CRI or Phillips could

> sell, transfer, assign, grant any option with respect to, merge, or otherwise dispose of any of the ownership or control of CRI, or any part of the Plant or of the Plant Site, or allow any of the foregoing to occur unless ... CRI or Phillips has *first afforded Amoco the option to buy all of CRI or to buy all of the certain assets of CRI*, which assets include but are not limited to the entirety of the Plant and the Plant Site, whichever is applicable, on terms and conditions no less favorable to Amoco than those contained in the offer. (Emphasis added.)

25. Accordingly, Engelhard, as successor to CRI and its rights and obligations under the Supply Agreement, was also prohibited from selling, merging or otherwise transferring ownership or control of the CRI business, the CD-Catalyst Plant or the Plant Site without first affording INEOS, Amoco Chemical's successor, the option to purchase the relevant assets.

26. In 1994 and 1998, the CRI business (including the Plant and CRI's rights and obligations under the Supply Agreement) was transferred first to Mallinckrodt and next to Engelhard. By letters dated October 13, 1993 and December 17, 1993, Amoco Chemicals waived its first refusal rights concerning the purchase of

8

CRI by Mallinckrodt, while expressly reserving its first refusal rights with respect to subsequent transactions. In a Letter Agreement dated March 24, 1998, by and between Amoco Polymers and Engelhard, attached hereto as Exhibit B, the parties refined and reaffirmed the terms of the Supply Agreement, including the terms of the right of first refusal. Pursuant to that Letter Agreement, Amoco Polymers consented to the assignment of the Supply Agreement from Mallinckrodt to Engelhard and waived its right of refusal for such transaction.

27.    In a Letter Agreement dated September 30, 1999 concerning Engelhard's intention to enter into a sale/leaseback transaction of certain assets with Chase Equipment Leasing, Inc., attached hereto as Exhibit C, the parties amended and reaffirmed the terms of the Supply Agreement, including the terms of the right of first refusal. The Letter Agreement provides in relevant part:

> The assets would include, pursuant to Equipment Schedule No.3 to the Master Lease Agreement dated as of September 27, 1999 ... certain equipment in the plant Engelhard uses to manufacture catalyst products for Amoco ... pursuant to the Catalyst Supply Agreement dated September 17, 1992 between Amoco Chemical Company and Catalyst Resources, Inc. ... *Article 17 of that Agreement, however, provides Amoco with a right of first refusal for any transfer of the ownership of the Amoco Plant Equipment. Engelhard has requested that Amoco waive its right of first refusal for, and consent to, this transaction only.*
>
> ...
>
> 2.    *Article 17 of the Agreement shall remain in full force and effect and apply to all other transfers described in Article 17 (including without limitation, any change in control of Engelhard)* and shall continue to apply to any sale or transfer by Engelhard of Amoco Plant Equipment covered by Article 17 if the sale/leaseback does not occur. (Emphasis added.)

28.    In a subsequent Letter Agreement dated January 24, 2005 concerning Engelhard's intention to enter into a sale/leaseback transaction of certain

assets with Key Corporate Capital, attached hereto as Exhibit D, the parties once again

amended and reaffirmed the terms of the Supply Agreement, including the terms of the

right of first refusal. The Letter Agreement provides in relevant part:

> The assets would include, pursuant to Equipment Schedule No.3 to the
> Master Lease Agreement ... certain equipment in the plant Engelhard uses
> to manufacture catalyst products for Amoco ... pursuant to the Catalyst
> Supply Agreement, dated September 17, 1992 ... *Article 17 of that*
> *Agreement, however, provides Amoco with a right of first refusal for any*
> *transfer of the ownership of the Amoco Plant Equipment. Engelhard*
> *has requested that Amoco waive its right of first refusal for this*
> *transaction only.*
>
> ...
>
> 2. *Article 17 of the Agreement shall remain in full force and effect*
> *and apply to all other transfers described in Article 17* (including without
> limitation, any other sale or transfer to Lessor) of Amoco Plant Equipment
> covered by Article 17 if the transaction set forth in the Equipment
> Schedule and Master Lease Agreement between Lessor and Engelhard
> does not occur. (Emphasis added.)

## THE DEFENDANTS' BREACH OF THE SUPPLY AGREEMENT

29. In January 2006, as part of a hostile takeover of Engelhard, BASF,

through its wholly owned subsidiary Iron Acquisition, made the first of several all-cash

proposals to acquire all outstanding shares of common stock of Engelhard. Although

at first Engelhard's board rejected the offers and proposals of BASF, on May 29, 2006

the Board of Directors of Engelhard Corporation approved an Agreement and Plan of

Merger among BASF, Iron Acquisition and Engelhard.

30. On June 6, 2006, BASF announced that it had completed the

acquisition of Engelhard, and as a result of the transaction, Engelhard would become a

wholly owned subsidiary of BASF. A June 9, 2006 BASF press release entitled,

"BASF Receives Over 90% of Engelhard Shares," stated in relevant part, "BASF

intends to complete the acquisition of Engelhard through a merger of the acquisition vehicle, Iron Acquisition Corporation, into Engelhard Corporation ... Following the merger, Engelhard will be a wholly owned subsidiary of BASF."

31.    On June 12, 2006, BASF announced the completion of the acquisition whereby Engelhard became a wholly owned subsidiary of BASF and was subsequently renamed and converted to BASF Catalysts.

32.    The acquisition of Engelhard by Iron Acquisition was characterized by the parties to the acquisition as a "change in control" transaction, and thus triggered Article 17 of the Supply Agreement. Among other things, the merger also triggered certain rights of senior executives of Engelhard to receive substantial amounts of compensation and benefits as a result of a change in control of Engelhard which these executives exercised.

33.    Accordingly, pursuant to the Supply Agreement, once it received an offer from BASF, Engelhard was required to, among other things, 1) notify INEOS, in writing, of the terms and conditions of the offer it had received for Engelhard; and 2) afford INEOS the option to buy the CRI business or the Plant and Plant site assets described in the Supply Agreement.

34.    However, Engelhard failed to give INEOS notice of the offer it received from BASF and failed to ascertain whether INEOS intended to exercise or waive its right of first refusal.

35.    Engelhard's actions and inactions amount to a breach of the Supply Agreement.

11

36.     Both before and after BASF's acquisition of Engelhard, INEOS communicated on various occasions to alert Defendants of INEOS's interest in exercising its right of first refusal. On September 18, 2006, and again on November 14, 2006, INEOS expressed its concerns regarding the breach of these first refusal rights in written correspondence sent from the INEOS offices in Lisle, Illinois. Defendants rebuffed the efforts of INEOS to exercise its right of first refusal pursuant to the Supply Agreement. For example, by letter dated July 28, 2006, attached hereto as Exhibit E, Engelhard denied that the right of first refusal in the Supply Agreement had been triggered.

37.     On information and belief, BASF was at all relevant times aware of INEOS's first refusal rights but nonetheless intentionally caused BASF Catalysts (both before and after its change of name from Engelhard Corporation) to breach its Supply Agreement with INEOS.

38.     Prior to its acquisition by BASF, Engelhard had discussed various capacity and technology improvements at the Plant with INEOS to address concerns expressed by INEOS that it needed more CD-Catalyst from the Plant at better costs in order to remain competitive in its business. BASF Catalysts and INEOS met on November 9, 2006 to discuss various options concerning such capacity and related improvements.

39.     After INEOS indicated that it continued to be interested in exercising the right of first refusal under the Supply Agreement, Defendants discontinued these discussions concerning Plant improvements. On December 21, 2006, BASF Catalysts sent INEOS a letter, attached hereto as Exhibit F, reiterating that

12

the right of first refusal had not been triggered and stating that Defendants were "not inclined to continue commercial negotiations," concerning modifications to the Plant unless INEOS abandoned its efforts to exercise the right of first refusal.

40.     The Defendants' termination of the parties' negotiations concerning capacity and other improvements to the Plant is a breach of the express terms of the Supply Agreement as set forth under Article 8 thereof. Specifically, under Article 8.C, INEOS has the right to propose to BASF Catalysts at any time a project to increase the capacity of the Plant. Moreover, Article 8.C states that where BASF Catalysts declines to proceed with a project proposed by INEOS to increase the capacity of the Plant, INEOS *"may agree to pay for all such costs ... in which case the parties shall proceed with the project."* (Emphasis added.) Accordingly, Defendants breached their duty of good faith in terminating its discussions with INEOS concerning the Plant capacity improvements.

41.     As a result of the Defendants' refusal even to discuss the necessary Plant improvements, INEOS's ability to compete in the market for the sale of CD-Catalyst is or soon will be compromised, resulting in substantial damages and loss of business.

## COUNT I

## BREACH OF CONTRACT (RIGHT OF FIRST REFUSAL)

42.     INEOS repeats and re-alleges each and every allegation contained in paragraphs 1 through 41 above.

43.     Defendants have breached the Supply Agreement by refusing to perform according to its material terms as set forth in Article 17 of the Supply

13

Agreement. In particular, Defendants have failed to 1) notify INEOS, in writing, of the terms and conditions of the offer for Engelhard; and 2) afford INEOS the option to buy the assets contemplated in the Supply Agreement, on terms and conditions no less favorable to INEOS than those set forth in BASF's offer to acquire Engelhard.

44.     INEOS and its predecessors have performed any and all necessary conditions on their part to enforce the Supply Agreement.

45.     Defendants' breach of the Supply Agreement has substantially impaired the value of the contract to INEOS and caused INEOS actual, expectancy, incidental and consequential damages.

46.     Defendants' breach of the Supply Agreement has unlawfully deprived INEOS of the entire benefit of the bargain for the construction of the CD-Catalyst facility and the long-term supply of CD-Catalyst.

### COUNT II

### BREACH OF CONTRACT (CAPACITY EXPANSION)

47.     INEOS repeats and re-alleges each and every allegation contained in paragraphs 1 through 46 above.

48.     Under paragraph 8.C of the Supply Agreement, INEOS has the right to propose to BASF Catalysts at any time a project involving costs for the design, engineering, purchase, construction and installation of buildings, equipment, machinery, instruments, hardware, fixtures and various other supplies and materials in order to increase the capacity of the Plant. Where BASF Catalysts declines to proceed with a project proposed by INEOS to increase the capacity of the Plant, INEOS has the right to pay for all such costs, in which case BASF Catalysts is obligated to proceed

14

with the implementation of the project.

49.     Defendants' refusal to continue negotiations concerning capacity modifications and improvements of the Plant constitutes a breach of BASF Catalysts' obligations under the Supply Agreement.

50.     Any delay in implementing the improvements to the Plant will result in INEOS's inability to obtain the greater amounts of CD-Catalyst at lower costs that it requires in order to maintain its competitive position.

51.     BASF Catalysts' breach of its obligations to INEOS has and will significantly damage INEOS and has harmed and will irreparably harm INEOS.

**COUNT III**

**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

52.     INEOS repeats and re-alleges each and every allegation contained in paragraphs 1 through 51 above.

53.     Defendants have a duty of good faith and fair dealing in the performance of the terms of the Supply Agreement.

54.     Defendants have breached the duty of good faith and fair dealing in the performance of the terms of the Supply Agreement by, *inter alia*, failing to comply with their obligations as set forth in Articles 8 and 17 of the Supply Agreement.

55.     Defendants have breached the duty of good faith and fair dealing by their failure to 1) notify INEOS, in writing, of the terms and conditions of the offer for Engelhard; and 2) afford INEOS the option to buy any or all of the assets contemplated in the Supply Agreement, on terms and conditions no less favorable to INEOS than those set forth in BASF's offer to acquire.

56.     Further, the Defendants have breached their duty of good faith and fair dealing by terminating negotiations related to the capacity improvements of the CD-Catalyst facility.

57.     The Defendants' current "interpretation" of the Supply Agreement and the right of refusal clause contained therein is inconsistent with the parties' prior course of dealing and has been contrived at a time when INEOS is seeking to negotiate the terms of the improvements to the Plant.

58.     Defendants' breach of the duty of good faith and fair dealing has caused INEOS actual, expectancy, incidental and consequential damages.

## COUNT IV

## TORTIOUS INTERFERENCE WITH CONTRACT

59.     INEOS repeats and re-alleges each and every allegation contained in paragraphs 1 through 58 above.

60.     BASF was aware of Engelhard's obligations to INEOS pursuant to the Supply Agreement, including Engelhard's obligations under the right of first refusal clause, at the time it acquired Engelhard.

61.     BASF intentionally caused BASF Catalysts (both before and after its change of name from Engelhard Corporation) to breach the Supply Agreement with INEOS.

62.     BASF's actions in interfering with the performance of the Supply Agreement had no legitimate business justification.

63.     BASF's tortious interference with the Supply Agreement has caused INEOS actual, expectancy, incidental and consequential damages.

16

## COUNT V

### DECLARATORY JUDGMENT

64.     INEOS repeats and re-alleges each and every allegation contained in paragraphs 1 through 63 above.

65.     For all of the above-mentioned reasons, there exists an actual, substantial and immediate controversy within the Court's jurisdiction. The controversy is the result of Defendants' conduct and should be redressed by a favorable judicial decision. The Court may thus properly declare the rights and other legal relations of the parties to this action with respect to INEOS's claims.

66.     For the reasons set forth above, Defendants' actions constitute a material breach of the contractual rights of INEOS.

67.     By reason of the foregoing facts, INEOS is entitled to a declaration that the actions of Defendants in failing to comply with the right of first refusal clause as set forth under Article 17 of the Supply Agreement was invalid and a breach of the contractual rights of INEOS.

68.     By reason of the foregoing facts and circumstances, INEOS is entitled to a declaration that the actions of the Defendants in failing to proceed with the negotiations related to the facility modification projects as contemplated under Article 8 of the Supply Agreement were invalid and a breach of the contractual rights of INEOS.

69.     Upon information and belief, Defendants contest INEOS's rights to the declaratory relief sought herein, and an actual controversy exists between the parties.

17

## COUNT VI

### SPECIFIC PERFORMANCE

70.     INEOS repeats and re-alleges each and every allegation contained in paragraphs 1 through 69 above.

71.     The CRI business, including the CD-Catalyst Plant and Plant site are unique assets of special value. Monetary damages cannot fully compensate INEOS for the loss of their first refusal rights caused by Defendants' breach.

72.     INEOS is entitled to specific performance for Defendants' breach of the Supply Agreement's right of first refusal provisions.

### PRAYER FOR RELIEF

WHEREFORE, INEOS requests that judgment be entered that:

A.      INEOS has been injured by Defendants' wrongful conduct in breach of the contract between INEOS and BASF Catalysts, and as a result, INEOS has been harmed in its business. INEOS is entitled to expectancy, compensatory, incidental and consequential damages in an amount to be determined at trial. INEOS is entitled to such declaratory and injunctive relief as is proper to restore the status quo among the parties;

B.      INEOS is entitled to specific performance of the Supply Agreement;

C.      INEOS requests a declaratory judgment declaring that

1.      Defendants have breached the Supply Agreement;

2.      BASF Catalysts was required under Article 17 of the Supply Agreement to 1) notify INEOS, in writing, of the terms and

18

conditions of the offer for Engelhard; and 2) afford INEOS the option to buy the CRI business at its fair market value;

3. BASF Catalysts was required under Article 8 of the Supply Agreement to proceed with discussions concerning the modification projects sought by INEOS in order to increase the capacity of the Plant;

D. Preliminarily, pending final resolution of this action and, thereafter, permanently enjoining Defendants and their agents, officers, employees, agents and all persons acting in concert with them from further breaching the terms of the Supply Agreement;

E. Awarding INEOS compensatory damages, including prejudgment interest, for those compensable injuries it has suffered due to Defendants' conduct alleged herein;

F. Awarding INEOS its costs incurred herein; and

G. Awarding such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

Civil Procedure, of all issues triable of right by a jury.

**WILDMAN, HARROLD,
ALLEN & DIXON LLP**

Dated: May 21, 2007

Douglas R. Carlson (0391948)
**WILDMAN, HARROLD,
ALLEN & DIXON LLP**
225 West Wacker Drive Suite 3000
Chicago, IL 60606
(312) 201-2000

Stephen M. Axinn
**AXINN, VELTROP & HARKRIDER
LLP**
1370 Avenue of the Americas
New York, NY 10019
Tel: 212-728-2200

- and -

Mark D. Alexander
**AXINN, VELTROP & HARKRIDER
LLP**
90 State House Square
Hartford, CT 06103
Tel: 860-275-8100

*Attorneys for Plaintiff*

**EXHIBIT A**

CATALYST SUPPLY

AGREEMENT


by and between


AMOCO CHEMICAL COMPANY


and


CATALYST RESOURCES, INC.



September 17, 1992


EXHIBIT

TABLE OF CONTENTS

PAGE

Article 1. Definitions . . . . . . . . . . . . . . . . . . . . . 2

| | | |
|---|---|---|
| 1.A. | Affiliate . . . . . . . . . . . . . | 2 |
| 1.B. | CD-Catalyst(s) . . . . . . . . . . . | 3 |
| 1.C | CD-Catalyst Product(s) . . . . . . . | 3 |
| 1.D. | Contract Year . . . . . . . . . . . | 4 |
| 1.E. | Day or day . . . . . . . . . . . . . | 4 |
| 1.F. | Demonstrated Plant Capacity . . . . | 4 |
| 1.G. | Fixed Assets . . . . . . . . . . . . | 4 |
| 1.H. | Minimum Quantity . . . . . . . . . . | 5 |
| 1.I. | Packaging . . . . . . . . . . . . . | 5 |
| 1.J. | Phillips Corporate Engineering Expenses . . . . . . . . | 6 |
| 1.K. | Plant/Plant Site/Common Fixed Assets . . . . . . . . | 6 |
| 1.L. | Plant Start-up/Mechanical Performance | 7 |
| 1.M. | Quarter . . . . . . . . . . . . . . | 8 |
| 1.N. | Raw Materials . . . . . . . . . . . | 8 |
| 1.O. | Semi-works Unit . . . . . . . . . . | 9 |
| 1.P. | Technically Feasible . . . . . . . . | 9 |
| 1.Q. | Third Party Supplier . . . . . . . . | 9 |
| 1.R. | Transition . . . . . . . . . . . . . | 9 |
| 1.S. | Turnaround . . . . . . . . . . . . . | 10 |
| 1.T. | Utilities . . . . . . . . . . . . . | 10 |

Article 2. Plant Construction . . . . . . . . . . . . . . . . . 10

| | | |
|---|---|---|
| 2.A.(1). | Construction . . . . . . . . . . . . | 10 |
| 2.A.(2). | Late Plant Start-up | 10 |
| 2.A.(3). | CRI payments for Plant . . . . . . . | 12 |
| 2.B.(1). | Initial Investment . . . . . . . . . | 13 |
| 2.B.(2). | Common assets . . . . . . . . . . . | 13 |
| 2.B.(3). | Common assets after Plant Start-up . | 14 |
| 2.B.(4). | Reimbursement for early design and engineering costs . . . . . . . | 14 |
| 2.B.(5). | Modifications . . . . . . . . . . . | 14 |
| 2.B.(6). | Initial Investment cap . . . . . . . | 16 |
| 2.C. | Accelerated schedule . . . . . . . . | 17 |
| 2.D. | Progress reports . . . . . . . . . . | 18 |
| 2.E. | Mechanical Performance/Plant Start-up observation . . . . . . . . . . . | 18 |
| 2.F. | Ownership of Plant . . . . . . . . . | 19 |

Article 3. Duration . . . . . . . . . . . . . . . . . . . . . . 19

| | | |
|---|---|---|
| 3.A. | Term . . . . . . . . . . . . . . . . | 19 |
| 3.B. | Termination prior to Contract Year 10 . . . . . . . . . | 19 |
| 3.C. | Termination at end of and after Contract Year 10 . . . . . . . . . . . . | 20 |

(i)

PAGE

| | | |
|---|---|---|
| 3.D. | CRI termination | 20 |
| 3.E. | Disposal of inventory upon termination | 21 |
| 3.F. | Rights under License Agreement | 22 |
| 3.G. | Rights and obligations in event of termination | 22 |
| 3.H. | No other rights of termination | 22 |

Article 4. Supply and Purchase . . . . . . . . . . . . . . . . . 23

| | | |
|---|---|---|
| 4.A.(1) | CRI Obligation | 23 |
| 4.A.(2) | Amoco Obligation | 23 |
| 4.B. | Use of products | 24 |

Article 5. Alternate Use of Plant . . . . . . . . . . . . . . . 24

| | | |
|---|---|---|
| 5.A. | Production of CD-Catalyst Products | 24 |
| 5.B.(1). | Second through tenth Contract Years - estimate less than Minimum Quantity | 25 |
| 5.B.(2). | Second through tenth Contract Years - estimate greater than Minimum Quantity | 25 |
| 5.B.(3). | Post-tenth Contract Year | 25 |
| 5.C. | Limitations on alternate use | 26 |
| 5.D. | Net financial return | 27 |
| 5.E. | Books and records | 28 |
| 5.F. | Alternate use not to include CD-Catalysts | 28 |

Article 6. Production and Delivery Schedule . . . . . . . . . . 28

| | | |
|---|---|---|
| 6.A. | Quarterly forecasts | 28 |
| 6.B. | Notification for delivery | 29 |
| 6.C. | Obligation to deliver and take delivery | 29 |
| 6.D.(1). | Liquidated damages | 30 |
| 6.D.(2). | Not a penalty | 32 |
| 6.D.(3). | Deliveries to Amoco and 100% Affiliates | 32 |
| 6.E. | Termination for late delivery | 33 |
| 6.F. | Rights under License Agreement | 34 |

Article 7. Unit Price for CD-Catalyst Products . . . . . . . . 34

| | | |
|---|---|---|
| 7.A. | Definitions | 34 |
| 7.A.(1). | $i$ | 34 |
| 7.A.(2). | $P_i$ | 35 |
| 7.A.(3). | $W_i$ | 35 |
| 7.A.(4). | $FC_i$ | 36 |
| 7.A.(5). | TV | 39 |
| 7.A.(6). | $Q_i$ | 39 |
| 7.A.(7). | $VC_i$ | 39 |

PAGE

| | | |
|---|---|---|
| 7.A.(8). | $U_1$ | 42 |
| 7.A.(9). | $T_1$ | 42 |
| 7.A.(10). | * | 42 |
| 7.B.(1). | Formulae for deliveries in Contract Years 1 through 10 | 43 |
| 7.B.(2). | Formulae for deliveries in Contract Years 11 through 15 | 46 |
| 7.B.(3). | Formula for deliveries after Contract Year 15 | 47 |
| 7.B.(4). | Formulae for pounds through month of Mechanical Performance | 48 |
| 7.B.(5). | Demonstrated Plant Capacity discussion | 49 |
| 7.C.(1). | Time of invoicing and payment | 49 |
| 7.C.(2). | CRI payment if Plant Start-Up delayed | 50 |
| 7.D.(1). | Calculation of invoice price | 51 |
| 7.D.(2). | End of Contract Year notification of amounts | 54 |
| 7.D.(3). | Recalculation of price for Contract Year | 54 |
| 7.D.(4). | Raw Materials adjustment | 56 |
| 7.E. | Sample calculations | 57 |
| 7.F. | Minimization of fixed and variable costs | 57 |
| 7.G. | Books and records | 58 |

Article 8. Future Capital Investments . . . . . . . . . . . . . . . . . 58

| | | |
|---|---|---|
| 8.A.(1). | Government regulation | 58 |
| 8.A.(2). | Operating necessity | 62 |
| 8.A.(3). | Pro rata share | 64 |
| 8.A.(4). | Post-Contract Year 15 | 65 |
| 8.B. | Amoco payment | 65 |
| 8.C. | Capacity increase projects | 66 |
| 8.D. | Cost reduction projects | 67 |
| 8.E.(1). | Change in specifications/new CD-Catalyst Product types - $100,000 and less | 68 |
| 8.E.(2). | Change in specifications/new CD-Catalyst Product types - over $100,000 | 69 |
| 8.E.(3). | Interest | 73 |
| 8.F. | Yearly adjustment of amounts | 74 |
| 8.G. | Books and records | 74 |

Article 9. Sampling and Certificates of Analysis . . . . . . . . . . . . 74

| | | |
|---|---|---|
| 9.A. | Notice upon shipment | 74 |
| 9.B. | Certificate of Analysis | 75 |
| 9.C. | Testing | 75 |
| 9.D. | Qualification for shipment | 75 |

(iii)

PAGE

Article 10. Delivery and Transfer of Product . . . . . . . . . . . . . . 76

    10.A.     Freight, packaging . . . . . . . . . . . . . . . . . . . 76
    10.B.     Title, risk of loss . . . . . . . . . . . . . . . . . . . 76

Article 11. Warranties and Liabilities . . . . . . . . . . . . . . . . . 77

    11.A.(1).  Warranty of quality, warranty of title . . . . . . . . . 77
    11.A.(2).  Replacement of off-specification product   . . . . . . . 77
    11.A.(3).  Non-100% Affiliate Claims   . . . . . . . . . . . . . . 78
    11.B.(1).  Warranty of compliance with law . . . . . . . . . . . . 80
    11.B.(2).  Notices of violation   . . . . . . . . . . . . . . . . 81
    11.C.(1).  Exclusion by CRI of other warranties . . . . . . . . . . 81
    11.C.(2).  Exclusion by Amoco of consequential damages . . . . . . 82
    11.D.(1).  CRI liability  . . . . . . . . . . . . . . . . . . . . 82
    11.D.(2).  CRI general indemnity . . . . . . . . . . . . . . . . . 83
    11.E.(1).  CRI indemnity for Environmental Claims . . . . . . . . . 84
    11.E.(2).  Limitation on environmental indemnity   . . . . . . . . 85
    11.E.(3).  Environmental Claims . . . . . . . . . . . . . . . . . . 85
    11.E.(4).  Overlap . . . . . . . . . . . . . . . . . . . . . . . . 87
    11.F.      Amoco indemnity for post-title transfer . . . . . . . . 87
    11.G.      Survival . . . . . . . . . . . . . . . . . . . . . . . . 88

Article 12. Inventory . . . . . . . . . . . . . . . . . . . . . . . . . 89

    12.A.     Minimum and maximum   . . . . . . . . . . . . . . . . 89
    12.B.     Reduction in event of termination . . . . . . . . . . . 89

Article 13. Status Reports and Process Changes   . . . . . . . . . . . . 90

    13.A.     Content of monthly report   . . . . . . . . . . . . . . 90
    13.B.     Changes in operating procedure . . . . . . . . . . . . . 91
    13.C.     Access to Plant   . . . . . . . . . . . . . . . . . . 91
    13.D.     Turnarounds   . . . . . . . . . . . . . . . . . . . . 91

Article 14. Other Termination . . . . . . . . . . . . . . . . . . . . . 92

Article 15. Audit Right . . . . . . . . . . . . . . . . . . . . . . . . 92

Article 16. Patent Infringement . . . . . . . . . . . . . . . . . . . . 94

Article 17. Right of First Refusal   . . . . . . . . . . . . . . . . . . 95

    17.A.     Transfer of CRI or Plant . . . . . . . . . . . . . . . . 95
    17.B.     Intra-Phillips transfer . . . . . . . . . . . . . . . . 96
    17.C.     Continuing prohibition . . . . . . . . . . . . . . . . . 97
    17.D.     Rights under License Agreement . . . . . . . . . . . . . 97

(iv)

| | | | PAGE |
|---|---|---|---|
| Article 18. Force Majeure | | . . . . . . . . . . . . . . . . . . . . . . . . . | 98 |
| | 18.A. | Definition . . . . . . . . . . . . . . . . . . . . . | 98 |
| | 18.B. | Procedure . . . . . . . . . . . . . . . . . . . . . | 99 |
| | 18.C. | Termination . . . . . . . . . . . . . . . . . . . . | 99 |
| Article 19. General Provisions | | . . . . . . . . . . . . . . . . . . . . . | 100 |
| | 19.A. | Assignment . . . . . . . . . . . . . . . . . . . . . | 100 |
| | 19.B. | Governing Law . . . . . . . . . . . . . . . . . . . | 100 |
| | 19.C. | Waiver . . . . . . . . . . . . . . . . . . . . . . . | 100 |
| | 19.D. | Notices . . . . . . . . . . . . . . . . . . . . . . | 101 |
| | 19.E. | Entire Agreement . . . . . . . . . . . . . . . . . . | 102 |
| | 19.F. | Articles . . . . . . . . . . . . . . . . . . . . . . | 103 |
| | 19.G. | Confidentiality . . . . . . . . . . . . . . . . . . | 103 |
| | 19.H. | Savings . . . . . . . . . . . . . . . . . . . . . . | 105 |
| | 19.I. | Remedies . . . . . . . . . . . . . . . . . . . . . . | 105 |
| Phillips Petroleum Company Agreement | | . . . . . . . . . . . . . . . . . . . | 106 |

Exhibits

| | |
|---|---|
| 1. | CD-Catalyst Definition |
| 2. | Specifications for CD-Catalyst Product Types |
| 3. | Article 3.B Termination Payment |
| 4. | Fixed Costs |
| 5. | Sample Calculations |

## CATALYST SUPPLY AGREEMENT

This Catalyst Supply Agreement (hereinafter referred to as the "Agreement") is signed and entered into the 17th day of September, 1992, by and between Amoco Chemical Company, a Delaware corporation with offices at 200 East Randolph Drive, Chicago, Illinois (hereinafter referred to as "Amoco"), and Catalyst Resources, Inc., a Delaware corporation with offices at One Northwind Plaza, 7600 West Tidwell, Suite 500, Houston, Texas (hereinafter referred to as "CRI").

WHEREAS, CRI is engaged in producing commercially at its Bayport, Texas facilities catalysts used in the production of polypropylene, and is currently producing at its semi-works facility in Bayport and selling to Amoco, pursuant to an agreement dated December 19, 1989 (hereinafter referred to as the "Debottlenecking Agreement"), quantities of a certain catalyst with respect to which Amoco is the owner of proprietary interests and which Amoco refers to as "CD-Catalyst" and which CRI refers to as "C-600 Catalyst";

WHEREAS, CRI is one hundred percent (100%) owned, indirectly, by Phillips Petroleum Company (hereinafter referred to as "Phillips");

WHEREAS, Amoco is a manufacturer and seller of polypropylene and a licensor of polypropylene process technology and requires CD-Catalysts (as defined below), both for its own production and sale of polypropylene, and for sale to its process licensees;

- 2 -

WHEREAS, Amoco and CRI wish CRI to be able to commercially manufacture CD-Catalysts at CRI's Bayport, Texas premises, and CRI wishes to sell CD-Catalysts made at such premises to Amoco and Amoco wishes to buy such CD-Catalysts from CRI;

WHEREAS, CRI will have to construct a new facility in order to be able to commercially manufacture CD-Catalysts at its Bayport, Texas premises;

WHEREAS, pursuant to this Agreement CRI expects to have its investment in such new facility essentially paid off by Amoco, with an acceptable return on such investment, ten (10) years after Plant Start-up (as defined below);

WHEREAS, Amoco needs a supply of CD-Catalysts no later than early 1994;

WHEREAS, were CRI to terminate this Agreement in accordance with its terms, Amoco would need at least three (3) years to make alternate arrangements for supply of CD-Catalysts;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, Amoco and CRI, intending to be legally bound, agree as follows:


Article 1.    Definitions

For purposes of this Agreement, the following definitions shall apply:

1.A.  A company or other entity shall be an "Affiliate" of another
      company (the "First Company") if:  (i) such company or entity is

- 3 -

controlled directly or indirectly by the First Company; or (ii) such company or entity and the First Company are controlled directly or indirectly by a common or third company or entity; or (iii) such company or entity controls the First Company directly or indirectly.  Control, for purposes of this definition, shall mean ownership of at least fifty one percent (51%) of issued voting stock or other ownership interests having ordinary voting power to elect a majority of the Board of Directors or persons having similar functions.

1.B. "CD-Catalyst" or "CD-Catalysts" shall mean a catalyst or catalysts useful for the polymerization or copolymerization of propylene based upon Amoco Information (as such term is defined in the Research and Development Agreement by and between Amoco and CRI of even date herewith, hereinafter referred to as the "R&D Agreement"), falling within the definition set forth in Exhibit 1, which is attached hereto and made a part hereof, as such definition may be modified from time to time by agreement in writing of the parties.

1.C. "CD-Catalyst Product" shall mean (x) CD-Catalyst of any of the specific types and conforming to the specifications for such type set forth in Exhibit 2, which is attached hereto and made a part hereof, as it may be modified from time to time by agreement in writing of the parties or as it may be supplemented through the operation of Article 8.E.(1).(i) or Article 8.E.(2).(a), or (y) CD-Catalyst of any new type and conforming to specifications for such new type as may be requested by Amoco subsequent to

- 4 -

execution of this Agreement and with respect to which CRI is
obligated to take the necessary steps to be able to manufacture
such at the Plant pursuant to Article 8.E.(1).(ii) or Article
8.E.(2).(b). Such specifications under (y) may be modified from
time to time by agreement in writing of the parties or
supplemented through the operation of Article 8.E.(1).(i) or
(ii), or Article 8.E.(2).(a) or (b).

Unless otherwise indicated, "CD-Catalyst Products" shall mean
CD-Catalyst Product of each and every type conforming to the
specifications for such types. It is expected that Exhibit 2
will be modified from time to time based upon Amoco requirements.

1.D. "Contract Year" shall mean any period of twelve (12) consecutive
calendar months beginning on the date of Plant Start-up or on any
anniversary of that date, which period is within the term of this
Agreement. Any such period which is after the effective date of
termination of this Agreement shall not be a Contract Year
hereunder.

1.E. "Day" or "day" shall mean a calendar day.

1.F. The "Demonstrated Plant Capacity" shall mean the maximum number
of pounds in the aggregate of CD-Catalyst Products that CRI is
capable of manufacturing at the Plant in any Contract Year.

1.G. "Fixed Assets" shall mean buildings, equipment, machinery,
instruments, valves, hardware, fixtures, piping, wiring, tubing,

- 5 -

Packaging (as defined below), and other tangible personal property, but not including Raw Materials (as defined below), materials and supplies referred to in Exhibit 4, CD-Catalysts, by-product, waste, off-specification products, scrap material, or spare parts.

1.H. Except as otherwise provided in Article 18.B, Amoco's "Minimum Quantity" shall mean,

(1) for any Contract Year hereunder through the tenth (10th) Contract Year, (i) seventy thousand (70,000) pounds in the aggregate of CD-Catalyst Products less any reductions provided for in Article 8.E, (ii) except if Amoco elects to acquire the rights and licenses under Articles III and IV of the License Agreement by and between Amoco and CRI of even date herewith (hereinafter referred to as the "License Agreement") pursuant to Article 2.1 or 2.3 of such License Agreement, in which case "Minimum Quantity" shall mean the number of pounds in the Contract Years provided under such Article 2.1 or 2.3 less any reductions provided for in Article 8.E; and

(2) for any Contract Year hereunder after the tenth (10th) Contract Year, one thousand (1,000) pounds in the aggregate of CD-Catalyst Products.

1.I. "Packaging" shall mean pressurized metal cylinders.

- 6 -

1.J. "Phillips Corporate Engineering Expenses" shall mean the total
expenses derived by first multiplying, for each of those Phillips
employees in the Phillips Corporate Engineering Division involved
in overseeing the engineering aspects of construction of the
Plant or of a project under Article 8.A.(1).(c), as the case may
be, the hourly rate of such employee by the number of hours such
employee spent in such overseeing, which number of hours are
reported monthly by Phillips Corporate Engineering Accounting,
and then totalling the resulting expenses for all such employees:
provided that the number of employees involved in such
overseeing, and the number of hours spent in such overseeing,
shall not be more than reasonable and necessary for CRI's
performance under this Agreement. The "hourly rate" of each such
employee shall be his or her annual salary divided by 2080, and
multiplied (i) in the case of construction of the Plant, by 1.57
(to cover benefits, office rental and communications expense),
(ii) in the case of a project under Article 8.A.(1).(c), by 1.26
for benefits, which may be adjusted as agreed by the parties to
include other Phillips' engineering costs for such a project.
Notwithstanding the foregoing, Phillips Corporate Engineering
Expenses, in the case of construction of the Plant, shall in no
event exceed $891,000.

1.K. "Plant" shall mean CRI's new facility for the commercial
production of CD-Catalyst Products to be constructed by CRI at
its premises in Bayport, Texas pursuant to Article 2.A.(1). The
Semi-works Unit, as defined below, shall not be part of the
Plant. "Plant Site" shall mean (a) the land on which the Plant

- 7 -

sits, plus (b) the land on which any Fixed Assets constructed,
installed or used in connection with the Plant including those
(i) which relate to, benefit or are required for CRI's Bayport
facilities as a whole or parts of such facilities other the
Plant, or for an alternate use of the Plant under Article 5, or
(ii) whose entire capacity is not required for CRI to be able to
manufacture at least one hundred and fifty thousand (150,000)
pounds in the aggregate of CD-Catalyst Products per Contract Year
at the Plant, or (iii) which are referred to in paragraph 2.(f)
of Exhibit 4 (the Fixed Assets referred to in (i), (ii) and (iii)
are hereinafter referred to collectively as "Common Fixed
Assets"), sit, plus (c) all land that is functionally part of the
Plant (whether for parking, storage, shipping, receiving,
inventory, or otherwise).

1.L. "Plant Start-up" shall mean the first day of the calendar month
immediately following the calendar month during which CRI
produces at least one thousand three hundred forty five (1,345)
pounds in the aggregate of CD-Catalyst Products at the Plant in a
period of seven (7) consecutive days (the occurrence of such
production shall be "Mechanical Performance"), provided that
within six (6) months of such first day CRI produces at least two
thousand eight hundred eighty five (2,885) pounds in the
aggregate of CD-Catalyst Products at the Plant in a period of
seven (7) consecutive days. If within six (6) months of such
first day CRI has not produced such quantity in such period,
Plant Start-up shall mean the first day of the calendar month
five (5) months before the first day of the calendar month during

- 8 -

which CRI does produce at least two thousand eight hundred eighty five (2,885) pounds in the aggregate of CD-Catalyst Products at the Plant in a period of seven (7) consecutive days.

1.M. "Quarter" shall mean a period of three (3) consecutive calendar months beginning on Plant Start-up or any anniversary thereof ("first Quarter") or on the first day of the calendar month that is three (3) ("second Quarter"), six (6) ("third Quarter") or nine months ("fourth Quarter") after Plant Start-up or any anniversary thereof.

1.N. "Raw Materials" shall mean the following chemical feedstocks for use in producing CD-Catalyst Products, and any additional materials as may be agreed in writing by the parties from time to time:

carbon dioxide;
caustic;
di-n-butylphthalate;
2-ethyl-1-hexanol;
hexane;
magnesium ethoxide;
silicon ethoxide;
tetra-n-butoxysilane;
tetrahydrofuran;
titanium tetrachloride; and
toluene.

- 9 -

1.O. "Semi-works Unit" shall mean CRI's existing semi-works catalyst production facility located at its premises in Bayport, Texas.

1.P. Being able to commercially manufacture products that conform to changed specifications for a CD-Catalyst Product type or to specifications for a new type of CD-Catalyst, requested under Article 8.E, shall be "Technically Feasible" hereunder if CRI produces, within one (1) month, or such longer period designated by Amoco, from the commencement of a Plant Trial (as such term is defined in the R&D Agreement) of such specifications, either at the Plant or at the Semi-works Unit, at least one thousand (1000) pounds of product that conform to the specifications requested. CRI's inability to produce such quantity within one (1) month, or such longer period designated by Amoco, from the commencement of a given Plant Trial shall not preclude other Plant Trials in the course of which such production may be made.

1.Q. A "Third Party Supplier" shall mean: a vendor, supplier, contractor, or provider of services, that neither Phillips nor CRI, either directly or indirectly, has any ownership, equity, control or investment interest in; or a public utility company.

1.R. "Transition" shall mean a change in Plant production from a CD-Catalyst Product of one type to another, or from a Developmental Catalyst (as such term is defined in the R&D Agreement) to a CD-Catalyst Product or vice versa.

- 10 -

1.S. A "Turnaround" at the Plant or "Plant Turnaround" shall mean
scheduled downtime at the Plant for maintenance or for projects
undertaken pursuant to Article 8.

1.T. "Utilities" shall mean electricity, hot oil, cold glycol,
nitrogen, natural gas and cooling water.

Article 2.   Plant Construction

2.A. (1).  CRI shall construct a new facility at its Bayport, Texas
premises so that it will be able to manufacture at such new
facility at least one hundred and fifty thousand (150,000) pounds
in the aggregate of CD-Catalyst Products per Contract Year.

(2).  CRI shall use its best efforts to complete construction of
the Plant, and to have Plant Start-up occur, as soon as possible,
and it shall proceed with all possible promptness and diligence
with such construction and with Plant Start-up.  If Plant
Start-up has not occurred by the Termination Option Date, as
defined below, then, notwithstanding anything to the contrary in
Article 18, Amoco may terminate this Agreement by giving notice
of termination to CRI within six (6) months of the Termination
Option Date, such termination to be effective thirty (30) days
after notice of termination has been given to CRI, with no
liability (except as provided below) for any of CRI's costs or
expenses (including design and engineering costs incurred prior
to signature of this Agreement) and no obligation to make any

- 11 -

payments to CRI under this Agreement. CRI shall in that event refund any amount directly reimbursed by Amoco under Article 2.B.(4), subject to the following. If Amoco exercises a right to terminate this Agreement in the event of failure to or delay in obtaining a permit or license necessary for construction (and only in such event), and provided that CRI has proceeded with all possible promptness and diligence in attempting to obtain such permit or license, then Amoco shall pay the following amount to CRI: (i) fifty percent (50%) of those of CRI's costs as described in Article 2.B.(1) (not including costs under Article 2.B.(2), but including costs incurred prior to signature of this Agreement up to a maximum amount of twelve million five hundred thousand dollars ($12,500,000)), incurred up to the effective date of termination, which it was permissible for CRI to incur under applicable law in the absence of such permit or license; minus (ii) any amount directly reimbursed by Amoco under Article 2.B.(4). Any excess of (ii) over (i) shall be paid by CRI to Amoco.

For purposes of this Article, "Termination Option Date" shall have the meaning set forth in (i), (ii), (iii) or (iv) below, whichever applies. (i) "Termination Option Date" shall mean March 1, 1994 (or the earlier date under paragraph C below), except only if the reason for Plant Start-up not occurring by March 1, 1994 (or the earlier date under paragraph C below) is any of the following: Force Majeure affecting CRI; failure to or delay in obtaining a permit or license necessary for construction; or failure to or delay in obtaining a permit or

- 12 -

license necessary for operation of the Plant. (ii) If Plant Start-up has not occurred by March 1, 1994 (or the earlier date under paragraph C below) due to Force Majeure affecting CRI, "Termination Option Date" shall mean March 1, 1994 (or the earlier date under paragraph C below), plus the shorter of the number of days of such Force Majeure or ninety (90) days. (iii) If Plant Start-up has not occurred by March 1, 1994 (or the earlier date under paragraph C below) due to failure to or delay in obtaining a permit or license necessary for construction, "Termination Option Date" shall mean March 1, 1994 (or the earlier date under paragraph C below), plus the shorter of the number of days of such delay or one hundred eighty (180) days. (iv) If Plant Start-up has not occurred by March 1, 1994 (or the earlier date under paragraph C below) due to failure to or delay in obtaining a permit or license necessary for operation of the Plant, "Termination Option Date" shall mean March 1, 1994 (or the earlier date under paragraph C below), plus the shorter of the number of days of such delay or three hundred sixty five (365) days.

(3). CRI shall use its best efforts to negotiate with Third Party Suppliers involved with design, engineering, procurement and construction for the Plant, payment terms that are as long as possible, and shall not pay any amount for design, engineering, procurement or construction for the Plant earlier than it is obligated to do so under its agreements with Third Party Suppliers.

- 13 -

2.B. (1).  Subject to (2), (3), (4) and (6) below, the total of the
actual, out-of-pocket costs incurred by CRI, directly to Third
Party Suppliers, for the design, engineering, purchase,
construction and installation of Fixed Assets necessary for and
related exclusively to being able to manufacture at the Plant at
least one hundred and fifty thousand (150,000) pounds in the
aggregate of CD-Catalyst Products per Contract Year, plus
Phillips Corporate Engineering Expenses for overseeing the
engineering aspects of construction of the Plant, and excluding
any other CRI and CRI Affiliate employee expenses incurred in
such design, engineering, purchase, construction and
installation, shall be referred to herein as CRI's Initial
Investment, or the "II". For purposes of this Agreement,
"out-of-pocket costs incurred" and "out-of-pocket expenses
incurred" shall mean "dollar payments made". Also for purposes
of this Agreement, "costs" shall include the meaning of
"expenses", and "expenses" shall include the meaning of "costs".


(2).  The II shall not include any costs for any Fixed Asset (i)
which relates to, benefits or is required for CRI's Bayport
facilities as a whole or parts of such facilities other than the
Plant, or for an alternate use of the Plant under Article 5, or
(ii) whose entire capacity is not required for CRI to be able to
manufacture at the Plant at least one hundred and fifty thousand
(150,000) pounds in the aggregate of CD-Catalyst Products per
Contract Year.

- 14 -

(3). Should any Fixed Asset, whose costs are included in the II
pursuant to (1) above or (5) below (prior to application of
Article 2.B.(6)), at any time after Plant Start-up relate to,
benefit or be required for CRI's Bayport facilities as a whole or
parts of such facilities other than the Plant, CRI shall
immediately notify Amoco of such, and the costs of such Fixed
Asset other than the pro rata share, as defined below, of those
costs, shall be subtracted from the II (after application of
Article 2.B.(6)). The pro rata share of the costs of such Fixed
Asset shall be agreed by Amoco and CRI but shall not in any case
exceed the portion of the capacity of such Fixed Asset utilized
in the manufacture of CD-Catalyst Products. Such reduced II
shall be the operative II hereunder for the Contract Year of such
reduction and subsequent Contract Years.

(4). Provided that, except as otherwise provided in this
Agreement, design and engineering costs falling under (1) above
incurred by CRI prior to signature of this Agreement, up to a
maximum amount of two million seventy thousand dollars
($2,070,000), shall be directly reimbursed by Amoco within thirty
(30) days from the date of receipt of an invoice issued by CRI
after the date of signature of this Agreement. Such costs
directly reimbursed by Amoco shall not be included in the II.

(5). During or after completion of construction of the Plant,
but no later than thirty (30) days after Mechanical Performance
(as such term is defined in Article 1.L), CRI may propose to
Amoco that the costs for constructing and installing new Fixed

- 15 -

Assets at the Plant and/or modifying existing Fixed Assets at the
Plant (including Phillips Corporate Engineering Expenses for
overseeing the engineering aspects of such but excluding any
other CRI and CRI Affiliate employee expenses incurred in such),
in order to facilitate Plant Start-up or improve Plant
operability, be included in the II, over and above the lump sum
bid obtained by CRI for construction of the Plant and what will
be included in the II under (1) above, subject to (6) below. CRI
shall include in such proposal the reason for the project and how
long it will take to complete the project. If the total such
costs for a particular such project are less than two hundred and
fifty thousand dollars ($250,000), and Amoco approves (in
writing) including such costs in the II, the total of such
actual, out-of-pocket costs incurred by CRI, directly to Third
Party Suppliers, plus applicable Phillips Corporate Engineering
Expenses, for such project up to $250,000, shall be included in
the II, subject to (6) below. Amoco may, at its sole option,
also agree to inclusion of such costs in the II for projects
whose such costs are two hundred and fifty thousand dollars
($250,000) or more. If Amoco agrees in writing to include such
costs in the II for projects of $250,000 or more, such actual,
out-of-pocket costs incurred by CRI, directly to Third Party
Suppliers, plus applicable Phillips Corporate Engineering
Expenses, in such project up to the agreed maximum costs for such
project, if any, shall be included in the II, subject to (6)
below. Except as provided above, the costs for such projects
shall not be included in the II.

- 16 -

Notwithstanding this paragraph (5), paragraph A above applies in its entirety without any modification, diminution or limitation. Nothing in this paragraph (5) shall in any way lessen, limit or modify CRI's obligations under paragraph A above.

(6).(a)    Such II, covering the costs under both (1) and (5) above and not including costs under (2) above or costs reimbursed by Amoco under (4) above, shall not exceed the maximum amount determined as follows: (i) thirty three million, four hundred ninety two thousand, three hundred eighty three dollars ($33,492,383); plus (ii) costs for changes or additions to the scope of work which is covered by the lump sum bid for construction of the Plant, up to ten percent (10%) of the amount referred in to (i) (i.e. up to $3,349,238.30); plus (iii) any amount to be added to the II under paragraph C below.

(b)    CRI shall keep accurate and complete books, records and accounts regarding the actual costs incurred for the construction of the Plant. CRI shall notify Amoco of the total of such actual costs incurred which, absent the cap in (6).(a) above, would be included in the II under paragraphs B.(1), (2), (4) and (5) above, no later than the first day of the calendar month after Mechanical Performance and, if any projects under B.(5) above are not yet completed at that time, again after completion of such projects. However, in no event shall the II for purposes of this Agreement exceed the maximum amount provided under paragraph B.(6).(a).

- 17 -

Accordingly, the II for purposes of this Agreement shall be the lesser of the maximum amount provided under paragraph B.(6).(a), or the total of the actual such costs incurred otherwise includable in the II under paragraphs B.(1), (2), (4) and (5), such lesser amount further reduced to include only the pro rata share of the costs of certain Fixed Assets in accordance with paragraph B.(3).

2.C. At any time prior to Mechanical Performance, upon the request of Amoco, CRI shall indicate within thirty (30) days of such request, whether it is able to accelerate construction of the Plant so that Plant Start-up can occur earlier than March 1, 1994, its then-current good faith estimate of the incremental cost (as the term "cost" is used in paragraph B.(1) above) for such acceleration and the accuracy ($\pm$ x %) of the estimate. If Amoco agrees in writing to such incremental cost, March 1, 1994, referred to in the definition of "Termination Option Date" in paragraph A.(2) above, shall be replaced by the earlier date requested by Amoco, and after CRI incurs such incremental cost, such out-of-pocket incremental cost incurred by CRI, directly to Third Party Suppliers, up to the amount of the estimate plus the percentage of the estimate representing its degree of accuracy on the up side, shall, at Amoco's sole option, exercisable within thirty (30) days after such incremental cost is incurred, either (i) be directly reimbursed by Amoco to CRI within thirty (30) days of the date of receipt of an invoice from CRI for such which, if Amoco selects such option, CRI shall issue within thirty (30) days of such selection, in which event such

- 18 -

incremental cost shall not be included in the II, or (ii) be added to the II.

2.D. From the date of signature of this Agreement until Mechanical Performance, CRI shall provide Amoco with at least monthly written progress reports on the status of the construction of the Plant. These reports shall include CRI's then-anticipated Plant Start-up date. Once such a progress report indicates an anticipated Plant Start-up date that is within three hundred sixty five (365) days from the date of the report, from that point on until Mechanical Performance, CRI shall provide at least two (2) such progress reports per month. Upon Amoco's request, CRI shall meet with Amoco, at least once per month, at a mutually agreed location, to discuss the status of the construction of the Plant. Each party shall bear its own expenses relating to any such meetings.

2.E. CRI shall notify Amoco at least ten (10) days in advance of those Plant operations and runs which CRI expects will demonstrate Mechanical Performance, and those which CRI expects will demonstrate, within six (6) months of the first day of the calendar month following Mechanical Performance, production of at least two thousand eight hundred eighty five (2,885) pounds in the aggregate of CD-Catalyst Products at the Plant in a period of seven (7) consecutive days. Amoco shall have the right to have a reasonable number of representatives be present at and observe such Plant operations and runs.

- 19 -

2.F. CRI shall be the owner and operator of the Plant for all purposes. Amoco shall gain no ownership interest whatsoever in the Plant by virtue of any payments made under this Agreement (except in accordance with Article 17).

## Article 3.   Duration

3.A. This Agreement shall remain in force and effect from the date of signature of this Agreement until the effective date of its termination pursuant to any provision of this Agreement.

3.B. Amoco may terminate this Agreement effective as of the last day of any of the fifth (5th), sixth (6th), seventh (7th), eighth (8th) or ninth (9th) Contract Years by giving notice thereof to CRI not less than two (2) years prior to the effective date of termination, such right of termination to exist only in the event that Amoco's best estimate, at the time of such notice of termination, of the aggregate amount of CD-Catalyst Products that will be consumed in the Contract Year following such notice by Amoco, its Affiliates and any process licensees of Amoco or of any of its Affiliates, is less than twenty thousand (20,000) pounds.  In the event that Amoco terminates this Agreement pursuant to this paragraph B (and only in such event--if this Agreement ends in any other manner or for any other reason or pursuant to any other provision of this Agreement, the payment set forth below shall not be required), after each anniversary of the effective date of termination up to and including the

- 20 -

anniversary ten (10) years after the day before Plant Start-up,
within thirty (30) days of receipt of an invoice issued by CRI
after such anniversary, Amoco shall pay to CRI any positive
amount due under Exhibit 3, which is attached hereto and made a
part hereof.

CRI shall use its best efforts to develop alternate uses for the
Plant in the event of termination pursuant to this paragraph B.

3.C. Amoco may unconditionally terminate this Agreement, with or
without cause, effective as of the last day of the tenth (10th)
Contract Year or as of the last day of any succeeding Contract
Year by giving notice thereof to CRI not less than two (2) years
prior to the effective date of termination.

3.D. CRI may terminate this Agreement effective as of the last day of
the thirteenth (13th) Contract Year or as of the last day of any
succeeding Contract Year by giving notice thereof to Amoco not
less than three (3) years prior to the effective date of
termination, such right of termination to exist only in the event
that Amoco notifies pursuant to Article 6.B for delivery in the
tenth (10th) or any subsequent Contract Year less than ninety
thousand (90,000) pounds in the aggregate of CD-Catalyst
Products, and notice of termination is given in a Contract Year
after the ninth (9th) for which Amoco has notified deliveries of
less than ninety thousand (90,000) pounds.

- 21 -

3.E. In the event this Agreement is terminated pursuant to any provision of this Agreement, Amoco shall make payment pursuant to Article 7 for CD-Catalyst Products, delivered to Amoco in accordance with this Agreement up until the effective date of termination. Also in the event this Agreement is terminated pursuant to any provision of this Agreement, after the effective date of termination, CRI shall notify Amoco of the amounts of CD-Catalyst Products of each type remaining in inventory. In the event only that Amoco (as opposed to CRI) gives notice of termination pursuant to any provision of this Agreement, Amoco shall purchase, and CRI shall sell to Amoco, the CD-Catalyst Products remaining in CRI's inventory on the effective date of termination, up to the maximum amount referred to in Article 12.B. At Amoco's option, to be exercised within thirty (30) days of CRI's notice, Amoco shall purchase and CRI shall sell to Amoco any CD-Catalyst Products remaining in CRI's inventory on the effective date of termination which Amoco is not obligated to purchase pursuant to the previous sentence. Amoco shall notify CRI of delivery dates and places for all CD-Catalyst Products it will purchase pursuant to the foregoing, such dates to be within forty-five (45) days of the date of CRI's notice. All purchases of CD-Catalyst Products remaining in inventory shall be deemed to have occurred in the last Contract Year, and the applicable price under Article 7.B. as recalculated under Article 7.D.(3) for such last Contract Year, shall apply. Except as otherwise provided above, invoicing shall be in accordance with Article 7.C.(1).

- 22 -

3.F. If this Agreement is terminated pursuant to any provision of this Agreement, Amoco may elect at any time within two (2) years of the giving of notice of termination, at its sole option and upon notice thereof to CRI, to acquire the rights and licenses under Articles III and IV of the License Agreement. Upon the giving of such notice, the rights and licenses under Articles III and IV of such License Agreement shall automatically become effective, without any further act by either party, provided that Amoco makes payment in accordance with Article V of such License Agreement.

3.G. The termination of this Agreement, either pursuant to the above or other provisions of this Agreement, shall be without prejudice to the rights and obligations of the parties under this Agreement accrued up to and including the effective date of such termination, and shall not affect any obligations of the parties (or of Phillips) after the effective date of such termination provided for in this Agreement.

3.H. The parties understand and agree that this Agreement will continue until the effective date of its termination pursuant to one of the provisions in this Agreement expressly providing for termination, and that the parties have no other rights of termination beyond those expressly provided for in the Agreement. The parties understand and agree that this Agreement could, therefore, continue for many, many years, but the parties agree that this Agreement is not terminable at will (except to the

- 23 -

extent that Article 3.C might be construed as giving a right to
terminate at will).

## Article 4.   Supply and Purchase

4.A. Commencing as of Plant Start-up and subject to the provisions of
this Agreement:

(1) during each Contract Year hereunder CRI shall manufacture at
the Plant and deliver to Amoco such CD-Catalyst Products notified
by Amoco pursuant to Article 6.B for delivery in such Contract
Year, up to the greater of: (i) one hundred and fifty thousand
(150,000) pounds in the aggregate of CD-Catalyst Products, or
(ii) the Demonstrated Plant Capacity.

(2)(a)     Amoco shall make payment in accordance with Article 7
           for CD-Catalyst Products delivered to Amoco in
           accordance with this Agreement during any Contract Year
           hereunder.

   (b)     For any Contract Year hereunder, to the
           extent the number of pounds in the aggregate of
           CD-Catalyst Products that Amoco notifies pursuant to
           Article 6.B for delivery in such Contract Year is less
           than Amoco's Minimum Quantity for such Contract Year,
           within thirty (30) days of the date of receipt of an
           invoice issued by CRI after the end of such Contract
           Year (even if after the effective date of termination

- 24 -

of this Agreement), Amoco shall pay the amount
resulting from multiplying (a) the Tier 1 price (for
any Contract Years through the fifteenth (15th)), or
the price under Article 7.B.(3) (for any subsequent
Contract Years), as recalculated after such Contract
Year under Article 7.D.(3), but with $VC_i$ (for any
Contract Years through the fifteenth (15th)) or x (as
defined in Article 7.B.(3)) equal to zero, by (b) the
difference between such number of pounds notified and
Amoco's Minimum Quantity, and then subtracting from the
product of (a) and (b) one hundred percent (100%) of
any net financial return from an alternate use of the
Plant for such Contract Year under Article 5.D.

4.B. Amoco shall have the right to make whatever use or disposition of
products purchased from CRI hereunder that it from time to time
considers appropriate, whether internal usage for the production
of polypropylene, resale to Affiliates or to process licensees of
Amoco (or of any of Amoco's Affiliates), or otherwise.

Article 5. Alternate Use of Plant

5.A. During the term of this Agreement, CRI shall use the Plant only
to produce CD-Catalyst Products for sale exclusively to Amoco,
except as otherwise provided in this Article 5 or as otherwise
agreed in writing by CRI and Amoco.

- 25 -

5.B. (1). For any Contract Year hereunder after the second (2nd) and through the tenth (10th), if Amoco's best estimate of the quantities of CD-Catalyst Products which Amoco anticipates it will purchase in such Contract Year, given in the calendar month preceding the first month of such Contract Year pursuant to Article 6.A, is less than Amoco's Minimum Quantity for such Contract Year, and CRI requests Amoco's consent to an alternate use of all or part of the unused capacity of the Plant for such Contract Year, Amoco shall not unreasonably withhold its consent to such alternate use.

(2). If such estimate for any Contract Year hereunder after the second (2nd) and through the tenth (10th) is equal to or greater than Amoco's Minimum Quantity for such Contract Year, CRI may not use the Plant in such Contract Year for any purpose other than to perform its obligations under this Agreement without Amoco's prior written consent, which consent Amoco may unreasonably withhold.

(3). For any Contract Year after the tenth (10th), if such estimate for such Contract Year indicates that Amoco will purchase less than ninety thousand (90,000) pounds in the aggregate of CD-Catalyst Products in such Contract Year, CRI shall have the right, without Amoco's consent, to use all or part of the unused capacity of the Plant for such Contract Year for purposes other than performing its obligations under this Agreement.

- 26 -

5.C. Notwithstanding the foregoing, (a) any such alternate use by CRI pursuant to paragraph B above, (i) shall not in any way affect the long term viability of the Plant for purposes of producing CD-Catalyst Products or affect the quantity or quality of CD-Catalyst Products produced, and (ii) shall not relieve CRI of its obligation to deliver CD-Catalyst Products notified by Amoco pursuant to Article 6.B for delivery during such Contract Year, even if the aggregate amount notified for delivery in such Contract Year exceeds the estimate referred to in Article 5.B.(1) for such Contract Year; and (b) prior to any alternate use of the Plant in a Contract Year pursuant to paragraph B above, (1) CRI must demonstrate to Amoco's reasonable satisfaction that such alternate use will not affect the performance or characteristics of any CD-Catalyst Product to be produced hereunder (including, but not limited to, products meeting the applicable specifications therefor), and if, notwithstanding such demonstration, such alternate use does affect the performance or characteristics of any CD-Catalyst Product produced hereunder, CRI shall immediately terminate, at Amoco's request, such alternate use, and (ii) CRI must have in place confidentiality arrangements acceptable to Amoco to ensure that no information Amoco considers confidential will be disclosed to a third party.

Provided further, that any consent given by Amoco under paragraph B shall be limited to a specific Contract Year and shall not affect, limit or waive its rights under this Article for subsequent Contract Years. Any alternate use by CRI of the Plant

- 27 -

shall not affect or relieve it from any of its obligations under
this Agreement.

5.D. If CRI makes an alternate use of the Plant in accordance with
paragraph B above in any Contract Year hereunder after the second
(2nd) and through the tenth (10th), and the number of pounds in
the aggregate of CD-Catalyst Products that Amoco notifies for
delivery in such Contract Year is less than Amoco's Minimum
Quantity for such Contract Year, CRI shall determine its net
financial return (as defined below) from such use for such
Contract Year within thirty (30) days following the end of such
Contract Year, and shall notify such amount, and how it was
determined, to Amoco within thirty (30) days following the end of
such Contract Year.

CRI shall also notify Amoco of its net financial return from an
alternate use of the Plant for each twelve (12) consecutive
calendar month period ending on an anniversary of the effective
date of termination of this Agreement, up to and including the
anniversary ten (10) years after the day before Plant Start-up,
if this Agreement is terminated pursuant to Article 3.B.  CRI
shall give such notice within thirty (30) days following the end
of such twelve (12) month period.

Such net financial return shall be (i) CRI's total sale proceeds
from such use made of the Plant during such Contract Year or such
twelve (12) month period, (ii) less the actual variable and fixed
costs for such use in such Contract Year or in such twelve (12)

- 28 -

month period, and (iii) less thirty seven percent (37%) of the difference between (i) and (ii). Notwithstanding the foregoing, such net financial return shall in no event be less than zero.

5.E. CRI shall keep accurate and complete books, records and accounts regarding any alternate use of the Plant and the net financial return from such use.

5.F. Notwithstanding other uses of the Plant permitted under paragraph B, during the term of this Agreement, CRI shall not produce CD-Catalysts for, or sell or transfer CD-Catalysts to, any party other than Amoco; other uses of the Plant shall not include making CD-Catalysts. After the effective date of termination of this Agreement, CRI shall not make CD-Catalysts at the Plant, and CRI shall not sell or transfer CD-Catalysts made prior to the effective date of termination to any party other than Amoco.

## Article 6.   Production and Delivery Schedule

6.A. On or before the fifteenth (15th) day of each of those calendar months that precede the first month of any Quarter of any Contract Year hereunder (except if Mechanical Performance occurs on or after the thirteenth (13th) day of a calendar month, in which event in that month of that year alone such notice shall be made within three (3) days of Mechanical Performance), Amoco shall notify CRI of Amoco's best estimate of: (i) the monthly quantities of CD-Catalyst Products of each type which Amoco anticipates it will purchase hereunder during the forthcoming

- 29 -

Quarter; and (ii) the monthly quantities of CD-Catalyst Products of each type which Amoco anticipates it will purchase hereunder during each of the three (3) Quarters following the Quarter referred to in (i). Amoco shall promptly advise CRI of any significant changes in such estimates. Such estimates shall be furnished for CRI's planning purposes and for purposes of Article 12 below only and, except as provided in Article 12, shall in no way alter the rights or obligations of either party hereto. Amoco shall have no liability under any provision of this Agreement if the quantities Amoco actually purchases, or notifies for delivery pursuant to paragraph B below, vary from any estimate given under this Agreement.

6.B. For deliveries of CD-Catalyst Products in any calendar month after the calendar month of Mechanical Performance, Amoco shall notify CRI of the number of pounds of CD-Catalyst Products of each type to be delivered during such month, together with the delivery dates, the place(s) of delivery and any other particulars for delivery, at least thirty (30) days in advance of such delivery dates.

6.C. Subject to the applicable maximum supply obligation under Article 4.A.(1), CRI shall deliver CD-Catalyst Products in accordance with notices given by Amoco pursuant to paragraph B above. Amoco shall not be obligated to take delivery of any CD-Catalyst Products except to the extent such deliveries are in accordance with notices given by Amoco pursuant to paragraph B. Amoco shall

be obligated to take delivery of CD-Catalyst Products delivered
in accordance with this Agreement.

6.D. (1).  For any deliveries notified to CRI pursuant to paragraph B
above for the seventh (7th) month after the calendar month of
Mechanical Performance and thereafter, if either (i) the number
of pounds in the aggregate of CD-Catalyst Products notified by
Amoco pursuant to paragraph B for delivery in any such month is
less than or equal to eighty five percent (85%) of one-twelfth
(1/12th) of the applicable maximum supply obligation under
Article 4.A.(1) and CRI, for any reason other than Force Majeure,
fails to deliver the full amounts of CD-Catalyst Products of each
of the types notified to the places designated within thirty (30)
days (except if during such thirty (30) days there is a Plant
Turnaround exceeding seven (7) days, in which case within forty
five (45) days) of the delivery dates specified, as notified to
CRI pursuant to paragraph B above, or (ii) the number of pounds
in the aggregate of CD-Catalyst Products notified by Amoco
pursuant to paragraph B above for delivery in any such month is
greater than eighty five percent (85%) of one-twelfth (1/12th) of
the applicable maximum supply obligation under Article 4.A.(1)
and CRI, for any reason other than Force Majeure and subject to
such applicable annual maximum supply obligation, fails to
deliver at least eighty five percent (85%) of the full amounts of
CD-Catalyst Products of each of the types notified to the places
designated within thirty (30) days (except if during such thirty
(30) days there is a Plant Turnaround exceeding seven (7) days,
in which case within forty five (45) days) of the delivery dates

- 31 -

specified, as notified to CRI pursuant to paragraph B above,
then, in either event, except to the extent Amoco exercises its
right of deduction set forth below, CRI shall pay to Amoco,
within thirty (30) days of the date of receipt of notice for
payment from Amoco (whether such notice is given before or after
the effective date of termination of this Agreement), the amount
(in dollars) resulting from application of the following formula:

$$\frac{70,000}{365}\left[(xy)\right],$$

where x = the number of days in excess of thirty (30) days
(except if during such thirty (30) days there is a
Plant Turnaround exceeding seven (7) days, in which
case in excess of forty five (45) days) after such
delivery dates specified that it takes for, in case (i)
above, the full amounts, and in case (ii) above, eighty
five percent (85%) of the full amounts, of CD-Catalyst
Products of each of the types notified pursuant to
paragraph B above to be delivered to such places
designated, but in no event may the number of days
extend beyond the effective date of termination of this
Agreement or exceed three hundred sixty five (365); and

y = one half (1/2) of the Tier 1 Price (for the time
through Contract Year fifteen (15)) or of the price
under Article 7.B.(3) (for Contract Years after fifteen
(15)) being invoiced or that would be invoiced under

- 32 -

Article 7.C.(1) for deliveries on the days referred to in the definition of x.

Amoco may, at its option, issue monthly interim notices for payment, or wait until x, as defined above, is determined. Amoco may also offset and deduct amounts owing from CRI under this provision from payments otherwise due to CRI under Article 7. Amounts owing from CRI under this provision shall not be recalculated under Article 7.D.(3) after the end of a Contract Year.

(2). Amoco and CRI agree that in the event of either (i) or (ii) of paragraph (1) above: Amoco will suffer serious damage, with respect to its internal requirements for CD-Catalyst Products for the production and sale of polypropylene, with respect to the requirements of process licensees for CD-Catalyst Products, and with respect to Amoco's licensing program and polypropylene business in general; that such damage will increase as time goes on; that it likely will be difficult and costly for Amoco to make alternate arrangements for supply of CD-Catalyst Products; and that it likely will be difficult to quantify and prove the actual amount of damage suffered by Amoco. This paragraph D is a good faith effort to reasonably estimate Amoco's likely direct, consequential and special damages in the event of either (i) or (ii) of paragraph (1) above, and is not intended as a penalty.

(3). Amoco agrees that for any particular delivery notified to CRI pursuant to paragraph B above with a delivery date specified

- 33 -

in such notice that is any time after the sixth (6th) month after the calendar month of Mechanical Performance, and with the place of delivery designated in such notice being a plant of Amoco or of a company one hundred percent (100%) owned, directly or indirectly, by Amoco Corporation, the amount provided under paragraph D.(1) is CRI's sole and total liability to Amoco and such company one hundred percent (100%) owned by Amoco Corporation, for any direct, consequential and special damages resulting from an instance of (i) or (ii) of paragraph (1) above in connection with such notified delivery.

6.E. Notwithstanding anything to the contrary herein, for any deliveries notified to CRI pursuant to paragraph B above for the seventh (7th) month after the calendar month of Mechanical Performance and thereafter, if for any reason other than Force Majeure, and subject to CRI's maximum supply obligation, CRI fails to deliver the full amounts of CD-Catalyst Products of each of the types notified to the places designated within ninety (90) days of the delivery dates specified, as notified to CRI pursuant to paragraph B above, then Amoco may terminate this Agreement effective as of the last day of any Contract Year in which the failure to deliver continues beyond ninety (90) days, by giving notice thereof to CRI.

Amoco's exercise of its rights under this paragraph E shall in no way alter or limit any other rights Amoco may have, and its failure to exercise its rights under this paragraph E in respect

- 34 -

of any particular delivery shall not limit, affect or waive its rights with respect to any other delivery.

6.F. If Amoco has the right to terminate this Agreement under paragraph E above, Amoco shall have the separate and independent right to elect to acquire, at any time within two (2) years of the time such right to terminate arises, the rights and licenses under Articles III and IV of the License Agreement at Transfer Cost (as such term is defined in such License Agreement), by giving notice thereof to CRI. Upon the giving of such notice, the rights and licenses under Articles III and IV of such License Agreement shall automatically become effective, without any further act by either party, provided that Amoco makes payment in accordance with Article V of such License Agreement.

## Article 7. Unit Price for CD-Catalyst Products

7.A. Amoco shall pay to CRI a per unit price, as set forth below, for each pound of CD-Catalyst Product produced at the Plant and delivered to Amoco in accordance with this Agreement. For purposes of this Article, the following terms shall have the meanings indicated:

(1). i — the number of the particular Contract Year in question, with the chronologically first Contract Year being numbered 1, the chronologically second Contract Year being numbered 2, and so on. So, for example, $W_3 = W$

- 35 -

(as defined below) for Contract Year 3; $W_{(i-1)}$ = W for
the Contract Year immediately preceding Contract Year i
(if i = 3, $W_{(i-1)}$ = W for Contract Year 2).


(2). $P_i$ =    the price in U.S. dollars per pound of CD-Catalyst
Product delivered to Amoco in accordance with this
Agreement in Contract Year i, and produced at the Plant
after the last day of the calendar month of Mechanical
Performance.


(3). $W_i$ =    the implicit price deflator for Gross Domestic Product
for Contract Year i, which shall be the implicit price
deflator for Gross Domestic Product for the last
complete calendar quarter (January - March, April -
June, July - September, or October - December) falling
entirely within Contract Year i, provided there is at
least one calendar month after such calendar quarter
that also falls within Contract Year i, as reported in
the issue of the U.S. Department of Commerce, Bureau of
Economic Analysis' Survey of Current Business of the
calendar month immediately following such calendar
quarter (disregarding any subsequent revisions to the
numbers reported in such issue). For example, if
Contract Year 1 ended on January 31, 1992, February 29,
1992, or March 31, 1992, the implicit price deflator
for GDP for Contract Year 1 would be the implicit price
deflator for GDP for the fourth (4th) quarter of 1991,

- 36 -

which would be found in the first line of Table 7.13 or Table 7.14 of the "National Income and Product Accounts" section of the January 1992 <u>Survey of Current Business</u> (i.e. 117.9).

(4). $FC_i$ — the total of the direct and allocated expenses for Contract Year i set forth in Exhibit 4, which is attached hereto and made a part hereof. Portions of costs for Fixed Assets which under other provisions of this Agreement are to be added to the actual $FC_i$, and any simple interest charge under Article 8.E.(3), shall be added to the $FC_i$ in accordance with such provisions. No other Fixed Asset or capital costs, and no other costs or expenses of any kind, shall be included in the $FC_i$. In particular, but without limitation, no costs or expenses arising from or related to a breach of an express warranty contained in Article 11.A or 11.B, no payments to Amoco pursuant to this Agreement, no costs or expenses of debt incurred by CRI, and no costs or expenses arising under the R&D Agreement, shall be included in the $FC_i$.

Notwithstanding the foregoing,

-- for Contract Year 1: the aggregate of the expenses to be included in the $FC_i$ under paragraphs 1.(b), (c) and (d), 2.(a), and 3 of Exhibit 4 shall in no event exceed one million, two hundred and sixty five thousand

- 37 -

dollars ($1,265,000); and the remainder of the $FC_i$
shall in no event exceed two million, six hundred
thousand dollars ($2,600,000).

--    for Contract Year 2: the aggregate of the expenses to
be included in the $FC_i$ under paragraphs 1.(b), (c) and
(d), 2.(a), and 3 of Exhibit 4 shall in no event exceed
the lesser of the actual aggregate amount of such
expenses for Contract Year 1 or one million, two
hundred and sixty five thousand dollars ($1,265,000);
and the remainder of the $FC_i$ shall in no event exceed
the lesser of (i) the actual amount of such other costs
and expenses for Contract Year 1, multiplied by the
ratio $\dfrac{W_2}{W_1}$,

or (ii) two million, six hundred thousand dollars
($2,600,000), multiplied by the ratio $\dfrac{W_2}{W_1}$.

--    for Contract Year 3: the aggregate of the expenses to
be included in the $FC_i$ under paragraphs 1.(b), (c) and
(d), 2.(a), and 3 of Exhibit 4 shall in no event exceed
the lesser of (i) the lesser of the actual aggregate
amount of such expenses for Contract Year 1 or one
million, two hundred and sixty five thousand dollars
($1,265,000), such lesser amount multiplied by the
ratio $\dfrac{W_3}{W_2}$, or (ii) the actual aggregate amount of such

expenses for Contract Year 2;

- 38 -

and the remainder of the $FC_i$ shall in no event exceed
the lesser of (i) the actual amount of such other costs
and expenses for Contract Year 2, multiplied by the
ratio $\frac{W_3}{W_2}$,

or (ii) two million, six hundred thousand dollars
($2,600,000), multiplied by the ratio $\frac{W_3}{W_1}$.

for Contract Year 4 and all subsequent Contract Years,
the $FC_i$ for such Contract Year shall in no event exceed
the lesser of (i) the actual amount of such costs and
expenses for the previous Contract Year, multiplied by
the ratio $\frac{W_i}{W_{(i-1)}}$,

or (ii) three million, three hundred eighty thousand
dollars ($3,380,000), such amount multiplied by the
ratio $\frac{W_i}{W_1}$.

If there is an alternate use of the Plant by CRI in a
Contract Year under Article 5, the amounts set forth
above for determining the applicable maximum amounts
(for Contract Years 1-3, where the $FC_i$ is segregated)
or the applicable maximum amount (for Contract Year 4
and thereafter), for the $FC_i$ in a given Contract Year,
both the stated dollar amounts and the actual amounts
of costs and expenses for a previous Contract Year,
shall be replaced by those amounts resulting from
multiplying the amounts set forth above by the ratio

$\frac{x}{y + x}$,

where x and y are defined as in paragraph 3 of Exhibit 4.

- 39 -

(5). TV (terminal value) - twenty five percent (25%) of the II.

(6). $Q_i$ - the actual, aggregate number of pounds of CD-Catalyst
Products delivered to Amoco in accordance with this
Agreement, during Contract Year i, and produced at the
Plant after the calendar month of Mechanical
Performance (not including any pounds presumed for
invoicing purposes (under paragraph C) to be delivered
in or during a Contract Year but which actually were
delivered prior to Plant Start-up).

(7). $VC_i$ = $\dfrac{(M_i)(Z_i)}{X_i + Y_i}$ + $\dfrac{(M_{(i-n)})(K_{(i-n)})}{X_{(i-n)} + Y_{(i-n)}}$ +

. . . + $\dfrac{(M_{(i-1)})(K_{(i-1)})}{X_{(i-1)} + Y_{(i-1)}}$ .

where $M_i$ - the total actual, out-of-pocket expenses
incurred by CRI in Contract Year i, directly
to Third Party Suppliers or, in the case of
Raw Materials, to Phillips (subject to
Article 7.F below), for: (i) Raw Materials
to the extent used in making CD-Catalyst
Products at the Plant; (ii) Utilities to the
extent used in making CD-Catalyst Products
at the Plant; and (iii) disposal of
by-product or waste generated in making
CD-Catalyst Products at the Plant,
unless CRI sells such by-product or waste,
in which case the $M_i$ shall not include any

- 40 -

expenses related to by-product or waste that is sold;

$X_i$ – the number of pounds of CD-Catalyst Products produced at the Plant in Contract Year i;

$Y_i$ – the number of pounds of off-specification products and scrap material produced in Contract Year i, except for such produced during Transitions that are reasonable in number and duration;

$Z_i$ – the number of pounds of CD-Catalyst Products delivered to Amoco in accordance with this Agreement in Contract Year i that were produced at the Plant in Contract Year i;

$K_{(i-n)} \ldots K_{(i-1)}$ – the number of pounds of CD-Catalyst Products delivered to Amoco in accordance with this Agreement in Contract Year i that were drawn from inventory and produced at the Plant respectively in each Contract Year from $(i-n)$ through $(i-1)$; and

$n$ – the number of Contract Years after the chronologically first Contract Year in which CD-Catalyst Products, remaining in inventory at the end of Contract Year $(i-1)$, were

- 41 -

produced at the Plant, including Contract
Year i (e.g., if i — 7 and the
chronologically first Contract Year in which
CD-Catalyst Products remaining in inventory
were produced was the third Contract Year,
then n — 4).

For purposes of the foregoing, CD-Catalyst Products
shall be deemed to be drawn out of inventory on a FIFO
(first in, first out) basis; CD-Catalyst Products in
inventory produced in the chronologically earliest
Contract Year shall be deemed to be the first
CD-Catalyst Products drawn out of inventory. Any
CD-Catalyst Products delivered to Amoco in Contract
Year i that were drawn from inventory and produced at
the Plant prior to or during the calendar month of
Mechanical Performance shall not be included in the
$VC_i$; such CD-Catalyst Products shall be treated in
accordance with Article 7.B.(4) and Article 7.C.(1).
Any CD-Catalyst Products delivered to Amoco in Contract
Year i that were produced at the Plant after the
calendar month of Mechanical Performance but prior to
Plant Start-up shall be deemed, for purposes of the $X_i$,
$Z_i$, and $K_{(i-n)} \ldots K_{(i-1)}$, to have been produced in the
first Contract Year, subject to Article 7.C.(2), but
without adding any of the expenses involved in
producing those pounds to the $M_i$ for the first Contract
Year.

- 42 -

No other costs or expenses shall be included in the $VC_i$. In particular, but without limitation, no costs or expenses arising from or related to a breach of an express warranty contained in Article 11.A or 11.B, no payments to Amoco pursuant to this Agreement, no costs or expenses of debt incurred by CRI, and no costs or expenses arising under the R&D Agreement, shall be included in the $VC_i$.

(8). $U_i$ —    the total number of pounds of Raw Materials whose expenses are included in the actual $M_i$ for such Contract Year, multiplied by the ratio

$$\frac{X_i}{X_i + Y_i}$$

for such Contract Year (as those terms are defined in the definition of $VC_i$).

(9). $T_i$ —    the average of the per pound prices paid by CRI directly to Third Party Suppliers or to Phillips for the pounds of Raw Materials represented by the $U_i$ for such Contract Year (i.e. the total Raw Materials expenses included in the actual $M_i$ for such Contract Year, first multiplied by the ratio $\frac{X_i}{X_i + Y_i}$ for such Contract Year (as those terms are defined in the definition of $VC_i$), and then divided by the $U_i$ for such Contract Year).

(10). * —    a multiplication sign (e.g., A*(II) means A times or multiplied by the II).

- 43 -

7.B. (1). For deliveries in accordance with this Agreement in any of Contract Years one (1) through ten (10), of CD-Catalyst Products produced at the Plant after the last day of the calendar month of Mechanical Performance, the per unit price shall be calculated according to the following formulae, subject to paragraphs C and D below and any agreed upon reduction under Article 11.A:

for pounds up to
and including the amount
of Amoco's Minimum Quantity
(herein referred
to as the "Tier 1 Price"):

$$P_i = \frac{VC_i}{Q_i} + \frac{FC_i + A*(II)}{70,000}$$

for pounds over and above the
amount of Amoco's Minimum
Quantity up to and
including 150,000 (herein
referred to as the "Tier
2 Price"):

$$P_i = \frac{VC_i}{Q_i} + \frac{B*(II)}{150,000 - 70,000}$$

for pounds in excess of
150,000 where no project
pursuant to Article 8.C
has been undertaken, or pounds
in excess of: [150,000 plus
incremental capacity agreed
beforehand to result from
projects paid for and completed
by CRI pursuant to Article 8.C]
(herein referred to as the "Tier
3 Price"):

$$P_i = \frac{VC_i}{Q_i} + \frac{3.0\%(II)}{Q_i}$$

for pounds of incremental
capacity agreed beforehand
to result from projects
paid for and completed by
CRI pursuant to Article 8.C
(herein referred to as the
"Tier 4 Price"):

$$P_i = \frac{VC_i}{Q_i} + \frac{B*(II)}{150,000 - 70,000}$$

for pounds of incremental
capacity from projects paid
for and completed by Amoco
pursuant to Article 8.C
(herein referred to as

- 44 -

the "Tier 5 Price"):

$$P_i \quad = \quad \frac{VC_i}{Q_i}$$

The value for A in the Tier 1 Price formula above shall be the lesser of: 20.19%; or the value for A calculated in accordance with (a) below. The value for B in the Tier 2 and 4 Price formulae above shall be the lesser of: 11.45%; or the value for B calculated in accordance with (a) below. For purposes of (a) below, (i) all costs for the Plant incurred by CRI prior to signature of this Agreement which are included in the II under Article 2.B.(1), (2) and (4) (subject to Article 2.B.(6)), shall be deemed to have been incurred on the first day, after the date of signature of this Agreement, on which CRI incurs costs for the Plant included in the II under Article 2.B.(1) (prior to application of Article 2.B.(6)); (ii) any costs to be included in the II under Article 2.B.(5) or otherwise (prior to application of Article 2.B.(6)) that will be incurred after Plant Start-up shall be deemed to have been incurred in the first Contract Year; (iii) if Plant Start-up did not occur by the earlier of the first day of the calendar month immediately following the calendar month in which falls the date that is fifty (50) days after the chronologically first calendar date by which at least ninety five percent (95%) of costs for the Plant included in the II under Article 2.B.(1), (2) and (5) (prior to application of Article 2.B.(6)) had been incurred, or February 1, 1994, such earlier date hereinafter referred to as the "Removal Date", whatever the reason for Plant Start-up not occurring by the Removal Date, then: the period from the Removal Date until Plant Start-up shall be removed in determining when CRI incurred costs for the Plant (so, e.g., costs "incurred by CRI prior to Plant Start-up", referred to in (a) below, would mean

- 45 -

costs incurred prior to the Removal Date; and the period from "the first day of the twenty fourth (24th) calendar month immediately preceding Plant Start-up to the day before Plant Start-up," referred to in (a) below, after removing the period from the Removal Date until Plant Start-up, would be the period from the first day of the twenty fourth (24th) calendar month immediately preceding the Removal Date to the day before the Removal Date); a "Year" (as used in Exhibit 3) for the time prior to Plant Start-up shall be any period of twelve (12) consecutive calendar months ending on the day before the Removal Date, or ending on the same calendar date in previous calendar years; and any costs for the Plant incurred by CRI during the period from the Removal Date to Plant Start-up, which are included in the II under Article 2.B.(1), (2) and (5) (prior to application of Article 2.B.(6)), shall be deemed to have been incurred in the first Contract Year; and (iv) the values for A and B shall be expressed as percentages, and shall be rounded to two decimal places (e.g., A = 19.07%).

      (a) If all costs for the Plant included in the II under Article 2.B.(1), (2), (4) and (5) (prior to application of Article 2.B.(6)) incurred by CRI prior to Plant Start-up, were incurred within the period from the first day of the twenty fourth (24th) calendar month immediately preceding Plant Start-up to the day before Plant Start-up,

$$A = 15.77\% + 6.51\% \left[ \frac{X_1}{II} \right] + 3.07\% \left[ \frac{X_2}{II} \right]$$

$$B = 6.69\% + 7.20\% \left[ \frac{X_1}{II} \right] + 3.19\% \left[ \frac{X_2}{II} \right].$$

- 46 -

where $X_1$ is as defined in paragraph 1.(k) of Exhibit 3 for the chronologically first Year (as "Year" is used in Exhibit 3) in which CRI incurred costs for the Plant which were included in the II;

$X_2$ is as defined in paragraph 1.(k) of Exhibit 3 for the chronologically second Year (as "Year" is used in Exhibit 3) in which CRI incurred costs for the Plant which were included in the II; and

all of this sub-paragraph (a) is subject to (i), (ii), (iii) and (iv) above.

(2). For deliveries in accordance with this Agreement in any of Contract Years eleven (11) through fifteen (15), of CD-Catalyst Products produced at the Plant after the last day of the calendar month of Mechanical Performance, the per unit price shall be calculated according to the following formulae, subject to paragraph D below and any agreed upon reduction under Article 11.A:

Tier 1 Price: $\quad P_i = \dfrac{VC_i}{Q_i} + \dfrac{FC_i + 46.7\%(TV)}{70,000}$

Tier 2 Price: $\quad P_i = \dfrac{VC_i}{Q_i} + \dfrac{10.5\%(TV)}{150,000 - 70,000}$

Tier 3 Price: $\quad P_i = \dfrac{VC_i}{Q_i} + \dfrac{3.0\%(TV)}{Q_i}$

- 47 -

Tier 4 Price:
$$P_i = \frac{VC_i}{Q_i} + \frac{10.5\%(TV)}{150,000 - 70,000}$$

Tier 5 Price:
$$P_i = \frac{VC_i}{Q_i}$$

(3). For deliveries in accordance with this Agreement in any Contract Year after the fifteenth (15th), of CD-Catalyst Products produced at the Plant after the last day of the calendar month of Mechanical Performance, the per unit price shall be calculated according to the following formula, subject to paragraph D below and any agreed upon reduction under Article 11.A:

$$P_i = \frac{x + y}{.78},$$

where $x =$ the lesser of (i) the average of the actual $VC_i$ for the previous three (3) Contract Years, such average multiplied by the ratio

$$\frac{W_i}{W_{(i-1)}},$$

or (ii) the actual $VC_i$ for the Contract Year in question, such lesser amount divided by the actual $Q_i$ for the Contract Year in question; and

$y =$ the lesser of (i) the average of the actual $FC_i$ for the previous three (3) Contract Years (but in no event shall the $FC_i$ for each such Contract Year to be averaged be greater than the maximum amount for such Contract Year provided under the definition

- 48 -

of $FC_i$), such average multiplied by the

ratio

$$\frac{W_i}{W_{(i-1)}} .$$

or (ii) the actual $FC_i$ for the Contract

Year in question (but in no event greater

than the maximum amount for such Contract

Year provided under the definition of $FC_i$),

such lesser amount divided by the actual $Q_i$

for the Contract Year in question.


(4).(a)   For deliveries of CD-Catalyst Products produced at the

Plant prior to or during Mechanical Performance, and

requested and accepted by Amoco, the per unit price

shall be calculated according to the following formula:

$$H = \frac{M_i}{X_i + Y_i} .$$

where $H =$   the price in U.S. dollars per

pound of CD-Catalyst Product; and


$M_i$, $X_i$ and $Y_i$ have the same meanings as in

the definition of $VC_i$ in Article 7.A,

except that the words "Contract Year"

wherever they appear in such definitions of

$M_i$, $X_i$, and $Y_i$ are deleted, and i =

(instead of a Contract Year) the period

beginning with the first production of

CD-Catalyst Products and extending through

the last day of Mechanical Performance.

- 49 -

    (b)   For deliveries of CD-Catalyst Products produced at the Plant after Mechanical Performance but prior to the first day of the calendar month immediately following the calendar month of Mechanical Performance, and requested and accepted by Amoco, the per pound price shall be $110.

(5). For Contract Years one (1) through fifteen (15), if and when Amoco's requirements for CD-Catalyst Products approach Demonstrated Plant Capacity, Amoco and CRI will discuss Demonstrated Plant Capacity.

7.C. (1). CRI shall invoice Amoco, promptly after each delivery in accordance with this Agreement of CD-Catalyst Products produced at the Plant after the calendar month of Mechanical Performance, using the appropriate formula under paragraph B above and in accordance with paragraph D below, reduced by any agreed upon amount under Article 11.A and subject to (2) below. Deliveries of CD-Catalyst Products, produced at the Plant after the calendar month of Mechanical Performance, shall be presumed for invoicing purposes only to be in or during a Contract Year, subject to (2) below. For deliveries of CD-Catalyst Products produced at the Plant prior to or during the calendar month of Mechanical Performance, after all such deliveries are completed, CRI shall issue one invoice to Amoco for all such deliveries, using the formula under paragraph B.(4).(a) and/or the price under paragraph B.(4).(b), as appropriate. Subject to (2) below, and to Article 6.D.(1), Article 11.A.(3) and Article 15, each invoice

- 50 -

shall be due and payable net thirty (30) days from the date of receipt of the invoice.

(2). If CRI has not produced, within six (6) months of the first day of the calendar month immediately following the calendar month of Mechanical Performance, at least two thousand eight hundred eighty five (2,885) pounds in the aggregate of CD-Catalyst Products at the Plant in a period of seven (7) consecutive days, then the per unit price calculated according to the formula set forth below shall apply retroactively to all CD-Catalyst Products produced after the calendar month of Mechanical Performance but prior to Plant Start-up. CRI shall within ten (10) days of the end of such six (6) month period, and of the end of each calendar month thereafter if such production has not yet occurred, pay to Amoco the amount of the difference between the Tier 1 price that has been invoiced under (1) above and the price applicable under the formula set forth below, for the number of pounds of CD-Catalyst Products produced in the calendar month whose first day is five (5) months before the first day of the calendar month just ended. Amoco may elect to offset and deduct such amount from the next invoice from CRI.

$$H = \frac{M_i + c}{X_i + Y_i} .$$

where $H =$ the price in U.S. dollars per pound of CD-Catalyst Product, under this paragraph (2);

- 51 -

c —    the total of those expenses set forth in
paragraphs 1 and 2 of Exhibit 4 incurred by
CRI during a calendar month after the
calendar month of Mechanical Performance
but prior to Plant Start-up, for the
CD-Catalyst Product production of such
month CRI must pay, or Amoco may deduct, an
amount pursuant to this paragraph (2); and

$M_i$, $X_i$, and $Y_i$ have the same meanings as in
the definition of $VC_i$ in Article 7.A,
except that the words "Contract Year"
wherever they appear in such definitions
of $M_i$, $X_i$ and $Y_i$ are deleted, and i — the
same calendar month referred to in the
definition of c.

7.D. (1). The $P_i$ to be used for invoicing Amoco for deliveries made
in accordance with this Agreement during a Contract Year, of
CD-Catalyst Products produced at the Plant after the last day of
the calendar month of Mechanical Performance, shall be calculated
according to the appropriate formula in paragraph B above, using
the following values but reduced by any agreed upon amount under
Article 11.A and subject to Article 7.C:

(i)  $Q_i$

The $Q_i$ to be used for invoicing for such deliveries during a
Contract Year shall be Amoco's estimate of the quantities of

- 52 -

CD-Catalyst Products which it anticipates it will purchase in such Contract Year, notified to CRI during the month preceding the first month of such Contract Year pursuant to Article 6.A.

(ii) $VC_i$

-- For such deliveries during the first (1st) Contract Year, CRI's best good faith estimate of the $VC_i$ for such Contract Year shall be used for invoicing, which estimate CRI shall notify to Amoco no later than Plant Start-up.

-- For subsequent Contract Years through the fifteenth (15th), the $VC_i$ to be used for invoicing for such deliveries during a Contract Year shall be the actual $VC_i$ for the previous Contract Year. For Contract Years after the fifteenth (15th), the $VC_i$ to be used for invoicing for such deliveries during a Contract Year shall be the average of the actual $VC_i$ for the previous three (3) Contract Years.

(iii) $FC_i$

-- For such deliveries during the first (1st) Contract Year, CRI's best good faith estimate of the $FC_i$ for such Contract Year shall be used for invoicing, which estimate CRI shall notify to Amoco no later than Plant Start-up and which shall be no greater than the maximum amount for Contract Year 1 provided under the definition of $FC_i$.

- 53 -

-- For subsequent Contract Years through the fifteenth (15th), the $FC_i$ to be used for invoicing for such deliveries during a Contract Year shall be the actual $FC_i$ for the previous Contract Year, but shall in no event be greater than the maximum amount for such previous Contract Year provided under the definition of $FC_i$. For Contract Years after the fifteenth (15th), the $FC_i$ to be used for invoicing for such deliveries during a Contract Year shall be the average of the actual $FC_i$ for the previous three (3) Contract Years (but in no event shall the $FC_i$ for each such Contract Year to be averaged be greater than the maximum amount for such Contract Year provided under the definition of $FC_i$).

(v)  II

The II to be used for invoicing for such deliveries during a Contract Year shall be the operative II under Article 2.B.(6).(b), unless costs which will be included in the II under Article 2.B are not yet incurred by the first day of the calendar month following the calendar month of Mechanical Performance, in which event CRI's best good faith estimate of the operative II as defined under Article 2.B.(6).(b) shall be used for invoicing until such operative II is known. Once such operative II is known, it shall be used for invoicing, and CRI shall immediately calculate the difference between the price already invoiced using CRI's best estimate of the operative II, and the price using the

- 54 -

operative II, for the number of pounds of CD-Catalyst Products invoiced using CRI's best estimate. CRI shall notify the above calculations to Amoco within ten (10) days following the date the operative II is known, and shall credit or debit, as appropriate, Amoco for the difference in the next invoice to Amoco.

(2). Within thirty (30) days following the end of any Contract Year (even if after the effective date of termination of this Agreement), CRI shall notify Amoco of the actual $U_i$, $T_i$, $FC_i$ and $VC_i$ (and each component of the actual $VC_i$: the actual $M_i$ and each component thereof, $Z_i$, $X_i$, $Y_i$, $K_{(i-n)}$, etc.) for such Contract Year, and the net financial return (as such term is defined in Article 5.D) from any alternate use of the Plant made in such Contract Year.

(3). After any Contract Year through the fifteenth (15th), CRI shall recalculate the $P_i$ for such Contract Year, using the actual $Q_i$, and the actual $FC_i$ (but in no event greater than the maximum amount for such Contract Year provided under the definition of $FC_i$), for such Contract Year, the operative II for such Contract Year under Article 2.B.(6).(b), and the appropriate formula for the pounds in question (Tier 1, 2, 3, 4 or 5 Price). For the first (1st) Contract Year only, the entire actual $VC_i$ for such Contract Year shall be used in such recalculation. For subsequent Contract Years through the fifteenth (15th), the $VC_i$ to be used in such recalculation shall be the actual $VC_i$ for such Contract Year, except that in the $\dfrac{(M_i)(Z_i)}{X_i + Y_i}$ term of the actual

- 55 -

$VC_i$ for such Contract Year, all Raw Materials expenses included in the actual $M_i$ of such term of the actual $VC_i$ for the previous Contract Year shall be substituted for all Raw Materials expenses included in the actual $M_i$ of such term of the actual $VC_i$ for such Contract Year. (Any Raw Materials expenses in the actual $VC_i$ for such Contract Year by virtue of CD-Catalyst Products produced in earlier Contract Years having been drawn from inventory and delivered in that Contract Year, remain in the $VC_i$ to be used in such recalculation; and any Raw Materials expenses in the actual $VC_i$ for the previous Contract Year by virtue of CD-Catalyst Products produced in Contract Years earlier than such previous Contract Year having been drawn from inventory and delivered in such previous Contract Year are not substituted into the $VC_i$ to be used in such recalculation.) The Raw Materials expenses included in the actual $M_i$ of such term of the $VC_i$ for such Contract Year, notified by CRI under (2) above, shall be part of the $VC_i$ to be used for invoicing for deliveries during the subsequent Contract Year (through the fifteenth (15th)) as set forth in (1).(ii) above, and shall result in an adjustment as set forth in (4) below.

After any Contract Year subsequent to the fifteenth (15th), CRI shall recalculate the $P_i$ for such Contract Year, using the actual $Q_i$ for such Contract Year and the amounts specified by the formula set forth in B.(3).

CRI shall notify any such recalculation to Amoco within thirty (30) days following the end of the Contract Year in question

- 56 -

(even if after the effective date of termination of this Agreement), and the difference between the applicable $P_i$ (Tier 1, 2, 3, 4 or 5 Price) as recalculated pursuant to this paragraph (3), and the $P_i$ invoiced under paragraph C.(1), for the number of pounds of CD-Catalyst Products delivered to Amoco in accordance with this Agreement during such Contract Year and invoiced at the $P_i$ under paragraph C.(1) (except that the recalculated Tier 1 Price shall not apply to any such pounds for which CRI has paid, or Amoco has deducted, an amount under Article 7.C.(2)). CRI shall credit or debit, as appropriate, Amoco for the difference in the next invoice to Amoco. If the amount of the credit due to Amoco is greater than the amount of such next invoice, CRI shall, at the same time it issues such next invoice, pay to Amoco the amount of the credit in excess of such next invoice. In the event this Agreement has terminated at the end of such Contract Year, Amoco or CRI, as the case may be, shall pay such difference between such recalculated $P_i$ and the invoiced $P_i$ for such number of pounds, to the other within thirty (30) days of the date of such notice of recalculation.

(4). In addition to such recalculation, within thirty (30) days following the end of the second (2nd) Contract Year and any subsequent Contract Year through the fifteenth (15th), CRI shall also calculate the following adjustment relating to the Raw Materials portion of the $\frac{(M_i)(Z_i)}{X_i + Y_i}$

term of the $VC_i$ used for invoicing for deliveries during such Contract Year. Such adjustment is intended to result in a sharing to a certain extent of efficiencies or inefficiencies in

- 57 -

the Plant's production of CD-Catalysts from Contract Year to Contract Year.

$VC_i$ Raw Materials adjustment:

$$\left[ \frac{\left[ \frac{U_{(i-1)}}{X_{(i-1)}} - \frac{U_i}{X_i} \right] T_{(i-1)}}{2} + \left[ T_{(i-1)} - T_i \right] \frac{U_i}{X_i} \right] X_i.$$

where i — the Contract Year just ended; and

$X_i$ — the same meaning as in the definition of $VC_i$.

CRI shall notify such adjustment and the calculations therefor to Amoco within thirty (30) days following the end of the Contract Year (even if after the effective date of termination of this Agreement), and shall credit (if an adjustment is positive) or debit (if an adjustment is negative), as the case may be, Amoco for the amount of the adjustment (in dollars) in the next invoice to Amoco. In the event this Agreement has terminated at the end of such Contract Year, Amoco (if an adjustment is negative) or CRI (if an adjustment is positive), as the case may be, shall pay the amount of such adjustment (in dollars) to the other within thirty (30) days of the date of such notice.

7.E. Exhibit 5, which is attached hereto and made a part hereof, sets forth various examples of calculations and recalculations under this Article.

7.F. CRI shall use its best efforts to minimize its variable and fixed costs (its actual $VC_i$ and $FC_i$) in the production of CD-Catalyst

- 58 -

Products, including, but not limited to, paying no higher than
market or, in the absence of market, other reasonable prices, for
Raw Materials, other materials and supplies, Utilities and
disposal of by-product or waste. To this end CRI shall consult
with Amoco on a monthly basis regarding its variable and fixed
costs and means of reducing such. CRI shall not maintain
inventories of Raw Materials or Packaging beyond what is
reasonably necessary to fulfill its obligations under this
Agreement.

7.G. CRI shall keep accurate and complete books, records and accounts
regarding its variable and fixed costs for producing CD-Catalyst
Products including, without limitation, the amount of
off-specification product and scrap material produced.

Article 8.   Future Capital Investments

8.A. (1). For any Contract Year through the fifteenth (15th), if as
the result of any regulation, statute, law, order, ruling or
action of any government, whether federal, state or local, or any
agency, branch, division or subdivision of any such government,
or any directive of Phillips applicable to all of Phillips'
chemical-related operations and to CRI and all of CRI's
chemical-related Affiliates, enacted or made after Plant
Start-up, additional actual, direct, out-of-pocket costs for the
purchase, construction and installation of Fixed Assets are
required for CRI's performance under this Agreement, other than
such costs arising from or related to a breach of any warranty

- 59 -

contained in Article 11.A or 11.B, then in such event and such
event alone, such costs (excluding, except to the extent
permitted under (c) below, any CRI and CRI Affiliate employee
expenses involved in such purchase, construction and
installation, and only such costs necessary for and related
exclusively to complying with such regulation, law, ruling,
action or directive), for any Contract Year through the fifteenth
(15th), shall be treated as follows:

(a)  To the extent all such costs for all projects required
     pursuant to A.(1) above, but excluding costs for projects
     referred to in A.(1).(c) below, are less than two hundred
     and fifty thousand dollars ($250,000) in total in any one
     Contract Year, CRI shall incur such costs. CRI shall give
     notice to Amoco of each such project and of such costs it
     incurs, and one-tenth (1/10th) of Amoco's share (as set
     forth in (3) below) of such out-of-pocket costs incurred by
     CRI, directly to Third Party Suppliers, for each such
     project shall be added to the actual $FC_i$ (as such term is
     defined in Article 7) for the Contract Year in which each
     such project is completed and each of the subsequent nine
     (9) Contract Years. The amount of Amoco's payment
     obligations hereunder shall not otherwise be affected; any
     other costs or expenses incurred by CRI in connection with
     the foregoing shall be for its own account and shall not be
     added to the II, $VC_i$ or $FC_i$.

- 60 -

(b) To the extent all such costs, for a particular project
believed by CRI to be required pursuant to A.(1) above, are
less than one million dollars ($1,000,000) but when added to
such costs for other projects under Article 8.A.(1),
including those undertaken pursuant to (a) above but
excluding those referred to in (c) below, the total such
costs for all such projects is two hundred and fifty
thousand dollars ($250,000) or more in any one Contract
Year, CRI shall notify Amoco of such proposed project before
any such costs are incurred, including the reason it is
required, whether it relates to, benefits or is required for
the Plant only or also other parts of CRI's Bayport
facilities or all the Bayport facilities as a whole, or for
an alternate use of the Plant under Article 5, and CRI's
best estimate of the total such costs for such project and
the accuracy ($\pm$ x %) of the estimate. If Amoco agrees such
project is required and agrees in writing as to the maximum
amount of such costs, such agreements not to be unreasonably
withheld, one-tenth (1/10th) of Amoco's share (as set forth
in (3) below), of such out-of-pocket costs incurred by CRI
in accordance with the foregoing, directly to Third Party
Suppliers, and up to the amount of the estimate plus the
percentage of the estimate representing its degree of
accuracy, shall be added to the actual $FG_i$ for the Contract
Year in which such project is completed and each of the
subsequent nine (9) Contract Years. The amount of Amoco's
payment obligations hereunder shall not otherwise be
affected; any other costs or expenses incurred by CRI in

- 61 -

connection with the foregoing shall be for its own account
and shall not be added to the II, $VC_i$ or $FC_i$.

(c)    To the extent all such costs, for a particular project
believed by CRI to be required pursuant to A.(1) above, plus
Phillips Corporate Engineering Expenses for overseeing
engineering aspects of such project, are in total one
million dollars ($1,000,000) or more, CRI shall give Amoco
notice containing the same particulars as in (b) above
before any such costs are incurred.  If Amoco agrees such
costs are required, such agreement not to be unreasonably
withheld, CRI shall proceed with such project, and, except
as otherwise provided in (3) below, one-tenth (1/10th) of
Amoco's share (as set forth in (3) below and in the
remainder of this paragraph) of the sum of: (i) the total of
such out-of-pocket costs incurred by CRI in accordance with
the foregoing, directly to Third Party Suppliers, plus (ii)
Phillips Corporate Engineering Expenses for overseeing
engineering aspects of such project; shall be added to the
actual $FC_i$ for the Contract Year in which such project is
completed and each of the subsequent nine (9) Contract
Years; provided, however, that Amoco's share of (i) plus
(ii) shall not in any case exceed one million dollars
($1,000,000).  The amount of Amoco's payment obligations
hereunder shall not otherwise be affected; any other costs
or expenses incurred by CRI in connection with the
foregoing, including all costs and expenses in excess of

- 62 -

Amoco's share as defined above, shall be for CRI's own account and shall not be added to the II, $VC_i$ or $FC_i$.

(2). For any Contract Year through the fifteenth (15th), if additional actual, direct, out-of-pocket costs for the purchase, construction, installation and/or repair of Fixed Assets are required to:

   (i) improve the safety or hygiene, or environmental fitness, of the Plant, in order to comply with CRI's standards and practices applicable to all of its Bayport facilities;

   (ii) improve the efficiency or operability of the Plant, in order to comply with CRI's standards and practices applicable to all of its Bayport facilities; or

   (iii) repair or replace a Fixed Asset, whose cost is included in the II (prior to application of Article 2.B.(6)), that has broken down or ceased to operate properly;

such costs (excluding any CRI and CRI Affiliate employee expenses involved in such purchase, construction, installation and/or repair, and only such costs necessary for and related exclusively to accomplishing (i), (ii) or (iii) above), for any Contract Year through the fifteenth (15th), shall be treated as follows:

- 63 -

(a) To the extent all such costs for all projects required
pursuant to (i), (ii) or (iii) above in any one
Contract Year are less than one hundred and fifty
thousand dollars ($150,000) in total, CRI may incur
such costs with one-tenth (1/10th) of Amoco's share (as
set forth in (3) below) of such out-of-pocket costs
incurred by CRI, directly to Third Party Suppliers, for
each such project, to be added to the actual $FC_i$ for
the Contract Year in which each such project is
completed and each Contract Year thereafter up to a
maximum of ten (10) Contract Years for which additions
shall be made to the actual $FC_i$ for each such project.
The amount of Amoco's payment obligations hereunder
shall not otherwise be affected; any other costs or
expenses incurred by CRI in connection with the
foregoing shall be for its own account and shall not be
added to the II, $VC_i$ or $FC_i$. CRI shall give notice to
Amoco of each project undertaken pursuant to the above
and of such costs it incurs.

(b) To the extent all such costs for all projects required
pursuant to (i), (ii) or (iii) above in any one
Contract Year are one hundred and fifty thousand
dollars ($150,000) or more in total, or if such costs
are otherwise required for CRI's performance under this
Agreement but do not fall under (i), (ii) or (iii)
above, then, if a particular project falls under
paragraph A.(1) above, C or D below, or Article

- 64 -

2.B.(5). CRI may proceed in accordance with such paragraph A.(1), C or D, or Article 2.B.(5). CRI may in any case undertake such project, but other than as provided under paragraph A.(1), A.(2).(a), C or D, or Article 2.B.(5), any costs or expenses incurred by CRI in so doing shall be for its own account, shall not be added to the II, $VC_i$ or $FC_i$, and shall in no way affect the amount of Amoco's payment obligations hereunder.

(3). If such costs are incurred for any Fixed Asset or project pursuant to (1).(a), (b) or (c) or (2).(a) above and such Fixed Asset or project relates to, benefits or is required for CRI's Bayport facilities as a whole or parts of such facilities other than the Plant, or for an alternate use of the Plant under Article 5, or such Fixed Asset or project is larger than required pursuant to (1).(a), (b) or (c) or (2).(a) above, then in either case only the pro rata share (as defined below) of such out-of-pocket costs incurred by CRI, directly to Third Party Suppliers, for such Fixed Asset or project, and not including any Phillips Corporate Engineering Expenses, shall be Amoco's share for purposes of calculating the addition to the $FC_i$. Otherwise Amoco's share shall be the total of such costs (plus, in the case of (1).(c), applicable Phillips Corporate Engineering Expenses). The pro rata share of such costs for purposes of the foregoing shall be agreed by CRI and Amoco but shall not in any case exceed the portion of the capacity of such Fixed Asset utilized in the manufacture of CD-Catalyst Products. Notwithstanding the above,

- 65 -

Amoco's share under (1).(c) above shall not exceed one million
dollars ($1,000,000).

Should any such Fixed Asset or project, at any time after such
costs or expenses are incurred, relate to, benefit or be required
for CRI's Bayport facilities as a whole or parts of such
facilities other than the Plant, at such time CRI shall
recalculate the addition to the $FC_i$ to include only the pro rata
share, as defined above, of the out-of-pocket costs incurred by
CRI, directly to Third Party Suppliers, for such Fixed Asset or
project. The recalculated addition to the $FC_i$ shall be operative
hereunder for the Contract Year of such recalculation and
subsequent Contract Years.

(4). If such costs as referred to in (1) or (2).(a) above are
required after the fifteenth (15th) Contract Year for CRI's
performance under this Agreement, CRI shall have sole
responsibility for such costs; any such costs shall be for CRI's
account and shall not be added to the II, $FC_i$ or $VC_i$ and shall in
no way affect the amount of Amoco's payment obligations
hereunder.

8.B. In the event only that Amoco (as opposed to CRI) terminates this
Agreement pursuant to any provision of this Agreement other than
Article 6.E or 14, within thirty (30) days of the date of receipt
of an invoice issued by CRI after the effective date of
termination for the following, Amoco shall pay to CRI, for each
particular project (and only for such projects) for which CRI

- 66 -

incurs costs in accordance with paragraph A.(1).(a) or (b) above, or paragraph E below, the amount resulting from application of the following formula:

$$(10 - x)y,$$

where x — the number of Contract Years for which additions to the actual $FC_i$ have been made for a particular project pursuant to paragraph A.(1).(a) or (b) above, or paragraph E below (starting with and including the Contract Year in which the project was completed); and

y — the amount to be added to the $FC_i$ the last Contract Year hereunder under paragraph A.(1).(a) or (b), or paragraph E.

If this Agreement ends in any other manner the payment set forth above shall not be required.

8.C. At any time CRI may propose to Amoco a project involving costs for the design, engineering, purchase, construction and installation of Fixed Assets in order to increase the capacity of the Plant. CRI shall include in such proposal its good faith estimate of the total such costs, and of the incremental Plant capacity to result. Amoco may also propose to CRI at any time a project involving such costs for increasing the capacity of the Plant. Prior to Contract Year 16, CRI shall not incur any such

- 67 -

costs without Amoco's prior agreement in writing as to such project, including its prior agreement on the amount of the incremental Plant capacity to result from the project. Any such costs incurred at any time by CRI in order to increase the capacity of the Plant shall be for its own account, shall not be added to the II, $FC_i$ or $VC_i$ and shall in no way affect the amount of Amoco's payment obligations hereunder, except to the extent that the Tier 4 Price under Article 7 applies. CRI shall notify Amoco of any such project undertaken and of its completion.

If CRI declines to proceed with a project proposed by Amoco to increase the capacity of the Plant, Amoco may agree to pay for all such costs (excluding any CRI and CRI Affiliate employee expenses), in which case the parties shall proceed with the project. The amount of Amoco's other payment obligations hereunder shall be unaffected, except to the extent that the Tier 5 price under Article 7 applies; any other costs or expenses of CRI incurred in connection with the foregoing shall be for its own account and shall not be added to the II, $FC_i$ or $VC_i$.

8.D. At any time either CRI or Amoco may propose a project involving costs for the design, engineering, purchase, construction and installation of Fixed Assets, or modification of existing Fixed Assets, in order to reduce the actual $VC_i$ or actual $FC_i$ (as such terms are defined in Article 7), either by way of reducing the rate of usage of Raw Materials or Utilities, achieving Plant efficiencies, or otherwise. For any Contract Year through the fifteenth (15th), no such costs shall be incurred without the

- 68 -

agreement in writing of both parties. For any Contract Year
through the fifteenth (15th), should both parties so agree, all
such out-of-pocket costs incurred (exclusive of any CRI and CRI
Affiliate employee expenses), directly to Third Party Suppliers,
shall be shared equally, and the amount of Amoco's other payment
obligations hereunder shall be unaffected. Any other costs or
expenses of CRI incurred in connection with the foregoing shall
be for its own account and shall not be added to the II, $FC_i$ or
$VC_i$. Any such costs incurred after the fifteenth (15th) Contract
Year shall be the sole responsibility of CRI; any such costs
shall be for CRI's account and shall not be added to the II, $FC_i$
or the $VC_i$ and shall in no way affect the amount of Amoco's
payment obligations hereunder.

8.E. (1). CRI shall take whatever steps are necessary, including
incurring necessary costs and expenses, with all possible
promptness and diligence, for it to (i) meet any change in
specification requested by Amoco for any CD-Catalyst Product type
and be able to commercially manufacture products conforming to
such changed specifications at the Plant, and (ii) be able to
commercially manufacture at the Plant CD-Catalyst of any new type
and conforming to specifications for such new type requested by
Amoco and not contained in Exhibit 2; provided that the total,
direct, out-of-pocket costs incurred by CRI, directly to Third
Party Suppliers, for the design, engineering, purchase,
construction and installation of Fixed Assets (excluding any CRI
and CRI Affiliate employee expenses involved in such design,
engineering, purchase, construction and installation) necessary

- 69 -

for and related exclusively to meeting any such changed
specifications and being able to commercially manufacture
products conforming to such changed specifications at the Plant,
or being able to commercially manufacture at the Plant
CD-Catalyst of any such new type and conforming to specifications
for such new type, does not exceed, in any one Contract Year,
$100,000; and provided further that being able to commercially
manufacture products that conform to such changed specifications
or to the specifications for such new type, turns out to be
Technically Feasible, unless CRI agrees otherwise. If such does
not turn out to be Technically Feasible, however, then Amoco's
Minimum Quantity for any Contract Year hereunder through the
tenth (10th) Contract Year shall be reduced by the number of
pounds of such changed specification product or of CD-Catalyst of
such new type that Amoco uses in that Contract Year. If the
above conditions are met, such changed specifications and such
new type of CD-Catalyst shall be new CD-Catalyst Product types
hereunder. If such changed specifications are changes to a
CD-Catalyst Product type set forth in Exhibit 2, Exhibit 2 shall
be deemed to be supplemented by such new CD-Catalyst Product
type. The costs and expenses incurred by CRI pursuant to the
foregoing shall be for CRI's account, shall not be added to the
II, $VC_i$ or $FC_i$ and shall in no way affect the amount of Amoco's
payment obligations hereunder.

(2). If the total such cost for meeting such changed
specifications and being able to commercially manufacture
products conforming to such changed specifications at the Plant,

- 70 -

or being able to commercially manufacture at the Plant CD-Catalyst of such new type and conforming to specifications for such new type, will exceed, in any one Contract Year, $100,000, CRI shall notify Amoco of such prior to incurring any such costs, including CRI's good faith estimate of the total such cost.

(a) With regard to requested changes in specifications, if thereafter requested by Amoco, and subject to an agreement in writing as to the maximum amount of such costs (which shall be exclusive of CRI and CRI Affiliate employee expenses), CRI shall take the necessary steps to meet such changes and be able to commercially manufacture products conforming to such changed specifications at the Plant with all possible promptness and diligence. Such changed specifications shall be a new CD-Catalyst Product type hereunder. If such changed specifications are changes to a CD-Catalyst Product type set forth in Exhibit 2, Exhibit 2 shall be deemed to be supplemented by such new CD-Catalyst Product type. One-tenth (1/10th) of: only such out-of-pocket costs incurred by CRI, directly to Third Party Suppliers, up to the agreed maximum and to the extent, when added to any costs incurred under (1) above or (2),(b) below in the Contract Year in which the project in question under this paragraph is completed, in excess of $100,000; shall be added to the actual $FC_1$ for the Contract Year in which such project is completed and each of the nine (9) subsequent Contract Years. The amount of Amoco's payment obligations hereunder shall not otherwise be affected; any other costs

- 71 -

or expenses of CRI incurred in connection with the foregoing shall be for its own account and shall not be added to the II, $VC_i$ or $FC_i$.

(b) With regard to CD-Catalyst of a new type requested by Amoco and not contained in Exhibit 2, if either (i) Amoco's good faith estimate of the cost for Amoco internally to purchase, construct and install Fixed Assets necessary for and related exclusively to Amoco being able to commercially manufacture CD-Catalyst of such new type not contained in Exhibit 2, or (ii) the cost for Amoco for the purchase, construction and installation of Fixed Assets necessary for and related exclusively to a third party being able to commercially manufacture CD-Catalyst of such new type for Amoco, as reflected by an offer from such third party, is less than such good faith estimate of CRI, Amoco shall notify CRI of such as well as the estimated time either Amoco or the third party would need to complete the project. CRI shall then notify Amoco within thirty (30) days of such notice whether it agrees to take the necessary steps to be able to commercially manufacture at the Plant CD-Catalyst of such new type and conforming to specifications for such new type at a total cost no greater than the lesser of (i) or (ii) above, and no later than the time estimated by Amoco or the third party. If CRI fails to give such notice within such time, or indicates in such notice that it cannot commercially manufacture at the Plant CD-Catalyst of such new type at such total cost by such time, then Amoco's

- 72 -

Minimum Quantity for any Contract Year hereunder through the tenth (10th) Contract Year shall be reduced by the number of pounds of CD-Catalyst of such new type that Amoco uses in that Contract Year. If CRI gives notice within such time that it can commercially manufacture at the Plant CD-Catalyst of such new type at a total cost no greater than the lesser of (i) or (ii) above by such time, and Amoco agrees in writing to such maximum cost, or if Amoco agrees in writing to the total cost previously notified by CRI or another maximum cost, CRI shall take such necessary steps with all possible promptness and diligence, and shall be able to commercially manufacture CD-Catalyst of such new type and conforming to specifications for such new type at the Plant no later than the time estimated by Amoco or the third party. Such new type of CD-Catalyst shall be a new CD-Catalyst Product type hereunder. One-tenth (1/10th) of: only the actual, out-of-pocket costs incurred by CRI, directly to Third Party Suppliers, for the design, engineering, purchase, construction and installation of Fixed Assets necessary for and related exclusively to it being able to commercially manufacture at the Plant CD-Catalyst Product of such new type (excluding any CRI and CRI Affiliate employee expenses involved in such design, engineering, purchase, construction and installation), up to the agreed maximum and to the extent, when added to any costs incurred under (1) or (2).(a) above in the Contract Year in which the project in question under this paragraph is completed, in excess of $100,000; shall be added to the

- 73 -

actual $FC_i$ for the Contract Year in which such project is completed and each of the nine (9) subsequent Contract Years. The amount of Amoco's payment obligations hereunder shall not otherwise be affected; any other costs or expenses of CRI incurred in connection with the foregoing shall be for CRI's account and shall not be added to the II. $VC_i$ or $FC_i$.

(3). If CRI incurs such out-of-pocket costs, directly to Third Party Suppliers, pursuant to either (a) or (b) of E.(2) above in excess of one million dollars ($1,000,000) for a particular project, for each Contract Year after the Contract Year in which such project is completed up to a maximum of nine (9) Contract Years, a simple interest charge calculated according to the following formula shall be added to the actual $FC_i$ for such Contract Year:

$$\left[x - \frac{xy}{10}\right] z,$$

where x — the total amount of such out-of-pocket costs incurred by CRI directly to Third Party Suppliers;

y — the number of Contract Years for which additions to the actual $FC_i$ have been made for the particular project pursuant to (a) or (b) of E.(2) above (starting with and including the Contract Year in which the project was completed); and

z — the average of the rates for Treasury bills and notes

- 74 -

maturing anytime in the calendar year in which the day
five years after the first day of the Contract Year in
question falls, as such rates are posted in the Wall
Street Journal published on the first day of the
Contract Year in question (or, if the Wall Street
Journal is not published on such day, as posted in the
next issue thereafter).

8.F. The fixed amounts referred to in paragraphs A.(1).(a), A.(2) and
E.(1), (2) and (3) (i.e. $250,000 in paragraphs A.(1).(a) and
(b); $150,000 in paragraph A.2; $100,000 in paragraphs E.(1) and
(2); and $1,000,000 in paragraph E.(3)), shall apply for Contract
Year 1 and, multiplied by the ratio $\dfrac{W_i}{W_1}$,

shall apply for each Contract Year thereafter.

8.G. CRI shall keep accurate and complete books, record and accounts
regarding any of the foregoing costs incurred.

Article 9.    Sampling and Certificates of Analysis

9.A. CRI shall give notice to Amoco when a shipment of CD-Catalyst
Products is to be made.  If thereafter requested by Amoco, CRI
shall ship a representative sample of each of the CD-Catalyst
Product lots to be shipped, of the amount requested by Amoco,
typically to be four (4) ounces but up to a maximum of two (2)
pounds, by air freight at CRI's cost to:

- 75 -

Amoco Chemical Company

Amoco Research Center, Mail Code C-3

Warrenville Road and Mill Street

Naperville, Illinois 60566

Attention: G. G. Arzoumanidis,

or to such other address or individual as may be designated in
writing by Amoco.

9.B. Within twenty-four (24) hours of each shipment of CD-Catalyst
Product hereunder, CRI shall send to Amoco a Certificate of
Analysis for CD-Catalyst Product of each type in the shipment
which shall contain the total slurry weight, if applicable; net
solids weight; the particle size distribution (e.g., $d_{10}$, $d_{50}$,
$d_{90}$); and the analyzed specifications for such CD-Catalyst
Product for a standard polymerization, i.e., polymer: yield,
bulk density, isotactic index and -100 mesh fines. The
Certificate of Analysis shall be sent via facsimile to such
person as designated in writing by Amoco.

9.C. CRI shall test each batch of products hereunder, prior to
shipment or placement into inventory, to determine whether they
meet the applicable CD-Catalyst Product type specifications
therefor, and shall deliver only products meeting the applicable
specifications.

9.D. CRI shall deliver only catalyst that is qualified for shipment,
as "qualified for shipment" is defined in Exhibit 2.

- 77 -

country of destination.

## Article 11. Warranties and Liabilities

11.A.   (1).   CRI warrants and represents, to Amoco, to Amoco

Corporation, and to companies one hundred percent (100%) owned,

directly or indirectly, by Amoco Corporation, which receive

products manufactured hereunder, that CRI has good and marketable

title to all products placed into inventory under Article 12 or

delivered to Amoco or Amoco designees hereunder, and that, at the

time of passage of title under Article 10.B, all such products

shall meet the applicable CD-Catalyst Product type specifications

therefor.

(2).   Upon notice from Amoco of a failure to meet specifications,

based upon correlating results of CRI's standard bulk

polymerization test and Amoco's polymerization tests (if any),

using testing procedures commonly accepted in the industry, CRI

shall take back immediately all products not meeting such

specifications, and replace them immediately with products

meeting such specifications, at no cost to Amoco, regardless of

the place of delivery of such products.  However, if the results

of Amoco's testing are incorrect and the products do meet the

specifications or if the products do not meet specifications at

the time of testing because of anything which occurs after title

to the products has passed to Amoco under Article 10.B, then CRI

shall have no obligation to take back or replace such products.

Notwithstanding the foregoing, Amoco shall have the option to

accept off-specification products, with a reduction in the per

- 78 -

unit price under Article 7 to be agreed upon. For those
off-specification products accepted by Amoco only, CRI shall be
deemed not to have warranted that those products shall meet the
applicable specifications as set forth above.

(3). For any delivery notified to CRI pursuant to Article 6.B.
with the place of delivery designated in such notice being a
location of a process licensee or of an entity not one hundred
percent (100%) owned, directly or indirectly, by Amoco
Corporation, whether or not identified as such, Amoco will
endeavor to limit the right of such entities to claim
consequential and special damages. To the extent any claims,
causes of action, lawsuits, costs, damages (including punitive
damages), losses, expenses (including all expenses of litigation
and attorneys' fees) or liabilities (including strict liability)
of such entities (hereinafter collectively referred to as
"Claims") arise from a breach by CRI of (i) its obligation under
Article 6.C or (ii) any of the warranties contained in Article
11.A.(1), and are incurred by, imposed or asserted against, or
claimed from Amoco, CRI shall be responsible for any and all such
Claims up to only a maximum amount of two million dollars
($2,000,000) per Claim if the Claim arises on or after the first
day of the sixth (6th) Contract Year or thereafter, or for any
and all such Claims up to only, per Claim, a maximum amount of
the invoice price under Article 7 of the full shipment giving
rise to the Claim, if the Claim arises on or after

- 79 -

the first day of the fourth (4th) Contract Year through the last day of the fifth (5th) Contract Year. To the extent a Claim arises from a breach by CRI of any of the warranties contained in Article 11.A.(1), CRI shall, in addition to the foregoing, immediately take back and replace all such non-conforming product at no cost to Amoco. For Claims arising prior to the last day of the third (3rd) Contract Year from a breach by CRI of any of the warranties contained in Article 11.A.(1), CRI's obligation shall be to immediately take back and replace all such non-conforming product. Amoco shall certify to CRI the amount of the Claim in question and shall have the right to offset and deduct such amounts certified from payments otherwise due to CRI under Article 7. Only one Claim based on a breach of the same warranty in Article 11.A.(1) may be made against CRI for each CD-Catalyst Product type in each shipment to a single location, irrespective of the number of cylinders containing product of that type in such shipment.

If a Claim arises from a failure by CRI to deliver the amounts of CD-Catalyst Products of the types notified to a place designated by a delivery date specified, as notified to CRI pursuant to Article 6.B, and such failure also gives rise to an amount owing to Amoco under Article 6.D.(1), any payment by CRI or deduction by Amoco for such a Claim up to the amount owing to Amoco under Article 6.D.(1), shall be deducted from the amount owing to Amoco under Article 6.D.(1). Otherwise, this paragraph (3) shall not apply to amounts owing under Article 6.D.(1).

- 80 -

If a product giving rise to a Claim meets the applicable
CD-Catalyst Product type specifications therefor at the time of
passage of title under Article 10.B, but the polypropylene made
using such product is considered deficient, CRI shall not be
responsible for any Claim based upon such product.

11.B.   (1). Except if this Agreement is terminated pursuant to Article
        2.A.(2), CRI warrants and represents that it shall obtain all
        necessary permits and licenses for its performance under this
        Agreement, that all products produced or delivered under this
        Agreement shall have been produced, packaged, labelled, stored,
        sold, shipped and delivered in compliance with, and that the
        Plant and all aspects of the Plant's construction and operation,
        including any waste disposal, shall at all times be in compliance
        with, all applicable local, state and/or federal laws, rules,
        orders, regulations, permits and licenses, including, without
        limitation,

        (i) the Toxic Substances Control Act; the Clean Air Act (42
        U.S.C. 7401 et seq); the Federal Water Pollution Control Act (33
        U.S.C. 1251 et seq); the Resource Conservation and Recovery Act
        (42 U.S.C. 6901 et seq); the Comprehensive Environmental
        Response, Compensation and Liability Act (42 U.S.C. 9601 et seq);
        the Occupational Safety and Health Act; and any other applicable
        environmental or worker health and safety laws, rules, orders or
        regulations;

        and

- 81 -

(ii) the Fair Labor Standards Act of 1938, as amended; Executive Order 11246 (Equal Employment Opportunity); Affirmative Action for Handicapped Workers, and for Disabled Veterans and Veterans of the Vietnam Era (41 C.F.R. 60-741.1 et seq; 41 C.F.R. 60-250.1 et seq); Federal Procurement Regulations relating to Minority Business Enterprises; and the Rehabilitation Act of 1973.

The reference to each of the foregoing enactments shall include any amendments to such acts or substitutions therefor and any implementing regulations or rules promulgated thereunder, in each case in effect from time to time.

(2). CRI further warrants and represents that it shall immediately notify Amoco of any and all formal notices of violation of any law, regulation, permit or license related to its performance hereunder, and any and all releases to the environment associated with its performance which are reportable to a governmental agency under applicable laws.

11.C. (1). Except for the warranties contained in Article 11.A or 11.B, CRI makes no other warranties, express or implied, in connection with the sale of the products hereunder to Amoco, and CRI specifically disclaims any warranty of merchantability or fitness for a particular purpose of the products sold hereunder to Amoco. CRI shall not be liable to Amoco for any consequential or special damages in connection with consumption or use of any CD-Catalyst Products purchased from CRI hereunder in Amoco's internal production of polypropylene, or in the internal production of

- 82 -

polypropylene of a company one hundred percent (100%) owned, directly or indirectly, by Amoco Corporation. An instance of (i) or (ii) under Article 6.D.(1) shall be deemed not to be in connection with consumption or use of CD-Catalyst Products; the limitations under this paragraph C.(1) do not apply to any instance of (i) or (ii) under Article 6.D.(1). The limitations under this paragraph C.(1) also do not apply to paragraph A.(3) above.

(2). Amoco shall not be liable to CRI for any consequential or special damages in connection with any matter arising under this Agreement.

11.D.    (1). Except as otherwise provided in Article 16, CRI and Amoco agree that CRI shall have sole and exclusive control over and responsibility and liability for, and Amoco shall have no responsibility or liability for, (i) all aspects of: design, engineering, construction and operation of the Plant (including Common Fixed Assets, as such term is defined in Article 1.K) and Plant Site (as defined in Article 1.K); Plant Start-up; production, storage, packaging, labelling, transportation, and delivery of products hereunder; the generation, release, discharge, emission, handling, treatment, storage and disposal from or at the Plant (including Common Fixed Assets) or Plant Site of wastes, by-products, hazardous substances, contaminants or pollutants, and arranging for the disposal of such, provided, however, that any disposal location shall be approved by Amoco (Amoco shall not, however, unreasonably withhold approval of a

- 83 -

disposal location proposed by CRI); and (ii) any other liability
arising from or at or related to the Plant (including Common
Fixed Assets) or to the Plant Site or to CRI employees or
employees of Third Party Suppliers.

(2). CRI shall defend, indemnify and hold harmless Amoco (and
Amoco Corporation and companies one hundred percent (100%) owned,
directly or indirectly, by Amoco Corporation, and any and all
officers, directors, agents and employees of any of them) from
and against any and all claims, causes of action, lawsuits,
costs, damages (including punitive damages), losses, expenses
(including all expenses of litigation and attorneys' fees) and
liabilities of every kind (including strict liability), arising
out of or related to those matters for which CRI is liable
pursuant to paragraph (1) above, or arising out of or related to
any breach by CRI of any of the express warranties contained in
Article 11.B of this Agreement (except those in Article
11.B.(1).(i)), (a) whether for or relating to property damage or
loss, personal injury, disease or death, contamination of or
adverse effects on the environment (whether such occurred before
or after execution of this Agreement), or otherwise, (b)
regardless of the person or entity who or which suffers or incurs
damage, loss, injury, cost or expense or who or which asserts a
claim, action or suit or when such a claim, action or suit is
asserted, and (c) without regard to the cause or causes thereof
and regardless of whether the damage, loss, injury, cost,
expense, claim, action or suit arises or is caused in whole or in
part from or by any fault or negligence (whether active or

- 84 -

passive, or sole, joint or concurrent) of Amoco or of its Affiliates or of any of its or their officers, directors, employees or agents, except only if and to the extent the damage, loss, injury, cost, expense, claim, action or suit arises from any fault or negligence (whether active or passive or sole, joint or concurrent) of Amoco or of its Affiliates or of any of its or their employees or agents in connection with a CD-Catalyst of a new type requested by Amoco and not contained in Exhibit 2 (per Article 8.E.(1).(ii) or 8.E.(2).(b)) and which was not Technically Feasible.

.11.E.   (1).   CRI shall indemnify, defend and hold harmless Amoco from and against any and all Environmental Claims (as defined in paragraph (3) below).  The foregoing indemnity shall extend to Amoco, Amoco Corporation, any company one hundred percent (100%) owned, directly or indirectly, by Amoco Corporation, any permitted assignees of Amoco, and any and all officers, directors, agents and employees of any of them (each an "Indemnitee").  Indemnification pursuant to this Article 11.E shall be made or given by CRI notwithstanding that an Environmental Claim is or was (i) forseeably caused or alleged to be caused, in whole or in part, (a) by the sole, joint or concurrent or comparative negligence, either active or passive, gross negligence or other fault of any Indemnitee or (b) without any fault of any Indemnitee or (ii) attributable to strict liability or no-fault liability of, or on the part of or with respect to, any Indemnitee.

- 85 -

(2). CRI shall have no obligation hereunder with respect to any Environmental Claim relating solely to events, conditions or circumstances which (a) first come into existence or which first occur after CRI, Phillips, and any of Phillips' Affiliates, all have ceased to be an owner of each of the Plant, the Plant Site, and Common Fixed Assets, and all have ceased to be an operator of each of the Plant, the Plant Site, and Common Fixed Assets, and (b) result from the sole negligence or other sole fault of a successor owner or operator of the Plant and Plant Site and the Common Fixed Assets (the parties hereto agreeing that as between them CRI shall have the burden of proving the existence of events, conditions or circumstances entitling CRI to avail itself of the foregoing limitation). Without limiting the generality of the foregoing, if a basis for actual recovery of any loss, damage or expense by any person or entity for an Environmental Claim with respect to the Plant, Plant Site, or Common Fixed Assets, as the case may be, is that an Indemnitee was an owner of the Plant, Plant Site, or Common Fixed Assets, and if at the same time CRI, Phillips, or any of Phillips' Affiliates, was also an owner or operator of the Plant, the Plant Site, or Common Fixed Assets, as the case may be, the limitation contained in the previous sentence shall not be applicable.

(3). An Environmental Claim shall mean any claim, cause of action, lawsuit, cost, damage (including punitive damages), loss, expense (including all expenses of litigation and attorneys' fees) and liability of every kind, which may be incurred by, imposed or asserted against, or claimed from, an Indemnitee,

- 86 -

whether attributable to periods of time before, on or after the date of signature of this Agreement, in any way arising out of or related to (a) the ownership, possession, use, operation, maintenance or condition of the Plant, the Plant Site, or Common Fixed Assets, or any part, raw material, by-product or waste thereof, or any spillage or release of product to the environment before title to such passes to Amoco hereunder, in connection with (i) any pollutant or contaminant subject to regulation under the Clean Air Act, the Federal Water Pollution Control Act, the Toxic Substances Control Act, the Texas Clean Air Act or the Texas Water Code, Ch. 26 (Sections 26.001-26.340), or other applicable federal, state and local environmental laws, (ii) any "hazardous substance" as such term is defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, (iii) any "hazardous waste", "hazardous substance", "sludge", "solid waste", or "regulated substance" as such terms are defined in the Resource Conservation and Recovery Act of 1976, the Texas Solid Waste Disposal Act or the Texas Water Code, Ch. 26 (Sections 26.341 et seq.), or any other material regulated thereunder, (iv) any failure to comply with Section 404 of the Clean Water Act, (v) the Occupational Safety and Health Act or other applicable federal, state and local worker health and safety laws, or (vi) any other pollution of the environment or any exposure of workers or other persons to any of the materials or substances described above; or (b) any breach by CRI of any of the express warranties contained in Article 11.B.(1).(i) of this Agreement. The reference to each of

- 87 -

the foregoing enactments shall include any amendments to such acts or substitutions therefor and any implementing regulations or rules promulgated thereunder, in each case in effect from time to time or at the time of the occurrence in question.

(4). The parties recognize that certain of CRI's indemnity obligations under this Article 11 may overlap. The fact that an indemnity obligation under one paragraph (e.g., D) applies does not preclude an indemnity obligation under another paragraph (e.g., E) from also applying, and the fact that the same claim or set of circumstances may not be covered or may not be covered to the same extent or may be precluded under one indemnity does not preclude another indemnity from applying; provided, however, that such overlap shall not permit an indemnified person to obtain a double recovery.

11.F.   Except for claims, causes of action, lawsuits, costs, damages, losses, expenses and liabilities for which CRI is responsible under Article 11.A.(3) or Article 11.D, Amoco shall defend, indemnify and hold harmless CRI (and its Affiliates, and its and their officers, directors, agents and employees) from and against any and all claims, causes of action, lawsuits, costs, damages (including punitive damages), losses, expenses (including all expenses of litigation and attorneys' fees) and liabilities of every kind (including strict liability), arising out of or related to Amoco's or Amoco's designee's disposition or use of products purchased from CRI hereunder once title to such products has passed to Amoco under Article 10.B, (a) whether for or

- 88 -

relating to property damage or loss, personal injury, disease or death, contamination of or adverse effects on the environment, or otherwise, and (b) regardless of the person or entity who or which suffers or incurs damage, loss, injury, cost or expense or who asserts a claim, action or suit or when such a claim, action or suit is asserted. The foregoing indemnification shall also not apply if the damage, injury, loss, cost or expense arose out of or was related to (i) the product not meeting specifications and Amoco did not accept the off-specification product pursuant to Article 11.A.(2), (ii) any breach by CRI of any of the express warranties contained in Article 11.A or 11.B, or (iii) any negligence of CRI.

11.C.   The obligations in this Article shall survive, without limitation as to time, after the effective date of termination of this Agreement, except that the obligations under Article 11.A shall survive after the effective date of termination of this Agreement for only the following period of time:  the time it takes after the effective date of termination of this Agreement for products manufactured and delivered hereunder to be used in the production of polypropylene up to a maximum of two (2) years after the effective date of termination of this Agreement; plus the period of the statute of limitations which applies to a claim of Amoco or of a company one hundred percent (100%) owned, directly or indirectly, by Amoco Corporation, or to a Claim of an entity not one hundred percent (100%) owned, directly or indirectly, by Amoco Corporation, as the case may be; plus, in the case of a

- 89 -

Claim of an entity not one hundred percent (100%) owned, directly or indirectly, by Amoco Corporation, three (3) months.

Article 12.  Inventory

12.A.   CRI shall maintain an inventory of CD-Catalyst Product of each type, commencing six (6) months after Plant Start-up and thereafter, of an amount no less than one-twelfth (1/12th) and, at all times during the term of this Agreement no greater than three-twenty fourths (3/24ths), of the sum of Amoco's most recent purchase estimates for the next four (4) Quarters for CD-Catalyst Product of each such type, given pursuant to Article 6.A.  Amoco shall not have title to, risk of loss in or any obligation to pay for, such CD-Catalyst Products until they are actually delivered to Amoco in accordance with this Agreement.  Upon twenty-four (24) hours' prior notice to CRI, Amoco shall have the right to audit this inventory and all documents, records and accounts pertaining thereto.

12.B.   Notwithstanding paragraph A above, in the event Amoco gives notice of termination pursuant to any provision hereof, CRI shall manage its inventory of CD-Catalyst Products such that by the effective date of termination, the inventory shall be as close to zero as possible.  In no event shall the aggregate inventory on the effective date of termination be greater than one sixth (1/6th) of the most recent aggregate purchase estimate under

- 90 -

Article 6.A for the Quarter in which the effective date of termination falls.

Article 13. Status Reports and Process Changes

13.A.   Commencing as of Mechanical Performance, CRI shall provide to Amoco monthly written reports regarding the status of the Plant's production process, which shall include information on:

- production of product meeting applicable specifications: pounds per month; batches per month;
- production of off-specification product: pounds per month; batches per month;
    - (i)   process causes for off-specification product;
    - (ii)  type and frequency of specifications not met during the month;
    - (iii) to what extent-off specification product was produced during Transitions;
- Raw Materials used: pounds per month and expense per month for each Raw Material;
- Utilities used: amount per month and expense per month for each Utility;
- Packaging expenses;
- yields:
    - i)   pounds of catalyst (on-spec) per pound of Mg $(EtO)_2$
    - ii)  pounds of catalyst (total) per pound of Mg $(EtO)_2$
- operating days per month;
- down days per month, giving process reasons for down days; and

- 91 -

   -  the number of Transitions per month, and the reason for and
duration of each Transition.

Such report shall also include the status of any investments
being made pursuant to Article 8 and, if requested by Amoco,
operating data and/or logs for each batch of product produced.

13.B.   Except if necessary to comply with applicable law, CRI shall not
implement any change in its standard operating procedures at the
Plant or the production process, that will affect the performance
or characteristics of any CD-Catalyst Product to be produced
hereunder (even if such change will not result in product failing
to meet specifications), without first obtaining Amoco's written
consent. If such a change is necessary to comply with applicable
law, CRI shall immediately notify Amoco of the necessary change
and the reason for the change. CRI shall not implement any
change in recipe for any CD-Catalyst Product produced hereunder
or change its source of supply for Raw Materials, without first
obtaining Amoco's written consent.

13.C.   At any time during the term of this Agreement CRI shall allow a
reasonable number of representatives of Amoco to visit and
observe the Plant and its operation, provided that Amoco gives at
least seventy two (72) hours' prior notice of such visit and that
such visit would not be unreasonably inconvenient for CRI. Such
visit shall not continue for an unreasonable period of time.

13.D.   Commencing as of Mechanical Performance, CRI shall notify Amoco

- 92 -

at least ten (10) days in advance of any Plant Turnaround and, upon completion of any Plant Turnaround, of the length of such Turnaround.

## Article 14. Other Termination

Notwithstanding any other provisions of this Agreement and without prejudice to any other rights or remedies a party may have, if any proceeding is instituted by or against a party for bankruptcy, reorganization, insolvency, liquidation or dissolution; or if a party becomes insolvent or comes under judicial management; or if any person seeks appointment of or has appointed a receiver, trustee, liquidator or custodian for a party or for any assets of a party; or if a party enters into an agreement with creditors regarding restructuring or deferral of payment of debt, defaults under a loan, makes an assignment for the benefit of creditors of all or part of its assets, or takes or suffers any similar action in consequence of debt; then, in any of the above events, the other party may terminate this Agreement effective as of the last day of any Contract Year during which any of the above occurs, exists or continues, by giving notice thereof to the first party.

## Article 15. Audit Right

CRI shall keep books, records and accounts in sufficient detail to enable any charge to or amount claimed or due from Amoco

- 93 -

hereunder, or any adjustment, determination or calculation
hereunder, to be determined accurately. At Amoco's request, CRI
shall provide reasonable documentation to support any of the
above. Amoco shall also have the right, at any time (including
after the effective date of termination of this Agreement) until
all payments due hereunder are settled, to have any of the "Big
Six" auditing firms of its choosing audit CRI's books, records
and accounts relating to any particular Contract Year, or
relating to pre-Plant Start-up, one time only for the books,
records and accounts relating to each Contract Year, to verify
any of the above. Such auditor shall also have access to the
Plant for such purposes.

CRI shall fully cooperate with any such audit. Without
limitation of the foregoing, CRI shall make available to such
auditor any and all books, records and accounts which such
auditor considers necessary to verify any of the above. The
findings of the auditor as to amounts payable shall be final and
binding on both parties. In the event the auditor determines
that any amount payable by Amoco is within plus or minus (+/-)
one percent (1%) of the amount invoiced or notified by CRI, the
cost of the audit shall be borne by Amoco. In all other cases
the cost of the audit shall be borne by CRI. For any overcharge
(even if less than one percent (1%)), CRI shall immediately
refund to Amoco the difference between the amount charged to or
claimed from Amoco and the amount determined by the auditor as
payable by Amoco, if Amoco has already paid the amount charged or
claimed; if Amoco has not paid the amount charged or claimed,

- 94 -

Amoco may deduct the amount of the overcharge from the invoice or notice in question. In the event the auditor determines that any amount payable by Amoco is more than the amount invoiced or notified by CRI, Amoco shall immediately pay to CRI the difference between the amount charged to or claimed from Amoco and the amount the auditor determines is payable by Amoco. CRI shall maintain books, records and accounts required hereunder or that support any charge to or claim from Amoco hereunder, or any adjustment or calculation hereunder, for three (3) years after the effective date of termination of this Agreement.

## Article 16. Patent Infringement

Amoco agrees to defend on behalf of CRI any action or suit which may be brought against CRI for infringement of any United States patent or patents asserted against CD-Catalyst produced by CRI to the extent any such action or suit is based upon CD-Catalyst sold to Amoco and manufactured in accordance with Amoco Information (as such term is defined in the R&D Agreement) and agrees to pay all damages and costs awarded in a final unappealed or unappealable judgment of a court in any such action or suit; provided that CRI promptly notifies Amoco in writing of the commencement of any such action or suit, permits Amoco to control the defense or settlement thereof, cooperates fully with Amoco and its counsel in the defense of such action or suit, and furnishes Amoco all relevant evidence within CRI's control. CRI may be represented in any such action or suit by counsel of its

- 95 -

own selection at its own expense. CRI agrees to defend on behalf of Amoco, its Affiliates, and process licensees of Amoco or any Affiliate of Amoco, any action or suit, which may be brought against Amoco, its Affiliates or process licensees of Amoco or any Affiliate of Amoco, for infringement of any United States patent or patents because of Amoco's, any of its Affiliate's, or any process licensee's, possession, use or sale of such CD-Catalysts prepared by CRI, to the extent any such action or suit is based upon methods, processes or equipment used to manufacture such CD-Catalysts not specifically designated by Amoco, and agrees to pay all damages and costs awarded in a final unappealed or unappealable judgment of a court in any such action or suit; provided that Amoco promptly notifies CRI in writing of the commencement of any such action or suit, permits CRI to control the defense or settlement thereof, cooperates fully with CRI and its counsel in the defense of such action or suit, and furnishes CRI all relevant evidence within Amoco's control. Amoco may be represented in any such action or suit by counsel of its own selection at its own expense.

The obligations in this Article shall survive after the effective date of termination of this Agreement.

Article 17. Right of First Refusal

17.A.    During the term of this Agreement, neither CRI nor Phillips,

- 96 -

which indirectly wholly owns CRI, shall sell, transfer, assign,
grant any option with respect to, merge, or otherwise dispose of
any of the ownership or control of CRI, or any part of the Plant
or of the Plant Site, or allow any of the foregoing to occur,
unless: (i) CRI or Phillips has received a bona fide
arm's-length offer to transfer the entire ownership or control of
CRI, or to transfer the ownership or control of certain assets of
CRI, which assets include but are not limited to the entirety of
the Plant and the Plant Site, to such party or parties; (ii) CRI
or Phillips has determined that it is willing to accept such
offer; (iii) CRI or Phillips has notified Amoco, in writing, of
the terms and conditions of such offer; (iv) CRI or Phillips has
first afforded Amoco the option to buy all of CRI or to buy all
of the certain assets of CRI, which assets include but are not
limited to the entirety of the Plant and the Plant Site,
whichever is applicable, on terms and conditions no less
favorable to Amoco than those contained in the offer; and (v)
Amoco does not exercise its option to buy all of CRI or to buy
all of the certain assets, which assets include but are not
limited to the entirety of the Plant and the Plant Site,
whichever is applicable, on such terms and conditions within
ninety (90) days of receipt of the written notification referred
to in (iii) above.

17.B.   The right of first refusal set forth in Article 17.A does not
apply and shall not prohibit CRI from selling, transferring,
assigning, granting options with respect to, merging, or
otherwise disposing of the entire ownership or control of the

- 97 -

Plant and the Plant Site to any company one hundred percent
(100%) owned, directly or indirectly, by Phillips, subject to the
condition that the transferee of the Plant and Plant Site shall
be bound by this Agreement to the same extent as CRI. Any
subsequent sale, transfer, assignment or dispostion during the
term of this Agreement by such transferee of CRI shall be subject
to the conditions of Article 17.A.

17.C.    If Amoco shall fail to exercise its option to buy set forth in
Article 17.A, CRI or Phillips shall be free to complete the
proposed transaction falling under Article 17.A.(i) on the same
terms and conditions as proposed, subject to the condition that
the transferee shall be bound by this Agreement, including
Article 17.A, to the same extent as CRI. If CRI or Phillips
fails to complete the transaction set forth in Article 17.A above
on the same terms and conditions as proposed, the foregoing
prohibition against CRI and Phillips shall continue in full force
and effect, and Amoco's option under Article 17.A shall
thereafter apply to each subsequent offer or offers as set forth
above.

17.D.    If Amoco does exercise its option to buy set forth in Article
17.A, and the rights and licenses under Articles III and IV of
the License Agreement are not obtained thereby, Amoco may elect
at any time within two (2) years of the exercise of its option to
buy, at its sole option and upon notice thereof to CRI, to
acquire the rights and licenses under such Articles III and IV.
Upon the giving of such notice, the rights and licenses under

- 98 -

Article III and IV of such License Agreement shall automatically become effective, without any further act by either party, provided that Amoco makes payment in accordance with Article V of such License Agreement.

## Article 18. Force Majeure

18.A.   Except as otherwise provided in this Agreement, and subject to paragraph B below, neither party shall have any liability for failure to perform any of the obligations herein imposed, for the time and to the extent such failure to perform is due to any cause or circumstance beyond the control of the affected party which by the exercise of reasonable diligence the party is unable to prevent, including, but not limited to, fire or explosion of such nature, floods, storms, lightning, earthquakes, tidal waves, wars, military operations, national emergencies, civil commotions, sabotage, strikes or other differences with workers or unions, transportation embargoes, unavailability of raw materials, equipment or materials, the order, requisition, request or recommendation of any governmental agency or acting governmental authority, or compliance therewith, or governmental proration, regulation or priority (any such cause is herein referred to as "Force Majeure"). Notwithstanding the foregoing, a failure, delay or inability to perform arising from or related to a breach of an express warranty contained in Article 11.A or 11.B, shall not be Force Majeure.

- 99 -

18.B.   In the event either party is delayed or rendered unable by Force
        Majeure to carry out all or part of its obligations under this
        Agreement, the party so affected shall give notice as to the
        commencement and nature of such Force Majeure to the other party
        within seventy-two (72) hours after the affected party learns of
        the occurrence of the cause to be relied upon, and upon the
        giving of such notice the obligations of both parties, so far as
        they are affected by such Force Majeure, and except as otherwise
        provided in this Agreement and subject to the below, shall be
        suspended during the continuance of the Force Majeure but for no
        longer period; provided, however, that the Force Majeure shall be
        remedied so far as practicable with all reasonable dispatch and
        provided further that the Force Majeure shall not extend the term
        of this Contract or any Contract Year hereunder. The affected
        party shall give notice to the other party as soon as reasonably
        possible after the initial notice, of the estimated duration of
        such Force Majeure. The requirement that Force Majeure be
        remedied with all reasonable dispatch shall not require the
        settlement of strikes or labor controversies by acceding to the
        demands of the opposing party or parties. Amoco's otherwise
        applicable Minimum Quantity, and CRI's otherwise applicable
        maximum supply obligation under Article 4.A.(1), in any Contract
        Year in which such Force Majeure occurs or continues, shall be
        prorated based upon the number of days in such Contract Year in
        which, and the extent to which, Force Majeure affected
        performance of obligations.

18.C.   Should either party invoke Force Majeure pursuant to the

- 100 -

foregoing for a period exceeding ninety (90) days, the other party may terminate this Agreement effective as of the last day of any Contract Year in which such Force Majeure continues beyond ninety (90) days, by giving notice thereof to the other.

## Article 19. General Provisions

19.A.    Assignment.  Neither party may assign this Agreement, or any part thereof, without the prior written consent of the other, except that Amoco may assign this Agreement in its entirety only without the consent of CRI at any time to any entity owned fifty percent (50%) or more, directly or indirectly, by Amoco Corporation, and CRI may assign this Agreement in its entirety only without the consent of Amoco to any company one hundred percent (100%) owned, directly or indirectly, by Phillips. Any other attempted assignment without the other party's consent shall be void. The terms of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted delegatees and assignees.

19.B.    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, excluding any choice of law rules which may direct the application of the laws of any other jurisdiction.

19.C.    Waiver.  Waiver by either party of any breach, or failure to enforce or require the performance of any of the terms or conditions of the Agreement at any time, shall not in any way

- 101 -

affect, limit or waive the right of that party thereafter to enforce the Agreement and compel strict compliance with every term and condition thereof, nor be deemed a waiver of any subsequent breach.

19.D.   Notices.  (1).  Notices under this Agreement shall be given in writing and delivered:

If to Amoco, to:  Amoco Chemical Company

Attn:  Vice President & General

Manager--Olefins & Polymers

200 East Randolph Drive

P.O. Box 87759

Chicago, Illinois 60680-0759

Facsimile No.: (312) 856-7026

If to CRI, to:   Catalyst Resources, Inc.

Attn:  President

One Northwind Plaza

7600 West Tidwell, Suite 500

Houston, Texas 77040

Facsimile No.: (713) 895-2035

or to such other address or individual as may be designated in writing by Amoco or CRI.

(2). Notices shall be deemed to have been given:

(i)  On the next succeeding business day if the

- 102 -

notice has been delivered by hand or sent by
facsimile; or

(ii) On the next succeeding business day following receipt
of a notice sent by registered or certified U.S.
mail, return receipt request, as evidenced by the
return receipt card properly endorsed by the
receiving party.

19.E.  **Entire Agreement**.  This Agreement, the Confidentiality Agreements
between Amoco and CRI dated January 6, 1986 and August 26, 1987,
the R&D Agreement, the License Agreement, and the
Debottlenecking Agreement, and all Exhibits to any of the
foregoing, constitute the entire agreement between the parties
hereto pertaining to the subject matter covered.  Notwithstanding
the August 2, 1991 letter agreement between Amoco and CRI, upon
the earlier of June 30, 1994 or the last day of the third
consecutive calendar month in which CRI produces at the Plant a
minimum of two thousand five hundred (2,500) pounds in the
aggregate of CD-Catalyst Products, or, at Amoco's option, at any
time after Mechanical Performance, the Debottlenecking Agreement
shall immediately terminate.  All other agreements,
understandings, representations, negotiations and discussions,
whether oral or written, made prior to the date of signature of
this Agreement, including the letter agreement from William T.
Harper of Amoco to Dr. Paul D. Smith of CRI dated May 10, 1989,
and the letters dated July 26, 1991, November 18, 1991, April 15,
1992 and July 9, 1992 from S. K. Welch to W. A. DeVore, are

- 103 -

cancelled and superseded. There are no other terms, conditions or understandings, written or oral, in effect between the parties. The acknowledgement or acceptance by a party of the purchase orders, shipping instructions, sales acknowledgement forms or any other document of the other party containing terms or conditions at variance with or in addition to those set forth herein shall not in any event be deemed to modify or vary the terms of this Agreement. This Agreement shall not be modified except by a written instrument of date even herewith or subsequent hereto signed by the duly authorized representatives of the parties. No requirement stated herein that an item be in writing may be waived except by means of a written instrument issued by the party making the waiver.

19.F.    Articles.  References to Articles are to the designated Articles in this Agreement, unless otherwise indicated. The headings of Articles or paragraphs in this Agreement or in the Table of Contents are for convenience and ease of reference only and shall have no effect on the interpretation thereof.

19.G.    Confidentiality.

(1).  Both Amoco and CRI understand that the contents of this Agreement are considered confidential and agree not to disclose at any time, before or after the effective date of termination of this Agreement and also after any permitted assignment of this Agreement, the terms and conditions to any third party, except (i) to the extent either party has the legal obligation to

- 104 -

disclose such information pursuant to a governmental request after first notifying the other party of such request; (ii) to any Affiliate of Amoco; (iii) to any Affiliate of CRI, provided that the contents of Exhibits 1 and 2 and Article 1.N are excluded from this exception and shall not be disclosed to any employee, agent or representative of any of CRI's Affiliates; and (iv) to any permitted assignee. Amoco and CRI shall each require that any Affiliate or assignee to whom either discloses the terms and conditions of this Agreement pursuant to the foregoing agrees to comply with this Article 19.G.

(2). CRI, before and after the effective date of termination of this Agreement and also after any permitted assignment of this Agreement, shall: (i) treat as confidential all Amoco Information (as such term is defined in the R&D Agreement, subject to the below); (ii) restrict access to Amoco Information to those of its employees reasonably requiring the same for the purpose of CRI's performance under this Agreement, the R&D Agreement or the License Agreement; (iii) not disclose Amoco Information to any third party without Amoco's express, prior written consent; and (iv) not use or allow to be used Amoco Information in any way other than for the purpose indicated in (ii). For purposes of this paragraph G.(2), Amoco Information shall include, without limitation, any information learned or acquired by CRI as a result or in the course of its performance under this Agreement, e.g. delivery locations, CD-Catalyst Product types and amounts delivered to particular locations, and number or identities of process licensees.

- 105 -

19.H.   <u>Savings</u>.   Should any provision of this Agreement be or become invalid or unenforceable, then the parties shall endeavor to agree to substitute provisions which in their effects come as close as possible to the invalid or unenforceable provision.   In case such substitute provisions cannot be agreed, the provision(s) which is (are) invalid or unenforceable shall be ineffective to the extent of such invalidity or unenforceability only, without affecting the validity or enforceability of the remainder of the Agreement, which remainder shall remain in full force and effect.

19.I.   <u>Remedies</u>.   Except as otherwise provided, the inclusion in this Agreement of any specific remedy available to either party shall not be construed as a limitation on the remedies available to either party in the event of a default or other breach of this Agreement by the other party, and, except as otherwise provided, all such remedies specified herein shall be in addition to and cumulative of any and all remedies available to either party under this Agreement, in law, or in equity, in the event of a default or other breach.

- 106 -

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective duly authorized representatives as of the day and year above written.

AMOCO CHEMICAL COMPANY                    CATALYST RESOURCES, INC.

By: _____               By: _____

Title: _____               Title: _____


Phillips Petroleum Company Agreement

In consideration of Amoco Chemical Company entering into the Catalyst Supply Agreement dated September 17, 1992 with Catalyst Resources, Inc. ("CRI"), Phillips Petroleum Company, which indirectly wholly owns CRI, hereby agrees that it is bound by Article 17 of such Agreement in accordance with its terms.


Phillips Petroleum Company

By: _____

Title: VICE PRESIDENT CHEMICALS

Date: SEPTEMBER 17, 1992

Exhibit 1

CD-Catalyst Definition

A solid hydrocarbon-insoluble, olefin polymerization catalyst component comprises a product formed by:

(A)   forming a solution of a magnesium-containing species from a magnesium alkyl carbonate or a magnesium carboxylate;

(B)   precipitating solid particles from such magnesium-containing solution by treatment with a transition metal halide;

(C)   reprecipitating such solid particles; and

(D)   treating the reprecipitated particles with a transition metal compound and an electron donor.

## Exhibit 2

## Specifications for CD-Catalyst Product Types

|  |  | CD-Catalyst Product Type | | | |
|---|---|---|---|---|---|
| Specification |  | ACD-010-H[2] | ACD-015-H[2] | ACD-020-H[2] | ACD-020-M[2] |
| Yield[1], Kg/g | min | * | 23.0 | 23.0 | 23.0 |
| Total Isotactic Index[1], Wt %, (C7 Extraction) | min | * | 95.6 | 95.6 | 95.6 |
| PP Bulk Density[1], g/ml (ASTM Method) | min | * | 0.372 | 0.372 | 0.372 |
| PP Powder[1], Wt % < 150μ | max | * | 1.2 | 0.8 | 0.8 |
| Catalyst $d_{16}$[3], μ | min | * | 2.1 | 3.2 | 3.2 |
| Catalyst $d_{50}$[3], μ | range | * | 12.0-17.0 | 18.5-24.0 | 18.5-24.0 |
| Catalyst $d_{84}$[3], μ | max | * | 27.0 | 36.5 | 36.5 |
| Ti, Wt% | range | * | 2.0-3.5 | 2.0-3.5 | 2.0-3.5 |
| Ti/Mg, weight ratio | range | * | 0.10-0.22 | 0.10-0.22 | 0.10-0.22 |
| DNBP, Wt% | range | * | 10.0-19.0 | 10.0-19.0 | 10.0-19.0 |
| Catalyst Solids Concentrations, Wt% in |  |  |  |  |  |
|     Hexane Slurry | range | 15-20 | 15-20 | 15-20 | NA |
|     Mineral Oil Slurry | range | NA | NA | NA | 29-31 |
| Hexane in Mineral Oil, Wt% Iodide-free) | max | NA | NA | NA | 5.0 |
| Catalyst Weight in Cylinder, Pounds | range | 45-60 | 45-60 | 90-120 | 90-120 |

[1] From CRI's standard one-hour bulk polymerization test.

[2] The H suffix indicates catalyst slurry in Hexane. The M suffix indicates catalyst slurry in mineral oil.

[3] As measured by CRI Malvern.

[4] To be determined after polymer plant tests and additional CRI Semi-works Unit runs.

Exhibit 2 (continued)

Catalyst is "qualified for shipment" when:

(1) Polypropylene from at least two standard polymerization tests from catalyst cylinder samples meets the specifications for yield, isotactic index and bulk density for the type of CD-Catalyst Product in question, and;

(2) the weight % of the polypropylene powder < 150 $\mu$ from the same polymerization tests meets the specification for the type of CD-Catalyst Product in question, and;

(3) the catalyst particle size meets the specifications for $d_{10}$, $d_{50}$, and $d_{90}$ for the type of CD-Catalyst Product in question, and;

(4) the Wt% Ti, Ti/Mg weight ratio and Wt% DNBP fall within the specification ranges for the type of CD-Catalyst Product in question, and;

(5) the catalyst weight in the cylinder and the Wt% catalyst solids fall within the ranges given for the type of CD-Catalyst Product in question.

Exhibit 3

1.    Subject to paragraph 2.(a) below, the following terms shall have the
      meanings indicated:

(a)              Year =        any period of twelve (12) consecutive
                               calendar months beginning on the date
                               of Plant Start-up or any anniversary
                               of that date, or, except as provided
                               in paragraph 2.(a)(iii) below or in
                               Article 7.B.(1), any period of twelve
                               (12) consecutive calendar months
                               ending on the day before Plant Start-
                               up or ending on the same calendar date
                               in previous calendar years.

(b)              i =          the number of the particular Year in
                               question, with the chronologically
                               first Year being numbered 1, the
                               chronologically second Year being
                               numbered 2, and so on.

(c) Cash Margin for
    Year i ("$CM_i$")    =     (1) amounts paid by Amoco to CRI under
                               Article 7 for CD-Catalyst Products
                               delivered to Amoco in accordance with
                               this Agreement during any Year i which
                               is a Contract Year (after any
                               recalculations or adjustments under
                               Article 7.D.(3) and (4) for such
                               Contract Year), plus (2) any amounts
                               paid for such Contract Year under
                               Article 4.A.(2)(b), less (3) the
                               actual $VC_i$ and $FC_i$ for such Contract
                               Year.  There is no CM for Years prior
                               to Plant Start-up or after the
                               effective date of termination of this
                               Agreement.

(d) Financial Book
    Depreciation
    ("$FBD_i$")       &mdash;    $\underline{\text{II}}$
                             14 . for any Year beginning on the date of Plant Start-up or any anniversary of that date. There is no FBD for Years prior to Plant Start-up.

(e) Income Before Taxes
    for Year i
    ("$IBT_i$")       &mdash;    $CM_i$ - FBD

(f) Current Taxes
    for Year i
    ("$CT_i$")       &mdash;    37%($CM_i$-TBD)

(g) Tax Book
    Depreciation
    ("TBD")       &mdash;    20%(II), for Contract Year 1
                             32%(II), for Contract Year 2
                             19.2%(II), for Contract Year 3
                             11.5%(II), for Contract Years 4 and 5
                             5.8%(II), for Contract Year 6
                             0, for all Contract Years thereafter

(h) Deferred Taxes
    ("DT")       &mdash;    37%(TBD - FBD)

(i) Net Income After
    Taxes for Year i
    ("$NIAT_i$")       &mdash;    $IBT_i$ - $CT_i$ - DT

(j) Change in Working
    Capital for
    Year i ("$CWC_i$")       &mdash;    the CWC for each of the Years indicated below shall be the amount corresponding to such Year:

| Year | CWC |
|------|-----|
| Contract Year 1 | $ 2,000,000 |
| Contract Year 2 | $ 200,000 |
| Contract Year 3 | $ 300,000 |
| Contract Year 4 | $ 200,000 |
| Contract Year 5 | $ 200,000, unless Contract Year 5 is the last Contract Year, in which case CWC for Contract Year |

- 2 -

5 –
-$2,700,000.

For any other Year, CWC shall equal
zero, except if such Year is the last
Contract Year, in which case CWC for
such Year shall equal negative two
million, nine hundred thousand
dollars (-$2,900,000), representing
the full recovery of Working Capital.

Increases in Working Capital from Year
to Year are denoted by positive
numbers; decreases in Working Capital
from Year to Year are denoted by
negative numbers.

(k) Net Cash Generated
for Year i
("$NCG_i$")  =  $NIAT_i + DT + FBD - X_i - CWC_i$.

where $X_i$ =  costs for the Plant incurred by CRI in
Year i which were included in the II,
subject to the below. If the total of
actual costs incurred by CRI which
would be included in the II under
Article 2.B.(1), (2), (3), (4) and
(5), absent the cap in Article
2.B.(6).(a), exceeds the maximum
amount provided under Article
2.B.(6).(a), then X for any Year i
shall equal the actual costs incurred
by CRI in Year i which would be
included in the II under Article
2.B.(1), (2), (3), (4) and (5), absent
the cap in Article 2.B.(6).(a),
multiplied by the ratio $\frac{a}{b}$,

where a =  the maximum amount provided under
Article 2.B.(6).(a); and

b =  the total of actual costs incurred by
CRI which, absent the cap in Article
2.B.(6).(a), would be included in the
II under Article 2.B.(1), (2), (3),
(4) and (5).

(l) Internal Rate of
Return ("IRR")  =  the rate that discounts the stream of
project NCGs over a given number of

– 3 –

consecutive Years to a net present value of zero. Mathematically the IRR is represented by that rate r for the NCGs over n consecutive Years such that:

$$\sum_{i\,=\,o}^{n} \left[\frac{NCG_i}{(1 + r)^i}\right] = 0,$$

where n = the number of consecutive Years; and

i = the number (from 1 to n) of the particular Year in question, with the chronologically first Year being numbered 1 and the chronologically last Year being numbered n.

2. If Amoco terminates this Agreement pursuant to Article 3.B, CRI shall calculate, as of the effective date of termination, its IRR for the number of consecutive Years beginning with the first Year in which CRI incurred costs for the Plant which were included in the II (prior to application of Article 2.B.(6)) and ending with the Year which would have been the tenth (10th) Contract Year had the Agreement not been terminated, in accordance with the following:

(a) (i) any costs for the Plant incurred by CRI prior to signature of this Agreement which are included in the II under Article 2.B.(1), (2) and (4) (subject to Article 2.B.(6)), shall be deemed to have been incurred on the first day, after the date of signature of this Agreement, on which CRI incurs costs for the Plant included in the II under Article 2.B.(1) (prior to application of Article 2.B.(6)); (ii) any costs included in the II under Article 2.B.(5) or otherwise (prior to

- 4 -

application of Article 2.B.(6)) incurred after Plant Start-up
shall be deemed to have been incurred in the first Contract
Year; and (iii) if Plant Start-up did not occur by the Removal
Date (as such term is defined in Article 7.B.(1)), whatever
the reason for Plant Start-up not occurring by the Removal
Date, then: the period from the Removal Date until Plant
Start-up shall be removed in calculating CRI's IRR; a "Year"
for the time prior to Plant Start-up shall be any period of
twelve (12) consecutive calendar months ending on the day
before the Removal Date, or ending on the same calendar date
in previous calendar years; and any costs for the Plant
incurred by CRI during the period from the Removal Date to
Plant Start-up, which were included in the II under Article
2.B.(1), (2) and (5) (prior to application of Article
2.B.(6)), shall be deemed to have been incurred in the first
Contract Year;

(b)    CRI shall calculate its NCG for each Year beginning with
       the first Year in which CRI incurred costs for the Plant which
       were included in the II (prior to application of Article
       2.B.(6)), through the last Contract Year under this Agreement;

(c)    payments by Amoco under Article 7 for CD-Catalyst Products
       notified pursuant to Article 6.B for delivery in the last
       Contract Year, shall be included in the CM and NCG for the
       last Contract Year;

- 5 -

(d)    in calculating the NCG for the last Contract Year, CRI shall
add to the NIAT the amount equal to twenty five percent (25%)
of the operative II (the full amount of the II as defined in
Article 2.B.(6).(b), without deduction for depreciation); and

(e)    CRI's NCG for each Year after the effective date of
termination shall equal zero.

3.    If such IRR calculated in accordance with paragraph 2 is greater
than or equal to 12.0%, no payment shall be due from Amoco.

4.    If such IRR calculated in accordance with paragraph 2 is less than
12.0%, after each anniversary of the effective date of termination
up to and including the anniversary which would have been the last
day of the tenth (10th) Contract Year had the Agreement not been
terminated, within thirty (30) days of receipt of an invoice issued
by CRI after each such anniversary, Amoco shall pay to CRI any
positive amount resulting from application of the following formula:

$$\left[\frac{a}{10-c}\right] - b - d,$$

where a —    that NCG required in the Year immediately following the
last Contract Year, to give CRI an IRR, for the period
beginning with the first Year in which CRI incurred
costs for the Plant which were included in the II (prior
to application of Article 2.B.(6)) and ending with the

− 6 −

Year which would have been the tenth (10th) Contract
Year had the Agreement not been terminated, calculated
in accordance with paragraph 2.(a), (b), (c) and (d)
above and with the NCG for each subsequent Year equal to
zero, of 12.0%;

b — the net financial return (as such term is defined in
Article 5) from any alternate use of the Plant made in
the Year ending on such anniversary;

c — the number of Contract Years for which the Agreement was
in effect; and

d — for the applications of the above formula after each of
the anniversaries of the effective date of termination
which would have been the last day of a Contract Year
had the Agreement not been terminated, "d" shall equal $\frac{1}{x}$

(where x — 10 minus the number of the last Contract Year
under this Agreement) times the aggregate amount by
which Amoco's Minimum Quantity was reduced in accordance
with Article 8.E.(1) and 8.E.(2).(b) while the Agreement
was in effect, multiplied by the Tier 1 Price for the
last Contract Year.

If no positive amount results from application of the above formula,
no payment shall be due from Amoco.

- 7 -

<u>Exhibit 4</u>

<u>1.  Direct Expenses</u>

Subject to paragraph 3 below, direct expenses to be included in the $FC_i$ for Contract Year i are actual, out-of-pocket expenses incurred by CRI in Contract Year i for items devoted exclusively to CRI's performance under this Agreement, and shall consist of:

(a)     actual hourly wages and benefits (including overtime) paid by CRI in Contract Year i for up to thirteen (13) hourly CRI operator employees at the Plant, except if employee expenses are excluded under other provisions of this Agreement (such number of operators and hours as documented by time sheets);

(b)     the hourly average of the actual hourly wages and benefits (including overtime) paid by CRI in Contract Year i to its maintenance employees, multiplied by the number of hours spent in Contract Year i by such employees maintaining the Plant (such number of hours as documented by work orders and time sheets);

(c)     the hourly average of the actual hourly rates paid by CRI in Contract Year i, directly to Third Party

Suppliers, for contract (third party) maintenance
labor, multiplied by the number of hours spent by
such personnel maintaining the Plant (such number of
hours as documented by purchase orders, invoices and
time sheets); and

(d)    out-of-pocket expenses incurred by CRI in Contract
Year i, directly to Third Party Suppliers, for
materials and supplies used for maintenance at the
Plant (not for Raw Materials), as documented by
purchase orders and invoices, except if such expenses
are excluded under other provisions of this
Agreement.

## 2.  Allocated Expenses

Allocated expenses to be included in the $FC_i$ for Contract
Year i are the objectively determinable, CD-Catalyst Product
and/or Plant related, portion of actual, out-of-pocket
(except for depreciation) expenses or charges incurred by
CRI in Contract Year i for items not devoted exclusively to
CRI's performance under this Agreement but which to an
extent are required for CRI's performance under this
Agreement.  Subject to paragraph 3 below, such allocated
expenses in Contract Year i shall consist of:

(a)    out-of-pocket expenses incurred by CRI in Contract

- 2 -

Year i, directly to Third Party Suppliers, for general maintenance supplies (e.g. nuts, bolts, sweeping compound, excluding any CRI employee or contract labor expenses), as documented by purchase orders and invoices, which expenses shall be accrued by CRI in its cost center 63, multiplied by $\frac{x}{y}$,

where $x =$ the total number of hours spent in Contract Year i by CRI maintenance employees and contract maintenance personnel maintaining the Plant (such number of hours as documented by work orders, purchase orders and time sheets); and

$y =$ the total number of hours worked in Contract Year i by CRI maintenance employees and contract maintenance personnel engaged by CRI (such number of hours as documented by purchase orders and time sheets);

(b) actual salary and benefits paid by CRI in Contract Year i to CRI's plant supervisors, production superintendents and engineers, which shall be accrued by CRI in its cost center 71 (for plant supervisors and production superintendents) and 62 (for

- 3 -

engineers), multiplied by $\dfrac{x}{x + y}$,

where $x =$    the total number of hours worked in Contract Year i by CRI's Plant operator employees (such number of hours as documented by time sheets); and

     $y =$    the total number of hours worked in Contract Year i by the operators at all of CRI's Bayport facilities other than the Plant (such number of hours as documented by time sheets);

(c)    expenses incurred by CRI in Contract Year i for quality control testing, consisting of actual salary and benefits paid by CRI in Contract Year i to CRI's quality control technician and chemist, and of amounts paid by CRI, directly to Third Party Suppliers, for materials utilized in performing quality control tests (as documented by purchase orders and invoices), and excluding any non—quality control personnel who may perform some quality control services, which such expenses shall be accrued by CRI in its cost center 64, multiplied by $\dfrac{x}{y}$,

where $x =$    the total number of hours spent in

— 4 —

Contract Year i by CRI's quality control employees in performing testing for CD-Catalyst Products (such number of hours as documented by time sheets); and

$y =$ the total number of hours worked by all CRI's quality control employees (such number of hours as documented by time sheets);

(d) actual hourly wages and benefits (including overtime) paid by CRI in Contract Year i to up to four (4) CRI warehouse employees, multiplied by $\dfrac{x}{x + y}$,

where $x =$ the number of pounds in the aggregate of CD-Catalyst Products shipped to Amoco in accordance with this Agreement in Contract Year i, and produced at the Plant after the calendar month of Mechanical Performance; and

$y =$ the number of pounds in the aggregate of catalyst products other than CD-Catalyst Products and excluding peroxides shipped by CRI in Contract Year i.

- 5 -

Such warehouse employees will, with respect to CRI's
performance under this Agreement, <u>inter alia</u>, package
and ship CD-Catalyst Products in pressurized metal
cylinders; purchase, paint, flush and maintain such
cylinders; and purchase and receive Raw Materials;

(e)     amounts paid by CRI in Contract Year i, directly to
Third Party Suppliers, for engaging third parties to
provide safety, environmental and skills training for
hourly Plant operators, multiplied by $\frac{x}{y + x}$,

where $x$ =     the total number of hours worked in
Contract Year i by CRI's Plant operator
employees; and

$y$ =     the total number of hours worked in
Contract Year i by the operators at all
of CRI's Bayport facilities other than
the Plant; and

(f)     financial book depreciation for one year (until fully
depreciated) for each of the Fixed Assets listed
below, purchased, constructed and installed by CRI in
connection with the Plant but the cost for which is
not included in the II, on the basis of straight-line
depreciation of the out-of-pocket costs incurred by
CRI directly to a Third Party Supplier for such Fixed

- 6 -

Asset (excluding any CRI and CRI Affiliate employee expenses incurred in the purchase, construction and installation of such Fixed Asset), over the depreciable life of the respective Fixed Asset. The depreciable life of each Fixed Asset, based upon generally accepted accounting principles and the 1990 Financial Depreciation Guidelines of Phillips Petroleum Company, shall be as indicated opposite the Fixed Asset:

| Fixed Asset | Depreciable Life |
|---|---|
| Hot Oil Unit | 15 years |
| Cooling Tower | 15 years |
| Centrifuge | 15 years |
| Product Warehouse | 15 years |

such depreciation for one year (until fully depreciated) for each such Fixed Asset multiplied by

$$\frac{x}{y},$$

where $x =$ the metered use in Contract Year i of such Fixed Asset for the manufacture of CD-Catalyst Products (as documented by meters and production logs); and

$y =$ the greater of the entire capacity of such Fixed Asset or the total metered use of such Fixed Asset in Contract Year i (as documented by meters and production logs).

- 7 -

Depreciation charges for the above shall be accrued by CRI in its cost centers 91, 92, 93, 94 and 95.

Depreciation charges not specified above (e.g. for the laboratory and maintenance shop) shall not be included.

3.  Direct and Allocated Expenses in Case
    of Alternate Use

If there is an alternate use of the Plant by CRI in a Contract Year under Article 5, only that portion of the expenses set forth respectively in paragraphs 1 and 2 above that results from multiplying the total of such expenses respectively by

$$\frac{x}{y + x} \; ,$$

where $x$ =  the $Q_i$ for such Contract Year; and

$y$ =  the number of pounds of product produced by CRI as part of its alternate use of the Plant in such Contract Year,

shall be direct and allocated expenses, respectively, to be included in the $FC_i$ for such Contract Year.

EXB4

# E X H I B I T   5:   EXAMPLES OF CALCULATIONS

## Assumptions:

- Initial Investment: **$35 MM**. *(For illustrative purposes only; the actual II will be determined in accordance with Article 2.B.(6).)*

- Contract Signing: September 17, 1992

- Mechanical Performance: December 1993

- The Removal Date as defined in Article 7.B.(1) is February 1, 1994.

- Plant Start-Up: March 1, 1994 (2,885 pounds in the aggregate of CD-Catalyst Products not produced in a period of seven (7) consecutive days until August, 1994.)

- The $3 MM spent in February 1994 was approved by Amoco to be included in the II under Article 2.B.(5).

- Actual spending pattern of initial investment:

| Spending of II, $MM | | |
|---|---|---|
| Pre-1992 | | 0.20 |
| 1992: | Jan | 0.70 |
| | April | 0.80 |
| | July | 1.00 |
| | Oct | 1.25 |
| 1993: | Jan | 1.05 |
| | Mar | 6.85 |
| | Aug | 7.50 |
| | Nov | 8.20 |
| | Dec | 4.45 |
| 1994: | Feb | 3.00 |
| T O T A L | | $35.00 MM |

**Note:** Pre-engineering spending of **$2.07 MM**, to be reimbursed under Article 2.B.(4) and which is not part of the II, is not included in the $35 MM capital shown on right.

1. Definition of Year and Timing of Spending for Purposes of this Agreement (Article 7.B.(1).(a); Exhibit 3, 1.(b), 2.(a)):

| Definition of Year & Timing of Spending for Purposes of This Agreement | |
|---|---|
| **Year** | **Period** | **Σ Spending** |
| 1 | 2/1/92 thru 1/31/93 | $ 5.0 MM |
| 2 | 2/1/93 thru 1/31/94 | $ 27.0 MM |
| 3 (Contract Year i) | 3/1/94 thru 2/28/95 | $ 3.0 MM |
| • | • • | 0.0 |
| • | • • | 0.0 |
| 13 (Contract Year 10) | 3/1/03 thru 2/29/04 | |

NOTES:
1) Capital spending incurred prior to contract signing of $2.7 MM—which includes the $0.9 MM spent prior to Year i, but not the pre-engineering spending of $2.07 MM which is not part of the //—is deemed to have occurred in October 1992 (Article 7.B.(1)).

2) The period from 2/1/94 to 2/28/94 is "removed" and costs incurred in this period ($3 MM) are deemed to have been incurred in Contract Year 1 (Article 7.B.(1)).

2. Calculation of A and B (Article 7.B.(1).(a)):

$A$ = *the lesser of:* 20.19% ; or 15.77% (% // Spent in Year 1) + 3.07% (% // Spent in Year 2)

$A$ = 15.77% + 6.51% ($\frac{5}{35}$) + 3.07% ($\frac{27}{35}$) = 19.07%

$B$ = *the lesser of:* 11.45% ; or 6.69% + 7.20% (% // Spent in Year 1) + 3.19% (% // Spent in Year 2)

$B$ = 6.69% + 7.20% ($\frac{5}{35}$) + 3.19% ($\frac{27}{35}$) = 10.18%

Page 3

3. For Deliveries of CD-Catalyst Products Produced Prior to or During *Mechanical Performance* (Article 7.B.(4).(e)):

$H = \dfrac{M_i}{X_i + Y_i}$   where i equals the period beginning with the first production of CD-Catalyst Products and extending through the last day of *Mechanical Performance*:   $M_i = \$360,000;$   $X_i = 7,000$ lbs;   $Y_i = 1,000$ lbs

$H = \$45$ per lb

4. For CD-Catalyst Products Produced After the Calendar Month of *Mechanical Performance* but prior to *Plant Start-Up* (Article 7.C.(2)):

CALCULATION OF PRICING FOR CD-CATALYST PRODUCTS PRODUCED DURING THE MONTH OF JANUARY 1994:

A. Pricing for Invoicing Purposes (Article 7.C.(1), 7.B.(1)):

Tier 1   $P_1 = \dfrac{Est\ VC_1 + \dfrac{Est\ FC_1 + A\ (\$5,000,000)}{70,000}}{Est\ Q_1}$ ,   where estimated $\left(\dfrac{VC_1}{Q_1}\right) = \$45$ per lb;   estimated $FC_1 = \$3,750,000$

Tier 1   $P_1 = \$193.92$ per lb

B. Price Adjustment in July 1994 on CD-Catalyst Products Produced in January 1994 (Article 7.C.(2)):

Because *Plant Start-Up* did not occur until March 1, 1994, the per unit price set forth below applies retroactively to all CD-Catalyst Products produced after the calendar month of *Mechanical Performance* but prior to *Plant Start-up*.

$H = \dfrac{M_i + o}{X_i + Y_i}$   where i is the month of January 1994;   $M_{(Jan\ 94)} = \$480,000;$   $C_{(Jan\ 94)} = \$300,000;$   $X_{(Jan\ 94)} = 9,000$ lbs;   $Y_{(Jan\ 94)} = 1,000$ lbs

$H = \$78.00$ per lb

Adjustment = ( Invoice Price – $H$ ) 9,000

Adjustment = $\$1,061,280$   to be paid to Amoco.

A similar calculation would be made in August 1994 for CD-Catalyst Products produced in February 1994.

Case: 1:07-cv-02817 Document #: 1 Filed: 05/21/07 Page 154 of 168 PageID #:1

Page 5

## B. Year-End Price Recalculation (Article 7.D.(3)):

$$Actual\ VC_4 = \frac{M_4}{X_1} \cdot \frac{Z_1}{+Y_1} + \frac{M_4}{X_2} \cdot \frac{Z_2}{+Y_2} + \frac{M_5}{X_3} \cdot \frac{K_3}{+Y_3}$$

$$VC_{Recalc} = \frac{\#M_4}{X_1} \cdot \frac{Z_1}{+Y_1} + \frac{M_4}{X_2} \cdot \frac{Z_2}{+Y_2} + \frac{M_5}{X_3} \cdot \frac{K_3}{+Y_3} = \frac{(7,645,200)\ (145,000)}{145,000 + 100} + \frac{(7,005,000)\ (5,000)}{140,000 + 100} = \$7,790,000$$

$$= \frac{(7,835,400)\ (145,000)}{145,000 + 100} + \frac{(7,005,000)\ (5,000)}{140,000 + 100} = \$7,880,138$$

where #M4 contains the Raw Materials expenses included in $M_3$, but the Utilities and Waste Disposal costs of Contract Year 4.

Maximum Allowable $FC_4$ Must be ≤ the Lesser of : 1) Actual $FC_3$ $(\frac{W_4}{W_3}) = \$3,580,189$;  or  2) $\$3,380,000$ $(\frac{W_4}{W_1}) = \$3,718,000$

Actual $FC_4 = \$3,580,000$; but Maximum Allowable $FC_4 = \$3,580,189$

$$Tier\ 1 \quad P_4 = \frac{VC_{Recalc}}{Act\ Q_4} + \frac{FC_4 + A\ (35,000,000)}{70,000} = \frac{(7,880,138)}{150,000} + \frac{3,580,189 - 19.07\%\ (35,000,000)}{70,000} = \$199.03\ per\ lb$$

$$Tier\ 2 \quad P_4 = \frac{VC_{Recalc}}{Act\ Q_4} + \frac{B\ (35,000,000)}{80,000} = \frac{(7,880,138)}{150,000} + \frac{10.16\%\ (35,000,000)}{80,000} = \$97.07\ per\ lb$$

## C. Year-End Price Adjustment (Article 7.D.(3)):

Adjustment = ( Invoice Tier1 Price - Recalc Tier1 Price ) 70,000  +  ( Invoice Tier2 Price - Recalc Tier2 Price ) 80,000

Adjustment = $769,200   debit Amoco

D. Year-End Raw Materials Efficiency Adjustment (Article 7.D.(4)):

$$Adjustment = \left[ \left[ \frac{\frac{U_3}{X_3} - \frac{U_1}{X_1}}{2} \right] T_3 + (T_3 - T_4) \frac{U_4}{X_4} \right] X = \left[ \left[ \frac{(43 - 40)}{2} 0.93 \right] + (0.93 - 0.95) 40 \right] 145,000$$

Adjustment = $86,275  credit Amoco

**EXHIBIT B**



**Amoco Polymers**
4500 McGinnis Ferry Road
Alpharetta, Georgia 30202-3914
770-772-8200

March 24, 1998

Mr. Richard T. Higgons
Vice President, Corporate Development
Mallinckrodt, Inc.
675 McDonnell Boulevard
P. O. Box 5840
St. Louis, MO 63134

Dear Mr. Higgons:

Amoco Polymers, Inc. ("Amoco") understands that Mallinckrodt, Inc. ("Mallinckrodt") desires to
sell certain of its assets to Engelhard Corporation ("Engelhard"). The assets would include the
plant Mallinckrodt uses to manufacture catalyst products for Amoco (the "Plant") pursuant to the
Catalyst Supply Agreement dated September 17, 1992 between Amoco Chemical Company and
Catalyst Resources, Inc. (the "Agreement") and which subsequently was assigned by Catalyst
Resources, Inc. to Mallinckrodt and which subsequently was assigned by Amoco Chemical
Company to Amoco. Article 17 of that Agreement, however, provides Amoco with a right of
first refusal for any transfer of the ownership of the Plant. Mallinckrodt has requested that
Amoco waive its right of first refusal for this transaction only. In addition, Amoco has requested
that Mallinckrodt make certain commitments to Amoco. Consequently, Amoco proposes the
following agreement between us:

    1. Upon Amoco's receipt of a fully executed copy of this letter, Amoco will be deemed to
have waived its rights of first refusal under Article 17 of the Agreement only for the
transaction proposed in the February 23, 1998 letter of intent between Mallinckrodt and
Engelhard (the "Letter of Intent"), provided that the transaction set forth in the Letter of
Intent is consummated by December 31, 1998. Article 17 of the Agreement shall remain
in full force and effect and apply to all other transfers described in Article 17 and shall
apply to any sale or transfer by Mallinckrodt to Engelhard of assets covered by Article 17
if such occurs after December 31, 1998.

    2. Mallinckrodt agrees and, in the event the transaction described in the Letter of Intent is
consummated, will require Engelhard to agree, that the capacity tests performed from
February through June, 1998, will be used as a basis to define the current Plant capacity
pursuant to the formula described in the February 25, 1998 letter from Brian Conroy to
Glenn Galecki. Annualized GPCD-2 and SPCD-5 capacities will be adjusted downward
by a factor of no less than 0.9615 for planned maintenance time for both catalyst grades.
In addition, the annualized GPCD-2 and SPCD-5 capacities will be adjusted downward by
a factor of no less than 0.92 for GPCD-2 and no less than 0.97 for SPCD-5 to include
seasonal capacity effects. As a point of reference before the capacity tests are completed,





Mr. Richard T. Higgons
March 24, 1998
Page 2

the expected monthly capacity for GPCD-2 before adjustments is 15,000 lb. The expected
monthly capacity for SPCD-5 before adjustments is 10,000 lb.

3. Mallinckrodt agrees and, in the event the transaction described in the Letter of Intent is
consummated, will require Engelhard to agree that it will use its best efforts to submit to
Amoco, on or around June 30, 1998, a good faith proposal to debottleneck the Plant, that
will increase capacity by approximately thirty thousand (30,000) pounds, pursuant to the
terms of the Agreement, including Article 8.c. The proposal will be prepared using June
30, 1999 as the target date for having the additional capacity on-line.

4. Not withstanding paragraphs 2 and 3 above, Mallinckrodt's minimum supply obligation
under Article 4.A.(1) of the Agreement is a minimum of 150,000 lb of CD Catalyst
Products.

5. As requested by Mallinckrodt, two copies of the First Amendment to Catalyst Supply
Agreement (the "Amendment"), executed by Amoco, are attached to this Agreement.
Although Amoco has signed this Amendment, Mallinckrodt agrees, and in the event the
transaction described in the Letter of Intent is consummated, Mallinckrodt will required
Engelhard to agree, that it will, in good faith, negotiate additional modifications to the
Agreement with Amoco and the parties will use their best efforts to reach an agreement on
such modifications that is acceptable to both parties as soon as is reasonably possible.

Except as may be expressly modified above, all terms and conditions of the Agreement would
remain the same.

If you are agreeable to proceeding on the foregoing basis, please indicate you consent by signing
both of the enclosed originals of this letter and returning one fully executed original to me.

Very truly yours,

AMOCO POLYMERS, INC.

By: _____

_Group Vice President_

MALLINCKRODT, INC. accepts and agrees
to the foregoing terms and conditions:

By: _____
Title: _Vice President_
Date: _April 3, 1998_

i:\law\accgroup\herrin\apr\contract\mallin\abc3.doc

**EXHIBIT C**

Steven K. Welch
Vice President & General Manager
Worldwide Polypropylene



**BP Amoco Chemicals**

4500 McGinnis Ferry Road
Alpharetta, Georgia 30005-3914
770-772-8719
Facsimile: 770-772-8715

September 30, 1999

Mr. James A. Martin
Group Vice President and General Manager
Process Technologies
Engelhard Corporation
101 Wood Avenue
Iselin, NJ 08830

Dear Mr. Martin:

BP Amoco Polymers, Inc. ("Amoco") understands that Engelhard Corporation ("Engelhard") desires to enter into a sale/leaseback transaction of certain assets with Chase Equipment Leasing, inc. ("Lessor") pursuant to the Master Lease Agreement dated as of September 27, 1999 (the "Master Lease Agreement"). The assets would include, pursuant to Equipment Schedule No. 3 to the Master Lease Agreement dated as of October 1, 1999 (the "Equipment Schedule"), certain equipment in the plant Engelhard uses to manufacture catalyst products for Amoco (the "Amoco Plant Equipment") pursuant to the Catalyst Supply Agreement dated September 17, 1992 between Amoco Chemical Company and Catalyst Resources, Inc. (the "Agreement") and which subsequently was assigned by Catalyst Resources, Inc. to Mallinckrodt, Inc. and which subsequently was assigned by Mallinckrodt, Inc. to Engelhard and which subsequently was assigned by Amoco Chemical Company to Amoco. Article 17 of that Agreement, however, provides Amoco with a right of first refusal for any transfer of the ownership of the Amoco Plant Equipment. Engelhard has requested that Amoco waive its right of first refusal for, and consent to, this transaction only. Consequently, Engelhard proposes the following agreement between us:

1. Upon Amoco's receipt of a fully executed copy of this letter, Amoco will be deemed to have waived its rights of first refusal under Article 17 of the Agreement with respect to the Amoco Plant Equipment, and to have consented, only for the transactions set forth in the Equipment Schedule and Master Lease Agreement between Lessor and Engelhard.



EXHIBIT
C

Mr. James A. Martin
September 30, 1999
Page 2

2. Article 17 of the Agreement shall remain in full force and effect and apply to all other transfers described in Article 17 (including, without limitation, any change in control of Engelhard) and shall continue to apply to any sale or transfer by Engelhard of Amoco Plant Equipment covered by Article 17 if the sale/leaseback does not occur.

Except as may be expressly modified above, all terms and conditions of the Agreement would remain the same.

If you are agreeable to proceeding on the foregoing basis, please indicate your consent by signing both of the enclosed originals of this letter and returning one fully executed original to me.

Very truly yours,

BP AMOCO POLYMERS, INC.

By: _____
     STEVEN K. WELCH

ENGELHARD CORPORATION
accepts and agrees to the foregoing terms and conditions:

By: _____

Title: _____

Date: ____10/7/99_____

**EXHIBIT D**

 **bp**

BP Chemicals
Polyolefins Licensing
150 W. Warrenville Rd
Naperville, IL 60563
USA

January 24, 2005

Mr. Victor Sprenger
Group Vice President and General Manager
Process Technologies
Engelhard Corporation
101 Wood Avenue
Iselin, NJ 08830

Dear Mr. Sprenger:

BP Amoco Chemical Company ("Amoco") understands that Engelhard Corporation ("Engelhard") desires to enter into a sale/leaseback transaction of certain assets pursuant to the Amended and Restated Master Lease Agreement, dated on or about January 13, 2005 (the "Master Lease Agreement"), between Engelhard and Key Corporate Capital Inc. ("Lessor"). The assets would include, pursuant to Equipment Schedule No. 3 to the Master Lease Agreement (the "Equipment Schedule"), certain equipment in the plant Engelhard uses to manufacture catalyst products for Amoco (the "Amoco Plant Equipment") pursuant to the Catalyst Supply Agreement, dated September 17, 1992 (the "Agreement"), between Amoco Chemical Company and Catalyst Resources, Inc., and which subsequently was assigned by Catalyst Resources, Inc. to Mallinckrodt, Inc., and which subsequently was assigned by Mallinckrodt, Inc. to Engelhard, and which subsequently was assigned by Amoco Chemical Company to Amoco. Article 17 of that Agreement, however, provides Amoco with a right of first refusal for any transfer of the ownership of the Amoco Plant Equipment. Engelhard has requested that Amoco waive its right of first refusal for this transaction only. Consequently, Engelhard proposes the following agreement between us:

1. Upon Amoco's receipt of a fully executed copy of this letter, Amoco will be deemed to have waived its rights of first refusal under Article 17 of the Agreement with respect to the Amoco Plant Equipment only to the transactions set forth in the Equipment Schedule and Master Lease Agreement between Lessor and Engelhard.

2. Article 17 of the Agreement shall remain in full force and effect and apply to all other transfers described in Article 17 (including, without limitation, any change in control of Engelhard) and shall continue to apply to any sale or transfer by Engelhard (including, without limitation, any other sale or transfer to Lessor) of Amoco Plant Equipment covered by Article 17 if the transactions set forth in the Equipment Schedule and Master Lease Agreement between Lessor and Engelhard do not occur.

Except as may be expressly modified above, all terms and conditions of the Agreement would remain the same.



EXHIBIT

D



Mr. Victor Sprenger
Page 2

If you are agreeable to proceeding on the foregoing basis, please indicate your consent by signing both of the enclosed originals of this letter and returning one fully executed original to me.

Very truly yours,

BP AMOCO CHEMICAL COMPANY

By: _____

ENGELHARD CORPORATION
Accepts and agrees to the foregoing terms and conditions:

By: _____

Title: GVP & Gm

Date: 1-26-2005

**EXHIBIT E**



**ENGELHARD**

RECEIVED
AUG 3 2006
M. NIEDERSCHULTE

July 28, 2006

Engelhard Corporation
101 Wood Avenue, P.O. Box 770
Iselin, NJ 08830-0770
732 205-5000

Mark A. Niederschulte
Ineos
Polyolefins Licensing
150 W. Warrenville Road
Napervill, IL 60563

Re: <u>Catalyst Supply Agreement by and between Amoco Chemical
Company and Catalyst Resources, Inc. dated September 17, 1992 (the
"Agreement")</u>

Dear Mr. Niederschulte:

As you agreed with Victor Sprenger during your teleconference on July 12, 2006, he forwarded your inquiry regarding Section 17 of the Agreement to our legal department. After reviewing both the Agreement and the Letter Agreement dated January 24, 2005, our lawyers have concluded that the purchase by Iron Acquisition Corporation of the shares of Engelhard Corporation from Engelhard's shareholders did not trigger the Right of First Refusal under Section 17 of the Agreement with respect to the Plant or the Plant Site.

I trust that their finding in no way impacts on the excellent business relationship, and that we will continue to meet our shared business objectives.

Very truly yours,
Engelhard Corporation

Dr. Wilfried Seyfert
Group Vice President



EXHIBIT
E

**EXHIBIT F**



**The Chemical Company**

December 21, 2006

Mark A. Niederschulte
Ineos Technologies
4225 Naperville Road
Suite 600 N
Lisle, IL 60532

Re: <u>Catalyst Supply Agreement dated September 17, 1992</u>

Dear Mr. Niederschulte;

Reference is made to your letter dated November 14, 2006 and our December 15, 2006 telephone call.

Our legal department has reviewed your letter, and analyzed the claims made therein. They do not agree with your conclusions and are prepared to defend BASF's position as necessary. BASF's management has conferred on this matter and, in light of Ineos' stated position, we are not inclined to continue commercial negotiations on the modification of the current Catalyst Supply Agreement until the claims made in your November 14 letter have been withdrawn.

This is an unfortunate path, but we will not negotiate in an environment which is laden with threats to our business.

Thank you.

Very truly yours,
BASF Catalysts LLC

Dr. Wilfried Seyfert
Group Vice President



EXHIBIT
F