IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

INEOS POLYMERS INC., )
)
            Plaintiff, )
)
  v. ) No. 07 C 2817
)
BASF AKTIENGESELLSCHAFT, et al., )
)
           Defendants. )

## MEMORANDUM OPINION AND ORDER

Each of the defendants in this diversity-grounded lawsuit--BASF Aktiengesellschaft ("German BASF") and its subsidiary BASF Catalysts LLC ("Domestic BASF")--has filed a Fed. R. Civ. P. ("Rule") 12(b)(6) motion to dismiss the action brought against them by INEOS Polymers Inc. ("INEOS").[1]  In turn INEOS has filed a single responsive memorandum addressing both motions. Because that filing displays a myopic (or perhaps more accurately astigmatic) view of the matter, this memorandum opinion and order will address some of the issues that bear on the viability of the Complaint.  And because such limited treatment exposes at least one potentially fatal flaw in INEOS' lawsuit, no view needs to be (or is) expressed here as to the several other contentions advanced by German BASF or Domestic BASF.

There is no great mystery about the generous standards that have long applied to the sustainability of federal complaints,

---

[1] German BASF has also moved for its dismissal under Rule 12(b)(2), and the parties are in the process of completing the briefing on that challenge to in personam jurisdiction.

except for the Supreme Court's recent injection of a "plausibility" requirement in <u>Bell Atl. Corp. v. Twombly</u>, 127 S.Ct. 1955, 1965, 1973 n.14 (2007) that has tightened things up somewhat. But INEOS mistakes that generosity for a principle that would excuse its failure to satisfy a fundamental prerequisite: its showing of standing to bring this suit to begin with.

INEOS charges that Domestic BASF has breached some provisions of the 1992 Catalyst Supply Agreement ("Agreement") originally entered into between Amoco Chemical Company ("Amoco") and Catalyst Resources, Inc. ("CRI"), and it charges German BASF with tortious interference with the performance of the Agreement. But the difficulty with all of INEOS' contentions is that Agreement ¶19.A set out this highly constricted provision as to permitted assignments of the Agreement:

> <u>Assignment</u>. Neither party may assign this Agreement or any part thereof, without the prior written consent of the other, except that Amoco may assign this Agreement in its entirety only without the consent of CRI at any time to any entity owned fifty percent (50%) or more, directly or indirectly, by Amoco Corporation, and CRI may assign this Agreement in its entirety only without the consent of Amoco to any company one hundred percent (100%) owned, directly or indirectly, by Phillips. Any other attempted assignment without the other party's consent shall be void. The terms of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted delegatees and assignees.

And although none of the parties has discussed the justification for that constraint, the reason is evident from the

extraordinarily detailed 106-page Agreement (exclusive of its also detailed and complex exhibits). What the Agreement revealed was a close interrelationship and interdependence of the original parties, so that the situation was really no different from that of a partnership in which neither partner can foist a stranger off on the other.

On that score INEOS' Amended Complaint ("AC") explains how it got into the act. AC ¶1 says in part:

> INEOS is the successor entity to the rights and duties of Amoco Chemical....

AC ¶5 goes on to say:

> Pursuant to a series of transactions, as of January 2006, Plaintiff INEOS had succeeded to the rights and obligations of Amoco Chemical, and Engelhard Corporation ("Engelhard") had succeeded to the rights and obligations of CRI and Phillips under the Supply Agreement.

And AC ¶12 describes the sequence of events through which INEOS ultimately entered the picture:

> In 2006, Innovene Polymers Inc. was the successor entity to Amoco Chemical under the Supply Agreement following the assignment of Amoco Chemical's rights to Amoco Polymers Inc. ("Amoco Polymers"), which was subsequently renamed BP Amoco Polymers Inc. ("BP Amoco Polymers") and later Innovene Polymers Inc. Innovene Polymers Inc. was renamed INEOS Polymers Inc. following the acquisition of its parent company by the INEOS group in December 2005. INEOS Polymers is the subsidiary of INEOS USA LLC, which markets and sells the catalysts purchased under the Supply Agreement, principally through its office in Lisle, Illinois.

In that respect, although INEOS' Mem. 6 says that "[t]he only assignment alleged in the Complaint, from Amoco to Amoco

3

Polymers, was an intra-corporate transfer between commonly-owned Amoco subsidiaries," that assertion glosses over--or more precisely ignores entirely--the fact that when what AC ¶12 calls "the INEOS Group" acquired the Amoco parent company, the consequence was that the Agreement was no longer in the hands of "any entity owned fifty percent (50%) or more, directly or indirectly, by Amoco Corporation" (Agreement ¶19.A). And what that means, it would appear, is that INEOS is attempting to advance its claims as an impermissible assignee of the Agreement via several mesne transfers.

INEOS seeks to avoid that issue by calling upon the doctrine that well-pleaded allegations in a complaint must be credited for Rule 12(b)(6) purposes. But that concept is inapplicable where the allegations are controverted by the very document or documents on which a plaintiff claims--in such a situation the controverted allegations are not, of course, "well-pleaded." In sum, INEOS must come to grips (as it has not) with the Agreement's anti-assignment provision and must explain (as it has not) why that should not bar its lawsuit.

Lest it be thought that INEOS' lack of standing is the only difficulty that it faces (it will be recalled that Agreement ¶19.A renders void any attempt at a contractually impermissible assignment), this opinion will go on to review a few (but not necessarily all) of the other independent bases for rejecting the

4

AC in the form that INEOS' counsel have chosen to present it. To begin with, in that drafting process INEOS' counsel have conformed to the well nigh universal (and universally incorrect) practice of approaching litigation in terms of "causes of action" (the Illinois state law concept) rather than "claims" (the federal concept)--see in that respect <u>NAACP v. Am. Family Mut. Ins. Co.</u>, 978 F.2d 287, 291-92 (7th Cir. 1992). In that regard, when applied properly (that is, as it reads), Rule 10(b) allows the use of separate counts to set out "[e]ach claim founded upon a separate transaction or occurrence"--not simply to limn different theories of recovery. Nonetheless this opinion will not trash the AC on that score--instead it will treat with the counts as they have been framed by INEOS' counsel.

First off, a couple of slam dunks. So-called Counts V (captioned "Declaratory Judgment") and VI (captioned "Specific Performance") plainly do nothing more than mark out different prayers for relief. And because that is not in any event the appropriate office of a separate count, and because the selfsame prayers are properly included under the heading "Prayer for Relief," Counts V and VI are stricken.

Relatedly, Count III (captioned "Breach of Covenant of Good Faith and Fair Dealing") ignores the universally held and oft-

repeated principle that Illinois law[2] does not treat that implied covenant as giving rise to a separate claim. As our Court of Appeals has stated succinctly in Echo, Inc. v. Whitson Co., 121 F.3d 1099, 1106 (7th Cir. 1997):

> The proper place for [plaintiff's] implied covenant argument was within a breach of contract claim, not standing alone as its own claim.

And that selfsame principle has been repeated again and again not only by Illinois state courts but by many of this Court's colleagues (see, e.g., LaSalle Bank Nat'l Ass'n v. Moran Foods, Inc., 477 F.Supp.2d 932, 937 (N.D. Ill. 2007)) and by this Court as well (see, e.g., Gentieu v. Tony Stone Images/Chicago, Inc., 255 F.Supp.2d 838, 870 (N.D. Ill. 2003)). Hence AC Count III is also stricken as a stand-alone count.

With those matters out of the way, this opinion returns to Counts I and II, which advance straight-out breach of contract theories. In that respect, even if INEOS could establish its right to enforce the Agreement at all, it is difficult to understand how it could do so against a non-contracting party such as German BASF. So if INEOS were to try again, it would have to make clear that such breach of contract contentions apply only to Domestic BASF (currently those counts refer to "defendants" in the plural).

---

[2] Agreement ¶19.B specifies the applicability of Illinois substantive law in construing the Agreement.

6

By contrast, AC Count IV--which is asserted only against German BASF, charging it with tortious interference with the performance of the Agreement by Domestic BASF--appears to face a different difficulty. Although neither German BASF nor this Court has located an Illinois case that treats specially with the parent-subsidiary relationship, rather than simply enunciating the well-established general proposition that no liability attaches where the allegedly interfering party is seeking to promote its own legitimate economic interests, German BASF has pointed to the opinion by this Court's colleague Honorable James Moran in <u>Oak Agency, Inc. v. Warrantech Corp.</u>, No. 96 C 1106, 97 WL 232619, at *2 (N.D. Ill. May 2):

> Can, then, Warrantech [the parent corporation] be liable for wishing, even directing, WDBS [the subsidiary] to terminate the agreement and stop paying commissions? We believe not. First, with respect to the agreement claim, Warrantech was privileged to act in its subsidiary's economic interest, or what it believed that interest to be, absent some egregious conduct not implicated here. <u>Boulevard Associates v. Sovereign Hotels, Inc.</u>, 72 F.3d 1029, 1036-1038 (2d Cir. 1995). <u>Copperweld Corp. v. Independence Tube Corp.</u>, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), although not directly on point, is helpful in highlighting the interdependence of economic relationships between parent and subsidiary even though each is a separate and distinct entity. Equally instructive is the Illinois concept that an employee cannot be held liable for tortious interference with his employer's contract so long as he is not acting to further his own interests and not those of the employer. <u>Medina v. Spotnail, Inc.</u>, 591 F.Supp. 190, 196-197 (N.D. Ill. 1984).

Because the existence or nonexistence of such a qualified

7

privilege is fact-dependent, however, INEOS is correct in asserting that the Count IV claim--if otherwise supportable--cannot be dispatched in Rule 12(b)(6) terms. Thus if INEOS could surmount the hurdle of its inability to complain about the asserted nonperformance of the Agreement because it is an unpermitted assignee, the claim advanced in AC Count IV might be sustainable.[3]

## Conclusion

At the threshold, INEOS' posture as a nonpermitted assignee of the Agreement precludes it from asserting the claims set out in the AC. And even apart from that flaw, the matters discussed in this opinion would necessitate the dismissal of AC Counts III, V and VI. Nonetheless, both because INEOS may come up with some predicate for its continued presence as a plaintiff in this District Court and because of the previously-set timetable for the final submissions on German BASF's Rule 12(b)(2) motion, this Court dismisses only the AC but not this action. It will await further input from the parties.

_____
Milton I. Shadur
Senior United States District Judge

Date: January 9, 2008

---

[3] On that score the earlier discussion about the inappropriate use of separate counts does not apply here. INEOS' assertion of German BASF's liability for intentional interference is indeed a claim separate from the direct breach-of-contract liability asserted against Domestic BASF (again see NAACP, 978 F.2d at 292).

8