IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
                          EASTERN DIVISION

INEOS POLYMERS INC.,                )
                                    )
                  Plaintiff,        )
                                    )
       v.                           )      No.  07 C 2817
                                    )
BASF AKTIENGESELLSCHAFT, et al.,    )
                                    )
                  Defendants.       )

                  MEMORANDUM OPINION AND ORDER[1]

     INEOS Polymers Inc. ("INEOS") has brought this diversity-based lawsuit against BASF Aktiengesellschaft ("German BASF") and its subsidiary BASF Catalysts LLC ("Domestic BASF"),[2] charging the breach of two provisions of the 1992 Catalyst Supply Agreement ("Agreement") that was originally entered into between Amoco Chemical Company ("Amoco") and Catalyst Resources, Inc. ("CRI"). This memorandum opinion and order dispatches INEOS' lawsuit on Rule 12(b)(6) grounds that are revealed by its own

---

[1] In essence this opinion replicates the oral ruling delivered to the litigants' counsel in open court on February 13, 2008. And because the ruling stands in part on the shoulders of this Court's January 9, 2008 memorandum opinion and order ("Opinion I"), familiarity with that opinion is assumed here, and a copy of that opinion is attached to this opinion. That inclusion also avoids the need to reproduce here certain contractual and other language quoted in Opinion I.

[2] Although German BASF has a separate iron in the fire--its motion for dismissal based on an asserted lack of in personam jurisdiction--both it and Domestic BASF share common cause in their Fed. R. Civ. P. ("Rule") 12(b)(6) motion to dismiss this action. Purely for convenience, then, they will be referred to here collectively as "BASF," treated as a singular noun to avoid some awkward locutions.

pleading and are spelled out hereafter.

Although the following observation is really rendered parenthetical by the conclusion and result reached here, it is worth noting that this Court has been troubled from the outset as to just how INEOS' attempted invocation of the right of first refusal spelled out in Agreement Art. 17.A[3] could work, which forms the principal gravamen of INEOS' Second Amended Complaint ("SAC").[4] This is Art. 17.A:

> During the term of this Agreement, neither CRI nor Phillips, which indirectly wholly owns CRI, shall sell, transfer, assign, grant any option with respect to, merge, or otherwise dispose of any of the ownership or control of CRI, or any part of the Plant or of the Plant Site, or allow any of the foregoing to occur unless: (i) CRI or Phillips has received a bona fide arm's-length offer to transfer the entire ownership or control of CRI, or to transfer the ownership or control of certain assets of CRI, which assets include but are not limited to the entirety of the Plant and the Plant Site, to such party or parties; (ii) CRI or Phillips has determined that it is willing to accept such offer; (iii) CRI or Phillips has notified Amoco, in writing, of the terms and conditions of such offer; (iv) CRI or Phillips has first afforded Amoco the option to buy all of CRI or to buy all of the certain assets of CRI, which assets include but are not limited to the entirety of the Plant and the Plant Site, whichever is applicable, on terms and conditions no less favorable to Amoco than those contained in the offer; and (v) Amoco does not exercise its option to buy all of CRI or to buy all of the certain assets, which assets include but are not limited to the entirety of the

---

[3] All further references to provisions of the Agreement will simply take the form "Art. --."

[4] That has been so from the very beginning--that is, in INEOS' original Complaint and its Amended Complaint ("AC") as well.

2

> Plant and the Plant Site, whichever is applicable, on such terms and conditions within ninety (90) days of receipt of the written notification referred to in (iii) above.

Here BASF's acquisition of what had originally been the CRI position in the Agreement came via a hostile takeover that originated in a tender offer but that, after rejection by the Board of the target company, resulted in a Merger Agreement (SAC ¶38). Because that transaction, rather than a sale of assets or a share purchase, does not comfortably fit into the language of the option spelled out in Art. 17.A (just how does a merger transaction get translated into "terms and conditions...no less favorable...than those contained in the offer"?), INEOS' counsel seem to have performed a sleight of hand by casting its SAC Prayer for Relief in the quite different terms of a failure to "afford INEOS Polymers the option to buy the CRI business <u>at its fair market value</u>." But the resolution of that puzzling issue would go to the ultimate merits, which cannot and need not be reached for the reasons explained hereafter.

At the outset of the issues that <u>are</u> before this Court, it grants INEOS' most recent motion, in which it seeks leave to file (a) its Reply in Support of Its Motion for Reconsideration and (b) the SAC. Although INEOS' argument in support of that motion is flawed in some respects (see, e.g., its Mem. 3 n.1 mischaracterization of the holding in <u>Publishers Res., Inc. v. Walker-Davis Publishers, Inc.</u>, 762 F.2d 557, 561 (7th Cir. 1983),

3

which BASF had cited in opposition to the INEOS motion), this Court prefers to meet INEOS' more deeply flawed analysis of the substantive issues head on.

To review the bidding somewhat, INEOS entered the picture more than 13 years after the Agreement was originally entered into between Amoco and CRI (Opinion I at 3 quotes from AC ¶¶6 and 12, INEOS' own statement of the sequence of events that led to INEOS' involvement, events that are elaborated on in SAC ¶¶24-30). For present purposes the critical--indeed the controlling--fact that emanates from what Opinion I at 4 summarized as "several mesne transfers" is that INEOS is indisputably not an "entity owned 50 percent (50%) or more, directly or indirectly, by Amoco Corporation"--the only permitted type of assignee under Art. 19.A, which is set out in full in Opinion I at 2.

That vital deficiency exposes the core of the most fundamental--the truly conceptual--flaw in INEOS' argument by which it seeks to preserve its lawsuit. What its counsel have forgotten--or perhaps more likely have preferred to ignore--is that this action deals with a contract--a universe in which the contracting parties have set out defined relationships and boundaries. Whenever a court construes a contract, it is constrained by the parties' self-defined boundaries--except, of course, in the comparatively infrequent cases in which those

4

self-defined boundaries are not respected because, for example, a contractual provision is held to be contrary to public policy.

Here INEOS' counsel have adduced a group of cases that expound some general rules for construing contractual clauses that limit the assignment of the contracts at issue in those cases--remember that "assignment" is really a shorthand term for defining the parties that can or cannot succeed to the rights and duties of the original contracting parties. But here original parties Amoco and CRI were not content simply to frame the restrictions in general terms. Instead the Agreement carefully limited the universe of entities that could permissibly succeed to the rights and duties of the respective parties. As to Amoco, it has already been said that Art.19.A permitted assignment without consent only to an entity in which it had at least a 50% ownership interest.[5] On the other side of the coin, Art. 19.A barred any assignment by CRIS other than to any other wholly-owned subsidiary of Phillips Petroleum Company.

What cannot be gainsaid is that through those restrictions the parties were locked together in their relationship, with neither having the unfettered right to foist some unrelated party on the other without the other's consent. And that narrow

---

[5] And, of course, by definition the Art. 17.A right of first refusal, granted originally to Amoco, could vest only in a successor that stood in Amoco's corporate shoes--an assignee that satisfied the conditions imposed by Art. 19.A.

5

universe of permitted assignments was specific on both sides of the deal--in particular, no one could succeed to Amoco's position under the limitations expressly embodied in Art. 19.A unless the putative assignee was "any entity owned 50% or more, directly or indirectly, by Amoco Corporation." INEOS fails that test.

It should be noted particularly that the Art. 19.A constraints speak in terms of percentages of ownership, a concept that involves a change in corporate control. It approaches the height of irony that SAC ¶9 speaks of the execution of a May 30, 2006 Merger Agreement as having "resulted in a de facto 'change of control' of Engelhard for purposes of Art. 17,"[6] while INEOS' counsel (who drafted the SAC) fail utterly to recognize the applicability of any comparable de facto changes as impacting the proper construction of Art. 19.A. In that regard INEOS' counsel should have been clued in to the total inapplicability of the caselaw that they cite, which says simply that contractual limitations on assignment do not forbid mere changes in control of a contracting party, as when another party or group acquires stock in that contracting party. Instead any fair reading of Art. 17.A contrasts sharply with that generality, for it specifies that no such change could pass muster unless it fit

---

[6] As indicated earlier, that "de facto 'change of control'" is what INEOS attempts to invoke as the triggering event that assertedly brought the Art. 17.A right of first refusal into play.

6

within the narrower boundaries of that provision.

All of that then defines the judicial role in dealing with the meaning and application of contractual constraints that the parties themselves have established at the outset of their relationship. And that is not a function of the complexity or lack of complexity in the manner in which the relationships moved from their original posture to the present situation--merely a red herring to which a substantial part of INEOS' most recent motion for reconsideration devotes itself. This Court's Opinion I reference to "mesne transfers" was purely descriptive, not a factor that controlled (or even impacted) the decision. For purposes of defining the current relationship between the litigants and whether it does or does not run afoul of the contractual restriction, the situation is no different from what it would have been if the shift from original contracting party Amoco to INEOS, a company that has no relationship at all to that original party, had been a one-step transaction rather than the product of a whole series of corporate transactions.

In sum, the bottom line remains that INEOS is just not an entity owned 50% or more, directly or indirectly, by Amoco Corporation. And that being so, it is not within the limited universe of permitted assignees that was carefully marked out by the original contracting parties when they put their deal together. Hence the motion to reject INEOS' attempted

7

enforcement of Art. 17.A is well taken. And that calls for dismissal not only of the SAC but also of the action itself, for INEOS' successive struggles to escape that result have confirmed that the basic defect on which this Court has elaborated at some length, both in Opinion I and this opinion, is not curable.

Before this opinion concludes, something should be said as to INEOS' position that BASF has somehow waived this non-waiver provision of Art. 19.C:

> Waiver by either party of any breach, or failure to enforce or require the performance of any of the terms or conditions of the Agreement at any time, shall not in any way affect, limit or waive the right of that party thereafter to enforce the Agreement and compel strict compliance with every term and condition thereof, nor be deemed a waiver of any subsequent breach.

Quite apart from the fact that it seems that the particulars as to INEOS' status had not been fully revealed to BASF until the present contretemps, so that any concept of a voluntary waiver is on shaky ground at best, it is a far cry from a party's willingness to continue with business as usual in the supply relationship that has been involved here to the dramatic change in status and disruption of relationships that would result if INEOS were successful in somehow enforcing a right of first refusal. It requires only a look at the sweeping language of Art. 19.C to see that its non-waiver provision applies flat-out to preserve BASF's ability to take the legal position that it has advanced here.

8

Conclusion

For the reasons that have been stated here (and have been forecast to a less elaborate extent in Opinion I), BASF's Rule 12(b)(6) motion is granted. And because INEOS' successive efforts to recast its claims via the AC and SAC demonstrate the non-curability of the fatal defect in those claims, this action is dismissed with prejudice. Finally, such dismissal calls for the denial of all other pending motions (Dkt. Nos. 34 (to the extent that it asserts a lack of personal jurisdiction over German BASF) and 42 (relating to discovery on the same subject)) on mootness grounds, and this Court so orders.

_____
Milton I. Shadur
Senior United States District Judge

Date: February 15, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
INEOS POLYMERS INC.,               )
                                   )
              Plaintiff,           )
                                   )
     v.                            )    No.  07 C 2817
                                   )
BASF AKTIENGESELLSCHAFT, et al.,   )
                                   )
              Defendants.          )
```

## MEMORANDUM OPINION AND ORDER

Each of the defendants in this diversity-grounded lawsuit--BASF Aktiengesellschaft ("German BASF") and its subsidiary BASF Catalysts LLC ("Domestic BASF")--has filed a Fed. R. Civ. P. ("Rule") 12(b)(6) motion to dismiss the action brought against them by INEOS Polymers Inc. ("INEOS").[7] In turn INEOS has filed a single responsive memorandum addressing both motions. Because that filing displays a myopic (or perhaps more accurately astigmatic) view of the matter, this memorandum opinion and order will address some of the issues that bear on the viability of the Complaint. And because such limited treatment exposes at least one potentially fatal flaw in INEOS' lawsuit, no view needs to be (or is) expressed here as to the several other contentions advanced by German BASF or Domestic BASF.

There is no great mystery about the generous standards that

---

[7] German BASF has also moved for its dismissal under Rule 12(b)(2), and the parties are in the process of completing the briefing on that challenge to in personam jurisdiction.

have long applied to the sustainability of federal complaints, except for the Supreme Court's recent injection of a "plausibility" requirement in Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1965, 1973 n.14 (2007) that has tightened things up somewhat. But INEOS mistakes that generosity for a principle that would excuse its failure to satisfy a fundamental prerequisite: its showing of standing to bring this suit to begin with.

INEOS charges that Domestic BASF has breached some provisions of the 1992 Catalyst Supply Agreement ("Agreement") originally entered into between Amoco Chemical Company ("Amoco") and Catalyst Resources, Inc. ("CRI"), and it charges German BASF with tortious interference with the performance of the Agreement. But the difficulty with all of INEOS' contentions is that Agreement ¶19.A set out this highly constricted provision as to permitted assignments of the Agreement:

> Assignment. Neither party may assign this Agreement or any part thereof, without the prior written consent of the other, except that Amoco may assign this Agreement in its entirety only without the consent of CRI at any time to any entity owned fifty percent (50%) or more, directly or indirectly, by Amoco Corporation, and CRI may assign this Agreement in its entirety only without the consent of Amoco to any company one hundred percent (100%) owned, directly or indirectly, by Phillips. Any other attempted assignment without the other party's consent shall be void. The terms of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted delegatees and assignees.

And although none of the parties has discussed the justification

11

for that constraint, the reason is evident from the extraordinarily detailed 106-page Agreement (exclusive of its also detailed and complex exhibits). What the Agreement revealed was a close interrelationship and interdependence of the original parties, so that the situation was really no different from that of a partnership in which neither partner can foist a stranger off on the other.

On that score INEOS' Amended Complaint ("AC") explains how it got into the act. AC ¶1 says in part:

> INEOS is the successor entity to the rights and duties of Amoco Chemical....

AC ¶5 goes on to say:

> Pursuant to a series of transactions, as of January 2006, Plaintiff INEOS had succeeded to the rights and obligations of Amoco Chemical, and Engelhard Corporation ("Engelhard") had succeeded to the rights and obligations of CRI and Phillips under the Supply Agreement.

And AC ¶12 describes the sequence of events through which INEOS ultimately entered the picture:

> In 2006, Innovene Polymers Inc. was the successor entity to Amoco Chemical under the Supply Agreement following the assignment of Amoco Chemical's rights to Amoco Polymers Inc. ("Amoco Polymers"), which was subsequently renamed BP Amoco Polymers Inc. ("BP Amoco Polymers") and later Innovene Polymers Inc. Innovene Polymers Inc. was renamed INEOS Polymers Inc. following the acquisition of its parent company by the INEOS group in December 2005. INEOS Polymers is the subsidiary of INEOS USA LLC, which markets and sells the catalysts purchased under the Supply Agreement, principally through its office in Lisle, Illinois.

In that respect, although INEOS' Mem. 6 says that "[t]he

only assignment alleged in the Complaint, from Amoco to Amoco Polymers, was an intra-corporate transfer between commonly-owned Amoco subsidiaries," that assertion glosses over--or more precisely ignores entirely--the fact that when what AC ¶12 calls "the INEOS Group" acquired the Amoco parent company, the consequence was that the Agreement was no longer in the hands of "any entity owned fifty percent (50%) or more, directly or indirectly, by Amoco Corporation" (Agreement ¶19.A). And what that means, it would appear, is that INEOS is attempting to advance its claims as an impermissible assignee of the Agreement via several mesne transfers.

INEOS seeks to avoid that issue by calling upon the doctrine that well-pleaded allegations in a complaint must be credited for Rule 12(b)(6) purposes. But that concept is inapplicable where the allegations are controverted by the very document or documents on which a plaintiff claims--in such a situation the controverted allegations are not, of course, "well-pleaded." In sum, INEOS must come to grips (as it has not) with the Agreement's anti-assignment provision and must explain (as it has not) why that should not bar its lawsuit.

Lest it be thought that INEOS' lack of standing is the only difficulty that it faces (it will be recalled that Agreement ¶19.A renders void any attempt at a contractually impermissible assignment), this opinion will go on to review a few (but not

13

necessarily all) of the other independent bases for rejecting the AC in the form that INEOS' counsel have chosen to present it. To begin with, in that drafting process INEOS' counsel have conformed to the well nigh universal (and universally incorrect) practice of approaching litigation in terms of "causes of action" (the Illinois state law concept) rather than "claims" (the federal concept)--see in that respect NAACP v. Am. Family Mut. Ins. Co., 978 F.2d 287, 291-92 (7th Cir. 1992). In that regard, when applied properly (that is, as it reads), Rule 10(b) allows the use of separate counts to set out "[e]ach claim founded upon a separate transaction or occurrence"--not simply to limn different theories of recovery. Nonetheless this opinion will not trash the AC on that score--instead it will treat with the counts as they have been framed by INEOS' counsel.

First off, a couple of slam dunks. So-called Counts V (captioned "Declaratory Judgment") and VI (captioned "Specific Performance") plainly do nothing more than mark out different prayers for relief. And because that is not in any event the appropriate office of a separate count, and because the selfsame prayers are properly included under the heading "Prayer for Relief," Counts V and VI are stricken.

Relatedly, Count III (captioned "Breach of Covenant of Good Faith and Fair Dealing") ignores the universally held and oft-

repeated principle that Illinois law[8] does not treat that implied covenant as giving rise to a separate claim. As our Court of Appeals has stated succinctly in Echo, Inc. v. Whitson Co., 121 F.3d 1099, 1106 (7th Cir. 1997):

> The proper place for [plaintiff's] implied covenant argument was within a breach of contract claim, not standing alone as its own claim.

And that selfsame principle has been repeated again and again not only by Illinois state courts but by many of this Court's colleagues (see, e.g., LaSalle Bank Nat'l Ass'n v. Moran Foods, Inc., 477 F.Supp.2d 932, 937 (N.D. Ill. 2007)) and by this Court as well (see, e.g., Gentieu v. Tony Stone Images/Chicago, Inc., 255 F.Supp.2d 838, 870 (N.D. Ill. 2003)). Hence AC Count III is also stricken as a stand-alone count.

With those matters out of the way, this opinion returns to Counts I and II, which advance straight-out breach of contract theories. In that respect, even if INEOS could establish its right to enforce the Agreement at all, it is difficult to understand how it could do so against a non-contracting party such as German BASF. So if INEOS were to try again, it would have to make clear that such breach of contract contentions apply only to Domestic BASF (currently those counts refer to "defendants" in the plural).

---

[8] Agreement ¶19.B specifies the applicability of Illinois substantive law in construing the Agreement.

By contrast, AC Count IV--which is asserted only against German BASF, charging it with tortious interference with the performance of the Agreement by Domestic BASF--appears to face a different difficulty. Although neither German BASF nor this Court has located an Illinois case that treats specially with the parent-subsidiary relationship, rather than simply enunciating the well-established general proposition that no liability attaches where the allegedly interfering party is seeking to promote its own legitimate economic interests, German BASF has pointed to the opinion by this Court's colleague Honorable James Moran in <u>Oak Agency, Inc. v. Warrantech Corp.</u>, No. 96 C 1106, 97 WL 232619, at *2 (N.D. Ill. May 2):

> Can, then, Warrantech [the parent corporation] be liable for wishing, even directing, WDBS [the subsidiary] to terminate the agreement and stop paying commissions? We believe not. First, with respect to the agreement claim, Warrantech was privileged to act in its subsidiary's economic interest, or what it believed that interest to be, absent some egregious conduct not implicated here. <u>Boulevard Associates v. Sovereign Hotels, Inc.</u>, 72 F.3d 1029, 1036-1038 (2d Cir. 1995). <u>Copperweld Corp. v. Independence Tube Corp.</u>, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), although not directly on point, is helpful in highlighting the interdependence of economic relationships between parent and subsidiary even though each is a separate and distinct entity. Equally instructive is the Illinois concept that an employee cannot be held liable for tortious interference with his employer's contract so long as he is not acting to further his own interests and not those of the employer. <u>Medina v. Spotnail, Inc.</u>, 591 F.Supp. 190, 196-197 (N.D. Ill. 1984).

> Because the existence or nonexistence of such a qualified

privilege is fact-dependent, however, INEOS is correct in asserting that the Count IV claim--if otherwise supportable--cannot be dispatched in Rule 12(b)(6) terms. Thus if INEOS could surmount the hurdle of its inability to complain about the asserted nonperformance of the Agreement because it is an unpermitted assignee, the claim advanced in AC Count IV might be sustainable.[9]

## Conclusion

At the threshold, INEOS' posture as a nonpermitted assignee of the Agreement precludes it from asserting the claims set out in the AC. And even apart from that flaw, the matters discussed in this opinion would necessitate the dismissal of AC Counts III, V and VI. Nonetheless, both because INEOS may come up with some predicate for its continued presence as a plaintiff in this District Court and because of the previously-set timetable for the final submissions on German BASF's Rule 12(b)(2) motion, this Court dismisses only the AC but not this action. It will await further input from the parties.

_____
Milton I. Shadur
Senior United States District Judge

Date: January 9, 2008

---

[9] On that score the earlier discussion about the inappropriate use of separate counts does not apply here. INEOS' assertion of German BASF's liability for intentional interference is indeed a claim separate from the direct breach-of-contract liability asserted against Domestic BASF (again see NAACP, 978 F.2d at 292).

17